James R. Belcher
Wyoming Bar # 5-2556
BELCHER & BOOMGAARDEN LLP
237 Storey Boulevard, Suite 110
Cheyenne, Wyoming 82009
Telephone: (307) 426-4105
*Attorneys for Creditors Learning Annex*
*Holdings, LLC, Learning Annex, LLC,*
*and Learning Annex L.P.*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

In re                                       )
      **RICH GLOBAL, LLC,**          )        **Case No. 12-20834**
                      )
      **Debtor.**                         )

## OBJECTION OF LEARNING ANNEX HOLDINGS, LLC, LEARNING ANNEX, LLC AND LEARNING ANNEX L.P. TO TRUSTEE'S MOTION TO APPROVE SETTLEMENT AGREEMENT WITH ROBERT AND KIM KIYOSAKI

Creditors Learning Annex Holdings, LLC, Learning Annex, LLC and Learning

Annex L.P. (collectively "Learning Annex"), through their attorneys Belcher &

Boomgaarden LLP, hereby object to the motion ("the Motion") by Trustee Tracy Zubrod

("the Trustee") for approval of a proposed settlement with Robert and Kim Kiyosaki

("the Kiyosakis"), filed on November 1, 2012.

### Preliminary Statement

1.     Learning Annex holds a $23.6 million unsecured claim against the estate of

Rich Global, LLC ("Rich Global") based on a final judgment entered by the United

States District Court for the Southern District of New York following two jury trials. The

judgment compensated Learning Annex for being wrongfully cut out of a business deal

conceived by Learning Annex that generated over $45 million in royalties – pure profits –

for Rich Global from 2007 to 2010.  While Rich Global was receiving this $45 million, Learning Annex received nothing.  Learning Annex's recourse is the judgment.

2.      When Learning Annex filed suit, Rich Global had more than ample assets and revenue streams to pay Learning Annex's share of the revenues Rich Global was receiving from the seminar business.  By 2010, however – while the lawsuit was pending – Rich Global transferred to its affiliates and principals, for virtually nothing, the bulk of its assets as well as its right to receive future revenues.  Learning Annex believes that the transfers were made to frustrate Learning Annex's ability to collect on a judgment, and that in both purpose and effect they were fraudulent transfers.

3.      The Trustee's Motion seeks approval of a settlement agreement with Rich Global's owners, Robert and Kim Kiyosaki, ostensibly to satisfy their obligations under promissory notes owed to the Rich Global estate.  Learning Annex submits that the proposed settlement is ill-conceived and harmful to the estate's creditors.

4.      First, the proposed settlement would completely satisfy the obligations of the Kiyosakis to the estate to pay the promissory notes (the "Notes") by their payment to the estate of only 75% of the unpaid principal and accrued interest.  The Kiyosakis have the financial ability to pay the Notes in full, and the Trustee's Motion provides no rationale for such a sizable discount other than a desire to achieve a "rapid resolution" of the case.  The Notes could be sold to third parties (and Learning Annex has made its own proposal to buy the Notes, as described below), producing the same speed but a higher recovery for the estate.

{00097979.DOC }

5.     Second, and more importantly, the proposed settlement would release the Kiyosakis, plus 19 companies they control and other "affiliated entities," from any fraudulent transfer, alter ego, piercing the corporate veil or related claims that the Rich Global estate may have.  The Trustee's Motion offers no rationale for this broad release, which would foreclose the estate's and potentially its creditors' ability to pursue valid claims worth tens of millions of dollars against entities who are not even obligated to pay the Notes.  Those claims represent the best hope that Learning Annex and other creditors have of obtaining significant recoveries on their claims against Rich Global.

6.     Shortly after this chapter 7 case was filed, and prior to the filing of the Motion, Learning Annex provided preliminary documentation to the Trustee to support potential fraudulent transfer and alter ego claims.  Learning Annex has also repeatedly asked the Trustee to meet with representatives of Learning Annex to discuss the claims, the documentation and additional information Learning Annex had learned in litigating with Rich Global.  However, the Trustee has refused to meet with Learning Annex.

7.     There is clear evidence that, to frustrate collection of the federal judgment and continue to cheat Learning Annex out of its share of the enormous profits earned by Rich Global, Rich Global's principals drained all significant assets out of Rich Global. The Kiyosakis are now attempting, through a purported settlement of the Note claims, to extinguish the estate's claims against other Kiyosaki entities, with no compensation paid to the estate and with no legitimate justification.  The Bankruptcy Court should refuse to put its seal of approval on this conduct and deny the Trustee's Motion.

{00097979.DOC }

# BACKGROUND

## A.   Learning Annex's Claim

8.   Learning Annex's $23.6 million unsecured claim against the Rich Global estate stems from a lawsuit filed in the Southern District of New York by Learning Annex against Rich Global and other entities in April 2009.  Learning Annex, which is in the business of promoting and conducting educational seminars, sought compensation in that suit for being cut out of an enormously successful business deal for putting on educational seminars which Learning Annex conceived and brought to Robert and Kim Kiyosaki, with whom Learning Annex had a long relationship.

9.   Learning Annex has received no compensation for its role in this lucrative business, which produced cash sales totaling nearly $500 million as of March 2012.  Rich Global received $42 million in royalties between March 2007 and May 2010 from the seminar business sales.   See **Ex. A** (Trial Exhibits showing Rich Dad revenues through May 2012).   Rich Global also received a promissory note worth $3.5 million from Tigrent, bearing an annual interest rate of 6% beginning on January 1, 2011, to satisfy additional past due royalties.  *Id.*[1]

10.   In July 2011, after deliberating for less than two hours, a jury found liability for *quantum meruit* and unjust enrichment stemming from Rich Global's wrongful conduct in cutting Learning Annex out of the deal and awarded Learning Annex over $14 million in damages, for a total of $20,620,614.71 after pre-judgment

---

[1]   It is unclear whether the Tigrent note was paid.   Rich Global's Bankruptcy Petition, however, did not list the note as an asset held by Rich Global.

{00097979.DOC }

interest.   In April 2012, after a re-trial solely on the issue of damages, a second jury

awarded Learning Annex over $15 million plus interest on the *quantum meruit* claims.

Subsequently, on July 17, 2012, following the disposition of another round of post-trial

motions, the Court entered final judgment in favor of Learning Annex (including interest)

in the amount of $23,687,957.21.[2]   See **Ex. B** (judgment).

**B.      Rich Global's Creation and Abandonment**

11.      Rich Global is part of the lucrative Rich Dad empire owned by Robert and

Kim Kiyosaki that includes other "Rich Dad" companies.   The original company –

Cashflow Technologies, Inc. ("Cashflow") – was launched in 1997.   The "Rich Dad"

empire began with the self-published release in 1997 of *Rich Dad Poor Dad*, a book co-

written by Robert Kiyosaki and his then business partner Sharon Lechter.   The book,

which has sold over 26 million copies, contains advice about becoming financially

independent.

12.      Cashflow is the owner of Rich Dad's approximately 89 active and

registered trademarks and trademark applications.   Another Rich Dad company, Rich

Dad Operating Co. ("RDOC"), a Nevada corporation, is listed as the sole member of

Rich Global.

13.      Rich Global was formed in 2006 specifically to receive the profits from the

Rich Dad seminar business.   After cutting out Learning Annex, Rich Global entered into

---

[2]      Rich Global filed a notice of appeal in the Court of Appeals for the Second Circuit before
filing for bankruptcy.   The appeal has been stayed.

{00097979.DOC }

a partnership with a company named Whitney (subsequently renamed Tigrent) to put on the seminars conceived by Learning Annex.

14.     As filings with the SEC demonstrate, in July 2006, Rich Global entered into agreements with Whitney and Rich Dad Education (another Wyoming LLC created and jointly owned by Whitney and Rich Global) to license the Rich Dad name and logo to the seminar business. See **Ex. C** (Exhibit 10.14 & 10.15 to Tigrent 10-K/A filed on May 29, 2009). The agreements confirmed that Rich Global "has the right to grant licenses with respect to use of certain intellectual properties, including certain valuable trademarks, service marks, names, characters, symbols, designs, likenesses and visual representations thereof." *Id.* The licensed material included the trade name "Rich Dad Education," the Rich Dad logo and other trademarks and trade names. In return, the 2006 licensing agreements provided that royalties from the Rich Dad seminar business were to be paid to Rich Global.

15.     The Rich Dad seminar business subsequently earned roughly $500 million in revenue, which was received by Rich Dad Education. Under the 2006 agreements, between March 31, 2007 and April 31, 2010, Rich Global earned over $45 million in royalties, an amount conceded to be accurate by Rich Global at trial. See **Ex. A** (Trial Exhibits showing Rich Dad seminar revenues).

16.     In May 2010, however, as pretrial discovery in the Learning Annex litigation intensified, Rich Global transferred the royalty stream payable by Rich Dad Education, as well as the right to license the Rich Dad intellectual property, out of Rich Global. Specifically, on May 26, 2010, the licensing agreement between Rich Global,

{00097979.DOC }

Rich Dad Education and Tigrent was terminated.  See **Ex. D** at Ex. 10.2 (2010 Tigrent 8-K, Settlement Agreement and Release).   In return for its "interest" in Rich Dad Education, Rich Global reportedly received 9.9% of Tigrent stock.  *Id.*  At trial, evidence was introduced and not contested that this Tigrent stock was – and continues to be – worth less than $100,000.  Thus, in return for its interest in the business that had netted over $45 million in profits in just three years, Rich Global received essentially no consideration.  Rich Global does not even list the Tigrent stock as an asset in its Chapter 7 petition.

17.   On the same day, May 26, 2010, a new licensing agreement was entered into between Rich Global's sole owner, RDOC, and Tigrent.  *See id.* at Ex. 10.1 (2010 Tigrent 8-K, Licensing Agreement).  The new agreement provides that RDOC "owns or otherwise possesses *exclusive* licenses for certain [Rich Dad] copyrights, trademarks, patents, and other valuable rights, and the right to license those rights to others."  *Id.*  It further provides that all future royalties from the seminar business were to be paid to RDOC -  not to Rich Global.  *Id.*

18.   RDOC has earned significant profits from the seminar business from 2010 through the present.  It earned $3 million in royalties alone in the first three months of 2012,  see **Ex. A**, and dozens of additional Rich Dad seminars were held in this summer and fall throughout the United States and Canada.  *See, e.g.,* http://richdadeducation.com.

19.   Rich Global, on the other hand, filed for bankruptcy in the District of Wyoming on August 20, 2012 – just one month after final judgment was entered in favor of Learning Annex.  Tracy Zubrod was appointed Trustee on August 21, 2012.

{00097979.DOC }

20.    As the bankruptcy filings demonstrate, once the assets from the seminar business were transferred during the pendency of the Learning Annex - Rich Dad litigation, Rich Global's revenue plummeted to zero in 2011 and 2012.    As the bankruptcy filings further demonstrate, the over $45 million that Rich Global received from the seminar business is no longer in possession of Rich Global.    Rich Global's Chapter 7 petition lists only $1,794,405 in total assets as of June 30, 2012.    The Note balances payable by the Kiyosakis that are the subject of the Motion total $1,783,358, or 99.4% of Rich Global's listed assets.    Neither Rich Global nor the Kiyosakis have offered any explanation as to the disposition of the $45 million, which apparently was transferred to Rich Global's principals and/or affiliates during the pendency of the Learning Annex lawsuit with Rich Global receiving no consideration in return.

21.    The steps Rich Global took to fend off anticipated liabilities are part of a pattern.    The Kiyosakis have a history of using improper intercompany transfers to protect their assets, as well as encouraging others to protect their assets in a similar manner.    In another lawsuit against Rich Dad and its principals, their former partner Sharon Lechter (co-author of *Rich Dad Poor Dad*) accused the Kiyosakis of improperly transferring millions of dollars of cash and other assets, retroactively changing management agreements, paying excessive bonuses to themselves and making below-market loans for the purpose of cheating Ms. Lechter.    See **Ex. E** (Affidavit of Ms. Lechter).    The court in that instance monitored Rich Dad's finances during the litigation by requiring bi-monthly reports on all Rich Dad accounts payable, accounts receivable and transaction and ledger information.    See **Ex. F** (August 12, 2008 Minute Order).

8

{00097979.DOC }

That case was ultimately settled with a payment to Ms. Lechter of $10 million.  The Kiyosakis have adopted similar transactions with Rich Global.  At the Rich Global Creditors' Meeting, Rich Global's representative explained the $2.2 million intercompany debt owed by Rich Global to RDOC purportedly result from management charges, fees, services provided and bills paid by RDOC on behalf of Rich Global.  Due to the transfer of royalty rights from Rich Global to RDOC, Rich Global had no income to pay experts and attorneys in the Learning Annex litigation.  Consequently, Cashflow paid those expenses for Rich Global.  And, of course, Rich Global made unsecured loans to the Kiyosakis - moving cash out of Rich Global.

22.     The Kiyosakis have also taught others to engage in similar schemes through the promotion of a small group of "advisors," including Garrett Sutton, Esq., a lawyer who specializes in "asset protection."  *See* **Ex. G** (excerpt from the Rich Dad website promoting Mr. Sutton, available at http://www.rich dad.com/About/Advisors.aspx). Robert Kiyosaki's Rich Dad website links to Mr. Sutton's webpage where Mr. Kiyosaki offers a public testimonial for Mr. Sutton, describing him as Mr. Kiyosaki's "corporate advisor for asset protection."  *Id.*  Mr. Kiyosaki further endorses Mr. Sutton's work by stating: "My Rich Dad always said to control everything while owning nothing.  Garrett and his team will professionally assist you in accomplishing this important wealth protection objective."  **Ex. H** (testimonial of Robert Kiyosaki).

23.     In a book authored by Mr. Sutton, "Own Your Own Corporation" – published under the Rich Dad Advisors brand and for which Mr. Kiyosaki authored the forward – Mr. Sutton advocates asset protection strategies as an "incentive" for creditors

9

to settle.  **Ex. I** (excerpt from Chapter 6 of Rich Dad Advisors' *Own Your Own Corporation*, available at http://www.amazon.com/Own-Your-Corporation-Companies-Everyone/dp/0446678619).  On his website, Mr. Sutton advocates incorporating in Wyoming or Nevada and taking advantage of state laws as a way to force judgment creditors to settle for "pennies on the dollar."  *See* **Ex. J** (excerpt from the blog of Garret Sutton, Esq., available at http://www.garrettsutton.com/blog?Current Page=2).

## C.    Learning Annex's Failed Attempts to Engage the Trustee

24.    After receiving the bankruptcy filing, Learning Annex contacted the Trustee to share its grave concerns regarding the improper dissipation of Rich Global's assets, including the strong evidence of fraudulent transfer and alter ego claims.  To this day, the Trustee has resisted these attempts.  The Trustee has refused each of Learning Annex's requests for a meeting (or even a phone call) with nothing more than short email messages.  *See, e.g.* **Exs. K-O** (correspondence between counsel and Trustee).

25.    For example, on September 21, 2012, Learning Annex counsel provided the Trustee with a seven page outline of the issues of concern, along with over 160 pages of supporting documentation.  *See* **Ex. L** (Sep. 21 email and outline).  Following the September 26, 2012 Creditors Meeting at which Rich Global testified that it had not transferred assets or rights to receive royalties or revenues prior to its bankruptcy filing, Learning Annex sent an email to the Trustee providing additional information to contest the accuracy of these statements, as well as an updated substantive outline of the claims and additional documentation.  *See* **Ex. M** (Oct. 3, 2012 email).  The Trustee, however, refused to meet with Learning Annex.  *See* **Ex. N** (Oct. 10 email).

10

**D.      The Trustee's Motion & Proposed Settlement Agreement**

26.      Instead, on November 1, 2012, the Trustee filed the Motion seeking approval of the settlement agreement between the estate and Robert and Kim Kiyosaki. Trustee's Mot. to Approve Settlement, Nov. 2012 ("Mot."). The proposed settlement seeks to extinguish claims on the Notes for approximately 75% of the unpaid principal and accrued interest. Specifically, Rich Global's Schedule of Assets lists "Notes Receivable" from Robert and Kim Kiyosaki (the "Notes") in the principal amount of $1,544,478.88, plus accrued interest of $238,879.24 as of August 20, 2012. Proposed Settlement, 1. The proposed settlement would extinguish the Kiyosaki's Notes obligations in exchange for $1.4 million, a discount of approximately 25%.

27.      There is no question that the Kiyosakis have the financial ability to pay the Notes in full with all interest.[3] The proposed settlement and the Motion do not explain the reason for this discount, except for a desire to achieve a "rapid resolution of the Debtor's Chapter 7 case." (Mot. at 2). Nor is there any suggestion that the Kiyosakis have raised any defenses to the payment of the Notes. The Notes also could be sold, but the Motion is silent as to any efforts the Trustee made to sell the Notes.

28.      In addition to permitting the Kiyosakis to extinguish their obligations to pay the Notes at a steep discount, the proposed settlement agreement provides a very broad release in the following terms to a broad range of entities:

---

[3]      The Kiyosakis have recently boasted to the press about their exceptional wealth, claiming that Robert Kiyosaki is worth $80 million. *See, e.g.,* **Ex. P** (*Rich Dad, bankrupt Dad*, Oct. 10, 2012, New York Post).

**4. Release by Trustee and Estate.** In consideration of the $1,400,000 payment set forth in paragraph 1 above, the Debtor and the Debtor's estate, *for itself and its* successors, assigns, parent entities, subsidiaries, affiliates, predecessors, successors, and all other related entities, as well as its agents, employees, representatives, and *creditors, past and present*, do hereby release and forever discharge *Kiyosaki and the Kiyosaki Entities*, their representatives, heirs, successors and assigns, from any and all claims and causes of action, whether known or unknown, liquidated or contingent, which the Debtor and the Debtor's estate may have against Kiyosaki and the Kiyosaki Entities, as of the date of this Settlement Agreement, relating in any way to the events, transactions and occurrences admitted or at issue that arose prior to the date of this Settlement Agreement, including but not limited to the Claim, the Receivable, *and any claim that the Debtor or the Debtor's Estate could assert or could have asserted against Kiyosaki or the Kiyosaki Entities arising out of or related to any claim that Kiyosaki or the Kiyosaki Entities used the company or business form of the Debtor for fraudulent or improper purposes* and that Kiyosaki or the Kiyosaki Entities are liable for the obligations of the Debtor on any 'alter ego,' 'piercing the corporate veil,' or similar theory.

*Id.* at 3 (emphasis added).

29.     The extraordinary breadth of the release is evident in the settlement agreement's definition of "Kiyosaki Entities," which includes 19 named companies and "other affiliated entities," all of which are ones in which the Kiyosakis hold interests. *Id.* at 1. They include RDOC, Rich Global's sole owner and manager, that is the Rich Dad affiliate that received the revenue stream from the seminar business that Rich Global abandoned in 2010.

30.     It thus appears that the proposed release of claims based on "fraudulent or improper purposes" is an effort by the Kiyosakis to extinguish any potential fraud or fraudulent transfer claims that might be made under Sections 544, 548 and 550 of the Bankruptcy Code and under state law. *Id.* at 3. There is no discussion in the Motion or in the proposed settlement of the potential value of the various claims being released or

{00097979.DOC }

the Trustee's reasons for agreeing to the broad release.  Nor is there any explanation why at least 18 companies who are not contractually obligated to pay the Notes should be the beneficiaries of releases in connection with claims that are unrelated to the Notes.  The Trustee has no business releasing companies which have no Note payment obligation.

31.    Examination of the copies of the Notes provided by the Trustee only raises further questions as to the soundness of the agreement.  For instance, the Notes are dated as of various dates in 2009, but it is unclear if they actually were executed in 2009 or some later time.  **Ex. Q** (Kiyosaki Notes).  In addition, the proposed settlement agreement states that the Notes are not yet due.  Proposed Settlement, 1.  However, the Notes contain a notation that some payment (perhaps accrued interest) is payable annually, but the scheduled amount of accumulated interest ($238,879.24) suggests that no interest has ever been paid.  **Ex. Q** (Kiyosaki Notes).

**E.    Learning Annex's Counterproposals**

32.    In the interests of moving forward in the best interests of both the estate and the creditors, Learning Annex submitted to the Trustee a written counterproposal with two options on November 16, 2012.  **Ex. R** (Nov. 16, 2012 Letter to Trustee).

33.    The first counterproposal was that the proposed settlement agreement be modified to make clear that the release not extend to claims that the Trustee or the creditors of the estate have the right to pursue under Sections 544 through 551 of the Bankruptcy Code and under state law, and also does not extend to alter ego claims that the Trustee (or creditors of the estate) may pursue.  *Id.* at 5.  This was proposed to preserve valuable claims held by the estate.

13

34.     The second counterproposal was that Learning Annex would purchase all of the claims for $1.5 million that otherwise would be settled (*i.e.,* the Notes and all fraudulent transfer and alter ego claims that the estate could have pursued).  *Id.*  In addition, Learning Annex offered (as part of the assignment of claims, or a similar arrangement that is effective and is mutually acceptable) to pay to the Chapter 7 estate any excess that it receives from the pursuit of such claims over the total of the following items:  (a) the actual costs and fees incurred by Learning Annex in pursuing such claims; plus (b) the $1.5 million purchase price; plus (c) interest on the $1.5 million purchase price at the interest rates specified in the Notes.  This would result in the estate realizing a minimum of $100,000 more than the Kiyosakis agreed to pay, as well as the estate having a substantial opportunity to recover additional sums from the fraudulent conveyance and alter ego actions which will be vigorously pursued.  Thus, the estate would incur no cost or risk of pursuing the claims and would be guaranteed a $1.5 million cash payment.  *Id.*

35.     In its letter, Learning Annex made another attempt to engage the Trustee and noted that it was willing to discuss variations of the counterproposals if the Trustee so wished.  *Id.*  As of the date of this filing, however, the Trustee has not responded, leaving Learning Annex with no choice but to pursue these objections.

## OBJECTIONS

36.     In order to enter into a compromise or settlement agreement on behalf of the estate, a bankruptcy trustee must obtain the approval of the bankruptcy court, after proper notice and a hearing.  Fed.R.Bankr.P. 9019(a).  The Court's decision regarding the approval of a proposed settlement "must be an informed one based upon an objective

evaluation of the developed facts." *Reiss v. Hagmann*, 881 F.2d 890, 892 (10th Cir. 1989); *see also Protective Committee For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (there "can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all the facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated").

37.    A "major issue for the court's determination is whether the settlement is in the best interests of the estate, with special consideration given to the concerns of the estate's creditors." *In re Rivermeadows Assocs., Ltd.*, No. 95-20322, 1996 WL 194270 at *4 (Bankr. D. Wyo. Feb. 26, 1996) (noting that "the interest of the creditors is paramount to the interests of the debtor"); *see also Kopp v. All Am. Life Ins. Co. (In re Kopexa Realty Venture Co.)*, 213 B.R. 1020, 1022 (B.A.P. 10th Cir. Kan. 1997) ("In considering the propriety of the settlement it is appropriate for the court to consider… the interests of creditors in deference to their reasonable views").

38.    In addition, in assessing the propriety of a settlement, a court should consider several factors, including "the probable success of the underlying litigation on the merits, the possible difficulty in collection of a judgment, the complexity and expense of the litigation," as well as the extent to which the settlement is a product of arms-length bargaining and not fraudulent collusion. *Id.* at 1022; *In re Bugaighis*, 2004 Bankr. LEXIS 2243 at *14 (Bankr. D. Colo. Nov. 5, 2004) (citing *Conn. Gen. Life Ins. Co. v. United Companies Fin. Corp.* (*In re Foster Mortgage Corp.*), 68 F.3d 914, 918 (5th Cir. 1995)); *Griffin v. Novastar Mortg. (In re Ramsey)*, 356 B.R. 217, 226 (Bankr. D. Kan.

15

{00097979.DOC }

2006); *In re Papinsick*, 2007 Bankr. LEXIS 3917, at *11 (Bankr. N.D. Okla. Nov. 16, 2007).

**I.      The Proposed Settlement Does Not Reflect Sound Business Judgment.**

39.      It is clear from the substance of the proposed settlement that the agreement was not entered into through an exercise of sound business judgment and thus not in the best interests of the estate.  *See Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F. 3d 452, 466 (2d Cir. 2007).

40.      *First*, the proposal accepts the payment of $1.4 million in exchange for the Notes, a steep discount from the face amount of the Notes, together with accrued interest owing.  There is no mention that the Kiyosakis have raised any defenses to their Note obligations.  There should be little doubt about the ability to collect the full amount of the Notes with accrued and accruing interest, which makes the hefty discount suspect and potentially inappropriate.

41.      *Second,* even more alarmingly, the proposed settlement places virtually no value on significant potential fraudulent transfer and alter ego claims against a whole host of individuals and entities – claims that are potentially worth more than 30 times the value of the Notes.  This release is far outside the bounds of any reasonable assessment of the value of those claims.  *See, e.g.*, *In re Hydronic Enterprise, Inc.*, 58 B.R. 363 (Bankr. D. R.I. 1986) (refusing to grant approval of the compromise of $105,000 claim for $10,000 because it was not in the best interests of the estate given the value of the claims and the probability of their success); *In re Qmect, Inc.*, 359 B.R. 270, 272-73 (Bankr. N.D. Cal. 2007) (refusing to approve settlement where although the debtor faced an

{00097979.DOC }

"uphill battle" in litigation, the chance of prevailing was not negligible and therefore, the amount of the proposed settlement was insufficient).  In fact, there is no legitimate reason why the estate's potential claims should be addressed at all in the context of a proposed settlement with the Kiyosakis over their Note obligations.

42.    The facts strongly suggest that Rich Global and the Kiyosakis, as part of their asset protection strategies, made transfers in an attempt to thwart the collection of the Learning Annex judgment with the purpose (and with the effect) of committing fraudulent transfers.  Rich Global earned over $45 million in royalties from the Rich Dad seminar business, but now that revenue is gone.  And Rich Global's revenues and rights to lucrative intellectual property were transferred at a time when Rich Global had no other source of revenue, during the pendency of the Learning Annex litigation.

43.    In addition, there is evidence demonstrating that Rich Global and the other Rich Dad entities are mere alter egos of one another and of Robert and Kim Kiyosaki.  As evidence at the Learning Annex trial demonstrated, the entities have in fact been treated as one by the Kiyosakis and other executives.  Indeed, the very fact that the Kiyosakis entered into negotiations for the seminar business through one entity (Cashflow), created separate entities to house the business and receive the revenues (Rich Dad Education) and transferred the profits between different entities (first *to* Rich Global and now to RDOC) demonstrates how the Kiyosakis use these entities as convenient means for their own ends.  Yet, the proposed agreement releases the Kiyosakis and all of these 18 entities from potential alter ego all claims without a full investigation of the underlying facts, any determination of the value of those claims or even how the Note obligations came about.

17

44.     *Third*, the scope of the proposed release is improper.  A claim that another non-bankrupt entity is liable for the debts of the creditor, premised under an alter ego theory, is not a claim that belongs to the estate – it belongs to creditors.  The Trustee is authorized to dispose only the property of the estate, not property of the creditors.  *See* 11 U.S.C. § 363(b)(1).  But the proposed settlement does just the opposite – it purports to release the Kiyosakis and 19 other entities from claims of creditors.

45.     The Kiyosakis moved tens of millions of dollars of funds, plus other lucrative assets and future revenue streams, from Rich Global to other Kiyosaki-owned entities.  The result was exactly what the Kiyosakis intended – a company that had no assets to pay the Learning Annex judgment.  Such glaring evidence warrants rejection of the proposed settlement.  *See, e.g.*, *In re Nationwide Sports Distributors, Inc.*, 227 B.R. 455 (Bankr. E.D. Pa. 1998) (refusing to approve settlement where there trustee made no showing that likelihood of success of claims against debtor was small or nonexistent); *In re Remsen Partners, Ltd.*, 294 B.R. 557 (Bankr. S.D.N.Y. 2003) (refusing to approve settlement because it was not in the best interests of the creditors, where claim would be pursued at no cost to the estate and there was a likelihood of success on the merits); *In re Hydronic Enterprise, Inc.*, 58 B.R. at 366 (considering probability of success on merits in refusal to approve settlement).

## II.     The Trustee Has Proceeded with a Troubling Lack of Transparency and Refusal to Fully Evaluate the Alternatives.

46.     Learning Annex also is dismayed at the disregard with which the Trustee has treated Learning Annex, the only non-insider creditor with a liquidated claim.

18

47.    *First,* it is difficult to discern whether the Trustee made any investigation at all of the claims that are to be released.   Learning Annex has provided the Trustee extensive preliminary documentation to support substantial fraudulent transfer claims against the very individuals and entities who are to receive a blanket release in the Kiyosaki Agreement.   *See* **Ex. L** (Oct. 3, 2012 email and outline).   If the Trustee credited any of those materials, the proposed consideration for releasing those claims is demonstrably inadequate.   If the Trustee has not credited the validity of these claims, she has provided no basis for her contrary assessment.

48.    *Second,* Learning Annex has repeatedly offered to meet with the Trustee to explain in more detail the bases for potential claims held by the estate.   Yet, the Trustee has refused to meet or even discuss such information.   This refusal is inexplicable given the potential value of the claims involved as well as the complexity of the underlying facts, which could best be explained in a face-to-face meeting.

49.    *Third,* it appears that – in the absence of any apparent investigation – the Trustee may be relying on inaccurate information provided by insiders with interests adverse to the creditors.   For example, Mr. Humpage – the Chief Financial Officer of RDOC (the sole member and manager of Rich Global) – stated at the September 26 Creditors Meeting that Rich Global owned rights to receive royalties "several years ago." In fact, Rich Global continued to receive royalties until 2010; those royalties totaled tens of millions of dollars; and Rich Global transferred its right to receive ongoing royalties to RDOC for virtually no consideration, even though those royalties were worth millions of dollars.   As another example, Mr. Humpage stated that he was not aware that Rich Global

{00097979.DOC }

ever possessed any intellectual property rights.  This is contrary to the July 2006

licensing agreement in which Rich Global possessed the right to license the Rich Dad

name in exchange for millions of dollars in royalties until transferred to RDOC via

termination of the Rich Global royalty agreement.

50.    The claims that would be released are serious claims of potentially

enormous value, and they cannot be abandoned in the absence of a full and complete

record that shows that the claims were investigated and that the proposed resolution is a

reasonable one.  *See, e.g., In re Lion Capital Group*, 49 B.R. 163, 189 (Bankr. S.D.N.Y.

1985) (rejecting settlement because the Trustee has "glossed over" a "facially significant

cause of action" and because "key facts relevant to others are not presented even in

summary fashion").

51.    The Kiyosaki settlement is not in the best interests of the estate or its

creditors; it is only in the best interest of the Kiyosakis – quick and cheap.  Therefore, the

Motion should be denied.

**III.    Learning Annex's Counterproposals Are Superior.**

52.    Learning Annex has submitted two counterproposals that would leave the

estate in a much better position than the proposed settlement agreement.  *See* **Ex. R** at 5.

53.    Under counterproposal two, in particular, the estate would realize $100,000

more in an up front payment than the Kiyosakis agreed to pay, in addition to providing

the funding and mechanism to pursue fraudulent transfer and alter ego claims.  Under this

proposal, all of the money recovered will go to the estate (minus Learning Annex's costs

{00097979.DOC }

and fees) for the Trustee to split amongst the creditors.  For this reason alone, the Court

should deny the Trustee's Motion.

## Conclusion

For the foregoing reasons, Learning Annex respectfully requests that the Court

deny the Motion and grant such other and further relief as may be just and proper.


Dated this 26th day of November, 2012


/s/ James R. Belcher
James R. Belcher
Belcher & Boomgaarden LLP
237 Storey Boulevard, Ste. 110
Cheyenne, WY  82009
PH: 307-426-4105
Attorneys for Learning Annex

{00097979.DOC }

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date this Objection was filed, a true and correct copy of the foregoing OBJECTION OF LEARNING ANNEX TO TRUSTEE'S MOTIONTO APPROVE SETTLEMENT AGREEMENT WITH KIYOSAKIS was served via the Court's electronic mailing service (CM/ECF) on all of the persons registered for electronic service, including counsel for the Debtor, the Chapter 7 Trustee and the United States Trustee.


/s/ James R. Belcher
James R. Belcher