Jamie N. Cotter (Wyoming Bar No. 7-4721)
Philip A. Pearlman (Colorado Bar No. 11426)
Ronald L. Fano (Colorado Bar No. 20797)
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203
Telephone: (303) 839-3800
Facsimile: (303) 839-3838
jcotter@spencerfane.com
ppearlman@spencerfane.com
rfano@spencerfane.com
*Attorneys for Chapter 7 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF WYOMING**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| RICH GLOBAL, LLC, | ) | Case No. 12-20834 |
| | ) | Chapter 7 |
| Debtor. | ) | |

**MOTION TO APPROVE SETTLEMENT OF DISPUTES BETWEEN**
**THE TRUSTEE AND ROBERT KIYOSAKI, KIM KIYOSAKI, PELE-KALA**
**CORPORATION, CASHFLOW TECHNOLOGIES, INC., BI CAPITAL, LLC,**
**AND RICH DAD OPERATING COMPANY, LLC**

Tracy L. Zubrod, trustee, by and through her undersigned counsel, hereby moves, pursuant to Fed.R.Bankr.P. 9019, for approval of a settlement of disputes between the Trustee and Robert Kiyosaki, Kim Kiyosaki, Pele-Kala Corporation, Cashflow Technologies, Inc., BI Capital, LLC, and Rich Dad Operating Company, LLC.  In support hereof, the Trustee states as follows:

**I.    BACKGROUND AND STATUS.**

1.    The debtor, Rich Global, LLC ("Debtor"), is a Wyoming limited liability company.

2.    On July 17, 2012, a $23,687,957.21 judgment was entered against the Debtor in favor of Learning Annex Holdings, LLC, Learning Annex, LLC (n/k/a Benson Acquisition,

LLC), and Learning Annex, L.P. (collectively, "Learning Annex"), in the U.S. District Court for the Southern District of New York ("Learning Annex Judgment").

3.       The Debtor timely filed an appeal of the Learning Annex Judgment to the U.S. Court of Appeals for the Second Circuit.

4.       However, on August 20, 2012 ("Petition Date"), before its brief was due in the Second Circuit, the Debtor filed a voluntary petition in this Court, commencing the instant Chapter 7 case.

5.       Tracy L. Zubrod is the duly qualified and acting trustee ("Trustee") of the Debtor's Chapter 7 bankruptcy estate ("Estate").

6.       The bar date for filing proofs of claim in this case was January 2, 2013.  Only two proofs of claim were filed.  Proof of Claim No. 1, in the amount of $23,690,999.41, was filed by Learning Annex.   Proof of Claim No. 2, in the amount of $2,205,217.43, was filed by the Debtor's parent, Rich Dad Operating Company, LLC ("RDOC").

7.       By Order dated July 16, 2013, this Court (McNiff, J.), approved a settlement agreement between the Trustee and Learning Annex, whereby (a) the Trustee agreed to dismiss the Second Circuit appeal of the Learning Annex Judgment, (b) Learning Annex agreed to pay the Trustee $100,000.00, and (c) Proof of Claim No. 1 was allowed, as filed.

8.       The July 16, 2013 Order was appealed to the U.S. District Court for the District of Wyoming ("District Court") and was affirmed on August 17, 2015. The District Court's Order was appealed to the U.S. Court of Appeals for the Tenth Circuit and was affirmed on June 14, 2016.  The settlement with Learning Annex has been consummated.

DN 3420241.1

9.     In the meantime, on August 19, 2014, the Trustee commenced *Zubrod v. Kiyosaki, et al.,* Adv. Pro. No. 14-02021 ("Action"), seeking monetary, declaratory, and other relief, as more fully described below.

10.     The Defendants in the Action are: Robert Kiyosaki; Kim Kiyosaki; Pele-Kala Corporation ("Pele-Kala"), a Nevada corporation; Cashflow Technologies, Inc. ("CTI"), a Nevada corporation; BI Capital, LLC ("BI Capital"), a dissolved Nevada LLC; and RDOC, a Nevada LLC.

11.     On August 20, 2014, the Trustee filed her First Amended Complaint.  A copy of the First Amended Complaint is attached hereto as **Exhibit 1**.  The following introductory excerpt from the First Amended Complaint summarizes the general nature of the Trustee's claims:

> Robert and Kim Kiyosaki are the owners of The Rich Dad Company. "The Rich Dad Company" is a trade name collectively used by the Kiyosakis and several of their affiliated entities. The Rich Dad Company presents seminars and sells books, games, and other products and services intended to provide individuals with the knowledge and skills necessary to grow their personal wealth.
>
> The Debtor is one of the Rich Dad companies. In 2012, a large judgment was entered against the Debtor in favor of a company that assisted The Rich Dad Company in establishing its seminar business in 2006.
>
> In this proceeding [the Action], the Trustee asserts a variety of claims for relief to recover assets transferred from the Debtor and monetary judgments against the Kiyosakis and the principal Rich Dad entities. The overriding themes of the Complaint are that (1) the Kiyosakis have improperly used the Debtor and the non-bankrupt Rich Dad entities to shield the Debtor's assets from its creditors and (2) the Kiyosakis have so intermingled their personal interests and affairs with those of the Rich Dad entities that a judgment against one may be recovered from all.

12.     On November 6, 2016, the District Court withdrew the reference of the Action for all purposes.  The Action is now pending before the District Court as Case No. 16-cv-00217.

DN 3420241.1

13.    All major pre-trial tasks have been completed, except for final designations of exhibits and selection of testimony to be submitted through deposition excerpts.

14.    Three motions for partial summary judgment, filed by the Defendants, are pending.    These seek summary judgment on the Trustee's alter ego claim (Count 1), the Trustee's fraudulent transfer (and fraudulently incurred obligation) claims (Counts 4, 9, 14, 17, 21, 24, 26, and 27), and the Trustee's breach of warranty claims (Counts 6, 11, and 19).    All three motions have been fully briefed.

15.    A trial of the Action was scheduled to commence in the District Court on February 20, 2019.    At Defendants' request, the trial was initially set as a jury trial.    However, with the Trustee's consent, Defendants waived their right to a jury.

16.    On December 27, 2018, the parties to the Action executed a Settlement Agreement and Mutual Release ("Settlement Agreement").    A copy of the Settlement Agreement is attached hereto as **Exhibit 2**.

17.    Promptly after execution of the Settlement Agreement, the District Court vacated the February 20, 2019 trial and placed the Action in abeyance, pending the outcome of the instant Rule 9019 motion.

## II.    THE DISPUTES.

18.    The First Amended Complaint is 102 pages long and originally contained 27 claims for relief, denoted as "Counts."    These included claims for, or based upon:  alter ego/veil piercing, successor liability, breach of fiduciary duty, fraudulently incurred obligations, fraudulent transfers, breach of warranty, recharacterization of debt to equity, subordination of debt, collection of an account receivable, preferential transfer, and disallowance of RDOC's proof of claim.

4

19.     Six of the Counts have been dismissed by the District Court, as follows:

a.     By Order dated September 26, 2018, the District Court held that Defendant BI Capital was dissolved in 2008.  As a consequence, the District Court dismissed certain of the Trustee's claims against BI Capital on the ground that they were time-barred prior to the Petition Date.  BI Capital was the sole defendant in regard to Counts 15 and 16; accordingly, those Counts were dismissed in their entirety.  Several other claims against BI Capital remain pending, even though BI Capital was dissolved.

b.     By Order dated November 27, 2018, the District Court granted partial summary judgment against the Trustee on all of her breach of fiduciary duty claims. Accordingly, Counts 3, 5, 10, 15, and 18 have been dismissed.  (Count 15 was dismissed in both orders.)

20.     On December 10, 2018, the parties to the Action filed a 57-page Joint Final Pretrial Memorandum ("Joint PT Memorandum").  A copy of the Joint PT Memorandum is attached hereto as **Exhibit 3**.

21.     A general overview of the Trustee's remaining claims in set forth at pages 2-4 of the Joint PT Memorandum, and more detailed descriptions of the Trustee's remaining claims are set forth at pages 4-8.

22.     The "big ticket" claims asserted by the Trustee are the same claims which are the subject of two of the three pending motions for summary judgment.  These are the Trustee's alter ego/veil piercing claim and the Trustee's fraudulent transfer/fraudulently incurred obligation claims.  In these claims, the Trustee seeks to recover the amount of the Learning Annex Judgment, along with the unpaid balance of all administrative expense claims of the Estate.  If the Trustee were successful, the final judgment against all Defendants would be in the

5

neighborhood of about $27.5 million.  Because the Trustee asserted multiple claims, the Trustee

has several avenues to recover lesser sums.

23.     A general overview of Defendants' defenses is set forth at pages 8-10 of the Joint

PT Memorandum, and a brief description of their responses to the Trustee's remaining claims is

set forth at pages 10-13.  (Defendants have numerous additional defenses to the Trustee's claims,

which are set forth in other sections of the Joint PT Memorandum.)

## III.     TERMS OF THE SETTLEMENT AGREEMENT

24.     From the Trustee's perspective, the most significant terms of the Settlement

Agreement are as follows:

a.     The Settlement Agreement must be approved by the Bankruptcy Court to

be fully effective.  (Settlement Agreement, ¶ 1.)

b.     Defendants will pay the Trustee $7.5 million, plus interest, by means of a

wire transfer, no later than the later of (i) July 15, 2019 or (ii) sixty (60) days after the

"Approval Date."[1]   (Settlement Agreement, ¶s 2 and 4.a.)

c.     Interest will run on the $7.5 million at the prime rate published in the Wall

Street Journal from 60 days after the Approval Date until the payment is made.[2]

(Settlement Agreement, ¶4.a.)

d.     Defendant RDOC will withdraw its Proof of Claim.   (Settlement

Agreement, ¶4.e.)

---

[1] The "Approval Date" is "the later of (i) the date upon which the order granting the Motion to
Approve ('Approval Order') is entered on the Bankruptcy Court's docket, or (ii) if the Approval
Order is appealed and affirmed, the first date after the date upon which the period for
commencing a further appeal to the Tenth Circuit has expired."
[2] As a practical matter, if the Approval Date falls on or after May 16, 2019, no interest will
accrue on the $7.5 million, if it is timely paid.

6

e.      After her receipt of the settlement payment, the Trustee will move for the dismissal of the Action, with prejudice, the parties to bear their own costs and attorneys' fees.  (Settlement Agreement, ¶4.f.)

f.      For a period of approximately four years, the Kiyosakis will indemnify the Estate and all initial transferees of funds from the Estate from potential "clawback" claims asserted by creditors of (or a bankruptcy trustee for) the Rich Dad entity that makes the settlement payment.  (Settlement Agreement, ¶4.b.)

g.      If the settlement payment is not made, judgments in the amount of the missed payment will be entered against all of the Defendants on the fraudulent transfer claims asserted by the Trustee in the Action.  The Trustee will be entitled to interest and reasonable costs of collection, including her attorney's fees.  (Settlement Agreement ¶5.b.)

## IV.      STANDARDS OF REVIEW.

The decision of a bankruptcy court to approve a settlement must be "an informed one based upon an objective evaluation of developed facts." *Reiss v. Hagmann,* 881 F.2d 890, 892 (10th Cir.1989); *In re Kopexa Realty Venture Co.*, 213 B.R. 1020, 1022 (B.A.P. 10th Cir. 1997). In considering the propriety of a settlement, it is appropriate for this Court to consider (1) the probable success of the underlying litigation on the merits, (2) the possible difficulty in collection of a judgment, (3) the complexity and expense of the litigation, and (4) the interests of creditors in deference to their reasonable views.  *Kopexa Realty Venture Co.*, 213 B.R. at 1020.

7

As the Tenth Circuit stated in *In re Rich Global, LLC*, 652 F. App'x 625, 631-632 (10th Cir. 2016) (wherein it affirmed this Court's approval of the Learning Annex settlement, discussed above):

> "[A] court's general charge is to determine whether the settlement is fair and equitable and in the best interests of the estate." *W. Pac. Airlines*, 219 B.R. [575, 579 (D. Colo. 1988)] (internal quotation marks omitted). "[T]he court should, without conducting a trial or deciding the numerous questions of law and fact, review the issues and determine whether the settlement falls below the lowest point in the range of reasonableness." 8 *Norton Bankruptcy Law & Practice* § 167.2 (brackets and internal quotation marks omitted).

> Contrary to RDOC's assertions, we are not convinced that the bankruptcy court failed to adequately apprise itself of the facts and the law pertaining to the Second Circuit appeal. The court reviewed "the history of the litigation, the counts alleged, the District Court opinions [in the prepetition Learning Annex litigation] and the supporting documents found on the record." . . . It was not required to "decid[e] the numerous questions of law and fact." 8 *Norton Bankruptcy Law & Practice* § 167.2. Nor was it required to conduct a detailed analysis of the underlying law or a risk-adjusted value of continuing litigation, as RDOC urges.

*Id*. at 631-632 (bracketed material added, some citations omitted).

## V.   DISCUSSION.

### 1.   The Probable Success of the Underlying Litigation on the Merits.

As noted, there are six Defendants in the Action, and the Trustee has 21 remaining claims for relief. The core claims in the Action are the Trustee's alter ego/veil piercing claim (Count 1) and her various fraudulent transfer/fraudulently incurred obligation claims (Counts 4, 9, 14, 17, 21, 24, 26, and 27). Factors most relevant to the probable success of the Action include the following:

### a.   The outcome of the pending motion for partial summary judgment on the Trustee's alter ego claim is uncertain.

Defendants' motion for partial summary judgment on the Trustee's alter ego claim seeks a ruling that a 2016 amendment to the Wyoming Limited Liability Company Act should be

8

applied retroactively.   The 2016 amendment restricted the types of evidence that may be admitted to prove that the Debtor was an alter ego of the Defendants.   Whether the 2016 amendment should be applied retroactively is uncertain.

Defendants' motion for partial summary judgment on the Trustee's alter ego claim also seeks a ruling that the Trustee's evidence that the Debtor was used for fraudulent purposes should be excluded.  To establish fraud (a key factor in an alter ego claim), the Trustee intends to prove that the Defendants caused the Debtor to incur debt and make transfers that are avoidable as fraudulent under the Uniform Fraudulent Transfer Act and/or the Bankruptcy Code. However, Defendants contend that the only relevant type of fraud is fraud that involved a misrepresentation of facts, reliance, and damages.   There are no Wyoming cases that directly support the Trustee's view.  Accordingly, the outcome of this aspect of the motion is uncertain.

In addition, Defendants argue (with significant factual support) that the Debtor had separate bank accounts, maintained separate accounting records, and complied with legal formalities required by Wyoming law.  The Trustee will present expert testimony to demonstrate that the Kiyosakis and their related entities treated the Debtor as a mere instrumentality and, effectively, a piggy bank.  Whether this is enough to demonstrate the necessary intermingling of financial affairs for alter ego/veil piercing purposes is uncertain.

Finally, the Trustee contends that the Kiyosakis, CTI, and Pele-Kala may be held liable under her alter ego/veil piercing claim, even though none of them was an officer, director, or member of the Debtor.   Defendants dispute the Trustee's contention.   There are no Wyoming cases on point and the outcome of this aspect of the motion is also uncertain.

9

### b. The outcome of the pending motion for partial summary judgment on the Trustee's fraudulent transfer and fraudulently incurred obligation claims is uncertain.

A major component of the Trustee's case is her claim that an onerous licensing and management agreement executed by the Debtor in 2007 is avoidable as a fraudulently incurred obligation. As a result of this agreement, millions of dollars were transferred from the Debtor to its then-parent, BI Capital. Further, the 2007 agreement saddled the Debtor with debt that, in part, remains outstanding today.

The party who was most likely defrauded by the 2007 agreement was Sharon Lechter – a former business associate of the Kiyosakis. Whether Ms. Lechter qualified as a "creditor" of the Debtor in 2007, for purposes of the UFTA, is a major point of contention. The factual and legal issues were heavily researched and documented in the Defendants' motion, the Trustee's response, and the reply. This issue is a close call. If the Trustee were to lose this battle, it is possible that a major portion of the Trustee's potential recoveries would be eliminated, because payments made in satisfaction of a valid antecedent debt are considered to have been made for reasonably equivalent value.

The Trustee also challenges licensing and management agreements that the Debtor executed effective as of January 1, 2009. By then, Ms. Lechter was out of the picture. As explained below, Defendants contend that they were unaware of the existence and/or magnitude of the Learning Annex claim until late January 2009. Whether the Trustee will succeed in avoiding the 2009 agreements is uncertain. Again, if these agreements cannot be avoided, it is possible that another major portion of the Trustee's potential recoveries might be eliminated.

### c. The issue of the Debtor's insolvency is uncertain.

The Trustee contends that the Debtor became insolvent no later than March 1, 2007. To establish this contention, the Trustee relies upon a 2011 judgment entered against the Debtor in

10

the Learning Annex lawsuit (adjudicating the Debtor's liability) and the final Learning Annex

Judgment entered against the Debtor in 2012 (which fixed the amount of Learning Annex's

damages).  Whether the judgments entered in 2011 and 2012 may be used to establish insolvency

during 2007-2010 is a hotly disputed question of law.  It turns on whether the Learning Annex

claim should be considered a "contingent claim" and on whether hindsight use of the judgments

is legally permissible.  The U.S. Bankruptcy Court for the District of Colorado recently rendered

an opinion on this issue which is directly contrary to the Trustee's position.  *In re Blair*, 588 B.R.

605 (Bankr. D. Colo. 2018).   The Trustee contends that *Blair* (which is on appeal) was

incorrectly decided and that it is contrary to the controlling law of Arizona (which governs the

Trustee's state law fraudulent transfer claims) and *Gillman v. Scientific Research Products Inc.*

*(In re Mama D'Angelo, Inc.)*, 55 F.3d 552 (10th Cir. 1995) (which governs the Trustee's

bankruptcy claims).[3]

This issue was fully briefed in connection with cross-*Daubert* motions filed by the parties

to limit expert testimony.  The District Court concluded that the issue must be decided by the

court, itself.  However, the District Court has indicated that it will not issue a ruling on the issue

prior to trial.  If the Trustee were to lose this battle, it is possible that a major portion of her

potential recoveries would be eliminated.

     d.     **When Defendants became aware of the existence and magnitude of the Learning Annex claim is uncertain.**

Defendants will present the testimony of the Kiyosakis and other witnesses in support of

their assertion that the Kiyosakis and their advisors were unaware that Learning Annex intended

---

[3] At the 21st Annual Rocky Mountain Bankruptcy Conference, presented by the American Bankruptcy Institute, on January 21-22, 2016, Hon. Cathleen D. Parker was a panelist for the session, "Controversial Valuation Issues in the Context of Financial Distress and Bankruptcy," which addressed the controversy surrounding the use of hindsight in solvency determinations under the UFTA and the Bankruptcy Code.

11

to assert any claims against the Debtor prior to late January of 2009, when they received a copy of the complaint in the Learning Annex lawsuit.   Furthermore, the Defendants assert that they were surprised by the entry of the jury verdicts in 2011 and 2012, which established liability and damages.   They contend that various transfers made during 2007-2011, which the Trustee characterizes as fraudulent in light of the 2011 and 2012 judgments, were made innocently and without any intent to hinder, delay, or defraud Learning Annex.

The Trustee concedes that Learning Annex made no written demand to the Debtor or to any of the Defendants prior to filing suit against the Debtor in late December of 2008. Nevertheless, the Trustee will present evidence that Learning Annex made an oral demand in 2006 and that Defendants' purported lack of knowledge is not credible.   The Trustee further argues that proper application of the "badges of fraud" test (applicable under both the Uniform Fraudulent Transfer Act and the Bankruptcy Code) will result in a finding that the Kiyosakis and their advisors acted with fraudulent intent.  However, this is another close issue.

       e.     **The extent of the Kiyosakis' personal involvement in wrongful acts is uncertain.**

Robert Kiyosaki has testified that his role in "The Rich Dad Company" was public-facing and that he entrusted the management of the various Rich Dad entities, including the Debtor, to his lawyers, accountants, officers, and staff.   Kim Kiyosaki also testified that she relied heavily on others to run the businesses.   The Kiyosakis' signatures appear on several of the key agreements that are at issue in the Action.   In addition, Kim Kiyosaki signed checks and authorized certain significant wire transfers.   Nevertheless, the District Court may find their testimony credible.  If so, they may escape personal liability on many of the Trustee's claims, including, the Trustee's alter ego/veil piercing claim.

   f.    **The outcome of the Trustee's claims based on breach of warranty and recharacterization debt to equity is uncertain.**

As discussed above, the Trustee's principal challenge to the 2007 and 2009 licensing and management agreements is that they are avoidable as fraudulently incurred obligations.    The Trustee also asserts that they are void or avoidable in her breach of warranty claims.    These claims are based on warranty provisions contained in the agreements, themselves.    As noted, Defendants have moved for partial summary judgment on the Trustee's three remaining breach of warranty claims.    Defendants contend that the warranty provisions are clear and that the Trustee is contorting their language.    The Trustee disputes this contention and further argues that the provisions should be construed against the Defendants, since they drafted the agreements. The outcome of this dispute is uncertain.

The Trustee also contends that the 2007 and 2009 licensing and management agreements are actually disguised equity contributions to the Debtor, which should be recharacterized as such.    The Tenth Circuit recognizes the authority of the court to retroactively recharacterize debt to equity.    However, this is an intensely factual inquiry and relief under this theory is very uncertain.

   g.    **The outcome of the Trustee's objection to RDOC's proof of claim is uncertain.**

The Trustee's objection to RDOC's proof of claim, in the amount of $2.2 million, relies upon the Trustee's ability to prove one or more of her other claims which challenge the validity of the Debtor's obligations under the 2007 and 2009 licensing and managements agreements or which seek to establish that RDOC engaged in fraudulent or inequitable conduct.    To bolster these claims, the Trustee has also asserted equitable subordination claims, pursuant to 11 U.S.C. § 510.    For the reasons discussed above, it is uncertain whether the Trustee will prevail on these matters.

13

h.     **The Trustee's claim against CTI to recover an improper prepetition setoff will likely be established.**

On the morning of the Petition Date, CTI owed the Debtor $1,471,856.75.  In a clumsy effort to shield this asset from the Trustee, one or more officers of The Rich Dad Company engineered a "sale" by RDOC to CTI of $1,471,856.75 of the Debtor's debt to RDOC, for the purpose of effecting an offset of the $1,471,856.75.  As a result, the receivable from CTI was not listed in the Debtor's Schedule B.  Moreover, the setoff transaction was not disclosed.  In Counts 23 and 24, the Trustee attacks this transaction as an avoidable setoff and as a preference or, alternatively, a fraudulent transfer.  Although Defendants have moved for summary judgment on the Trustee's fraudulent transfers claim regarding the $1,471,856.75 transfer, the Trustee believes it is highly likely that she will prevail in recovering this sum, regardless of her success on any of the other claims set forth in the First Amended Complaint.

i.     **The Trustee has received the benefit of a neutral evaluation of the Trustee's case by the mediator.**

On November 23, 2016, this Court entered an Order authorizing the Trustee to engage James T. Burghardt, Esq., as a mediator.   On April 20, 2017 and May 25, 2018, the Trustee attended all-day mediation sessions, both of which concluded without success.  However, in the course of preparation for and attendance at the mediations (which are confidential), the Trustee received the benefit of the mediator's neutral evaluation of the Trustee's case.

**2.     The Possible Difficulty in Collection of a Judgment.**

As noted, there are six defendants in the Action:  Robert Kiyosaki, Kim Kiyosaki, Pele-Kala, CTI, BI Capital, and RDOC.

The maximum recovery the Trustee might obtain in this case is approximately $27.5 million.  This sum includes the amount of the Learning Annex claim, plus an estimated figure for

14

unpaid administrative expenses of the estate.  It is possible, of course, that one or more judgments in lesser amounts might be entered against one or more of the Defendants.

The Trustee has not conducted asset investigations of any of the Defendants.  The Trustee's forensic accountant, Cordes & Company ("Cordes"), collected financial information relating to the Kiyosakis and the Rich Dad entities through 2012 and, to a very limited extent, to 2014.  However, this information is out of date, and, in any event, Cordes' investigation was not focused on determining the net worth of the Kiyosakis or any Rich Dad entity other than the Debtor.

The Trustee believes that a $27.5 million judgment against the Kiyosakis might eventually be collected.  However, the Trustee has no significant information regarding either Robert or Kim Kiyosaki's net worth.  BI Capital was dissolved in 2008 and its assets were transferred to RDOC.  RDOC is a limited liability company that is wholly-owned by the Kiyosakis.  The Trustee believes it is unlikely that significant wealth has been retained in RDOC. Prior to 2014, CTI held most of the Rich Dad intellectual property.  Although the Trustee assumes that CTI still holds the Rich Dad intellectual property, it is uncertain whether CTI could satisfy a $27.5 million judgment, at least in the short term.

**3.    The Complexity and Expense of the litigation.**

      a.    **Future Litigation.**

As a review of the Joint PT Memorandum will demonstrate, the litigation is very complex, both factually and legally.  As noted, Defendants elected to waive their jury demand. The District Court has ordered that, following trial, the parties must submit proposed finding and conclusions for the District Court's review, within 30 days after the trial transcripts become available.  The parties would likely be offered the opportunity to file comments on the

DN 3420241.1

submissions.   Thereafter, in due course, the District Court would issue a written opinion and judgment.

Given the complexity and magnitude of the case, it is likely that there would be significant post-trial litigation, regardless of who prevails at trial.  In addition, it is highly likely that an appeal, and perhaps a cross-appeal, would be filed with the Tenth Circuit.  Further, it is conceivable that one side or the other might seek review by the U.S. Supreme Court.

      b.      **Financial Considerations.**

The Estate is not well-funded, and the Trustee believes the proposed settlement offers her a compelling opportunity to avoid future litigation expense.

The Trustee is represented in the Action by Spencer Fane LLP ("Spencer Fane"). Spencer Fane also represented the Trustee in connection with four adversary proceedings and a private arbitration, which were commenced to compel turnover of documents to the Trustee, pursuant to 11 U.S.C. § 542.

Prior to commencing the Action, the Trustee retained the Cordes as her forensic accountants.  On November 22, 2017, Spencer Fane employed Cordes as an expert witness. Cordes prepared an initial expert report and a rebuttal expert report.  Cordes also prepared for and attended *Daubert* hearings in the Action, which resulted in the entry of an order by the District Court determining that Cordes is qualified to render expert opinions at trial.   Cordes' expert fees have been paid directly by the Trustee, with the Court's permission.

Spencer Fane also engaged Joel Laufer, Esq. as an expert witness to render opinions relating to the propriety (or, as it turned out, the impropriety) of certain actions of the Debtor and legal advice given to the Debtor immediately before the Petition Date.  Mr. Laufer's expert fees were paid by Spencer Fane, which has been reimbursed.

DN 3420241.1

As of December 18, 2018, the Trustee had collected $2,356,008.92.  The sources of these funds are as follows:

| Source | Description | Amount |
|---|---|---|
| Debtor | Petition date bank balance | $5,060.19 |
| Debtor | Petition date bank balance | $5,720.33 |
| Learning Annex | Settlement | $100,000.00 |
| Paul Weiss, Rifkind, Wharton | Unused retainer for legal fees | $314,629.80 |
| Kiyosakis, Robert & Kim | Promissory notes | $1,930,598.60 |
| **TOTAL** | | **$2,356,008.92** |

As of December 18, 2018, the Trustee had disbursed $1,986,213.37 for the following purposes:

| Payee | Description | Amount |
|---|---|---|
| Edward Nottingham, Esq. | Arbitration fees | $24,890.58 |
| Rabobank, N.A. | Bank fees | $122,065.21 |
| International Sureties, Ltd | Bond premium fee | $2,220.20 |
| Cordes & Company | Forensic accounting, fees & exp. | $224,322.43 |
| Cordes & Company | Expert witness, fees & expenses | $192,007.70 |
| James T. Burghardt, Esq. | Mediation fees | $37,099.00 |
| Spencer Fane | Attorney fees | $1,254,609.90 |
| Spencer Fane | Expenses (including Laufer fees) | $128,998.35 |
| **TOTAL** | | **$1,986,213.37** |

Thus, as of December 18, 2018, the Trustee's accounts held a balance of $369,795.55 ($2,356,008.92 minus $1,986,213.37).

Spence Fane is providing services to the Trustee on an hourly basis.  Spencer Fane has received eight interim awards of compensation for services provided through April 30, 2018, along with related expenses.   In connection with each of the eight interim awards of compensation for services, Spencer Fane has consented to "holdbacks" of awarded fees, ranging in the amounts of 10% to 20% of the fees awarded.  This was done to slow draws from the Trustee's resources.  Further, due to the diminished balance in the Trustee's accounts, Spencer Fane has not applied for any interim compensation for services from May 1, 2018, forward. Spencer Fane, has, however, requested and received a ninth interim award of allowed expenses.

DN 3420241.1

As of December 31, 2018, Spencer Fane's internal accounting records reflect a balance of unpaid fees (including holdbacks) and expenses in the amount of $769,500.77. Cordes is presently owed approximately $20,000.00 for expert services. The Trustee has not yet requested any interim payment of her commission. Based on receipts to date of $2,356,008,92, the Trustee's commission would be $93,930.27. (The Trustee also holds a Chapter 7 administrative expense claim for her services as a Court-approved attorney, in the approximate amount of $7,000.00).

Spencer Fane has assured the Trustee that it will continue to provide legal services until this case is concluded. However, if the proposed settlement is disapproved and the case is re-set for trial, Spencer Fane will request that the Trustee agree to a contingent fee arrangement that will (potentially) reward Spencer Fane for the future risk and inconvenience of non-payment of fees. Any such agreement would be subject to Court approval, after notice to interested parties.

If the proposed settlement is approved and consummated without controversy, the Trustee's total receipts in the case would increase to $9,856,008.92, and her commission would increase to $318,930,27. Subject to a final tally and allowance of outstanding professional fees and expenses (including sums owed to Spencer Fane and the Trustee), and expert fees (Cordes), the Trustee estimates that Learning Annex would receive a distribution of approximately $6.7 million.

### 4.     The Interests of Creditors in Deference to their Reasonable Views.

As noted, only two creditors filed proofs of claim – Learning Annex and RDOC. In the Action, the Trustee seeks disallowance of RDOC's Proof of Claim, and if the Settlement Agreement is approved and consummated RDOC's Proof of claim will be withdrawn.

DN 3420241.1

Accordingly, the Trustee believes that Learning Annex is the only creditor whose views on the merits of the proposed settlement matter.

Although Learning Annex's views are important, the Trustee elected not to involve Learning Annex in her settlement negotiations with the Defendants before the Trustee reached an agreement in principal with the settling parties. However, once it became clear that an agreement was in hand, the Trustee authorized her counsel to relay the terms to Learning Annex and to engage in substantive discussions of the merits of the settlement. Those discussions are continuing.

There are two principal reasons why Learning Annex's views were not sought earlier.

First, Rule 9019 contemplates that input from the creditors will be solicited after a proposed settlement is reached, but before the court has approved it. Rule 9019 is designed to protect the bankruptcy estate from improvident decisions of a trustee. Thus, regardless of any terms which purport to "bind" the trustee prior to court approval, a settlement agreement is not, in fact, binding on the trustee unless and until it is approved by the court after notice to the creditors. *In re Broadmoor Place Investments, L.P.*, 994 F.2d 744, 745 n. 1 (10th Cir. 1993) ("[T]here can be no [binding sale] contract in this situation without Bankruptcy Court approval[.]"); *In re Blehm Land & Cattle Co.*, 859 F.2d 137 (10th Cir. 1988) ("Under Bankruptcy Rule 9019, a settlement agreement with a Trustee is not enforceable until approved by the Bankruptcy Court."); *Geringer v. Strong*, 2017 WL 5176339 at *2 (D. Utah 2017) ("Under Bankruptcy Rule 9019, a settlement agreement with a Trustee is not enforceable until approved by the Bankruptcy Court."); *In re Psychrometric Systems, Inc.*, 367 B.R. 670, 674-676 (Bankr. D. Colo. 2007) (same).

19

Second, much of the information relied upon by the Trustee in negotiating the settlement was provided to the Trustee and her professionals pursuant to a stipulated Protective Order, entered by the Bankruptcy Court (McNiff, J.) on July 9, 2014 ("2014 Protective Order").  The Trustee believes that Learning Annex will not be in a position to formulate an informed opinion regarding the proposed settlement until it has had an opportunity to review certain confidential information.  On December 28, 2018, the Trustee, the Defendants, and Learning Annex (and its counsel) filed a stipulation with this Court seeking entry of an Order adding Learning Annex and its counsel as parties to the 2014 Protective Order, for the purpose of facilitating the Trustee's transfer of confidential information to Learning Annex for its use in evaluating the proposed settlement.  The Trustee has assured Learning Annex that the Trustee will support its reasonable requests to review confidential information necessary to allow Learning Annex to make an informed decision about the proposed settlement.

## VI.    CONCLUSION.

The proposed settlement is fair and equitable and in the best interests of the Estate.

WHEREFORE, Tracy L. Zubrod, trustee, prays for entry of an Order approving the Settlement Agreement and Mutual Release, and for such other and further relief as the Court deems just.

Dated:  January 8, 2019                SPENCER FANE LLP
                                       By:   */s/ Philip A. Pearlman*
                                              Philip A. Pearlman, CO #11426
                                              Ronald L. Fano, CO #20797
                                              Jamie N. Cotter, WY #7-4721
                                              1700 Lincoln Street, Suite 2000
                                              Denver, Colorado 80203
                                              Telephone: (303) 839-3800
                                              ppearlman@spencerfane.com
                                              jcotter@spencerfane.com
                                              rfano@spencerfane.com
                                       *Attorneys for Tracy L. Zubrod, Trustee*

DN 3420241.1

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 8, 2019, I served by prepaid first class mail a copy of the MOTION TO APPROVE SETTLEMENT OF DISPUTES BETWEEN THE TRUSTEE AND ROBERT KIYOSAKI, KIM KIYOSAKI, PELE-KALA CORPORATION, CASHFLOW TECHNOLOGIES, INC., BI CAPITAL, LLC, AND RICH DAD OPERATING COMPANY, LLC, on all parties against whom relief is sought and those otherwise entitled to service pursuant to the FED. R. BANKR. P. and the Wyoming LBR at the following addresses:

Rich Global
4330 N. Civic Center Plaza, Ste. 100
Scottsdale, AZ  85251-3529

Steven N. Berger
Engelman Berger, P.C.
3636 N. Central Ave., Ste. 700
Phoenix, AZ  85012-1936

Ethan J. Birnberg
Ballard Spahr LLP
1225 17th St., Ste. 2300
Denver, CO  80202-5596

Jenny M.F. Fujii
Kutner Brinen Garber PC
1660 Lincoln St., Ste. 1650
Denver, CO  80264-9911

Jonathan Harris
111 Broadway, Ste. 402
New York, NY  10006-1978

Lee M. Kutner
Kutner Brinen Garber PC
1660 Lincoln St., Ste. 1650
Denver, CO  80264-9911

Theodore J. Hartl
Ballard Spahr LLP
1225 17th St., Ste. 2300
Denver, CO  80202-5596

Mark E. Macy
Macy Law Office, P.C.
217 W. 18th St.
Cheyenne, WY  82001-4413

James R. Belcher, Esq.
Crowley Fleck PLLP
152 N. Durbin St., Ste. 220
Casper, WY 82601

Robert A. Shull
Dickinson Wright PLLC
1850 N. Central Ave., Ste. 1400
Phoenix, AZ  85004-4568

Edwin G. Schallert, Esq.
Debevoise & Plimpton LLP
919 Third Ave.
New York, NY 100

Gregory L. Williams
Markus Williams Young
 &  Zimmerman LLC
1700 Lincoln St., Ste. 4550
Denver, CO  80203-4540

John F. Young
Markus Williams Young
 & Zimmerman LLC
1700 Lincoln St., Ste. 4550
Denver, CO  80203-4540

Paul Hunter
2616 Central Ave.
Cheyenne, WY 82001-3054

US Trustee
308 West 21st St., 2nd Fl.
Cheyenne, WY 82001-3669

DN 3420241.1

Tracy L. Zubrod
219 E. 18th St.
Cheyenne, WY  82001-4507

Timothy Woznick, Esq.
Crowley Fleck PLLP
237 Storey Blvd., Ste. 110
Cheyenne, WY  82009

William Zanker, President
Learning Annex Holdings LLC
888c Eight Ave., #139
New York, NY 10019

William Zanker, President
Benson Acquisition, LLC
888c Eight Ave., #139
New York, NY 10019

William Zanker, President
The Learning Annex, L.P.
888c Eight Ave., #139
New York, NY 10019

Andrew L. Hyams, Esq.
Kerstein, Coren & Lichtenstein LLP
60 Walnut St., #400
Wellesley, MA 02481

Michael Schaper, Esq.
Debevoise & Plimpton LLP
919 Third Ave.
New York, NY 10022

Jonathan Harris, Esq.
Harris, St. Laurent & Chaudhry LLP
40 Wall St., 53rd Fl.
New York, NY 10005

Plate Investments Limited
c/o Sandra Stern, Esq.
Nordquist & Stern PLLC
330 Madison Ave., 6th Floor
New York, NY 10017

Plate Investments Limited
c/o Sandra Stern, Esq.
Nordquist & Stern PLLC
43 West 43rd St., Ste. 125
New York, NY 10036

Production Resource Group, LLC
c/o Jeffrey Boldt, Esq.
The Kuker Group LLP
508 E. Eighteenth St.
Cheyenne, WY 82001

Production Resource Group, LLC
c/o Overstreet, Homar & Kuker
508 E. 18th St.
Cheyenne, WY 82001

Production Resource Group, LLC
c/o Neil G. Marantz, Esq.
The Marantz Law Firm
150 Theodore Fremd Ave., Ste. A-14
Rye, NY  10580

*/s/ Nancy Schacht*
Nancy Schacht

2

DN 3420241.1