**EXHIBIT**

3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re: | ) |
| | ) |
| RICH GLOBAL, LLC, | ) |
| | ) |
| Debtor. | ) |
| | ) |
| TRACY L. ZUBROD, Trustee | )   Case No. 16-cv-00217 |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ROBERT T. KIYOSAKI, KIM | ) |
| KIYOSAKI, PELE-KALA | ) |
| CORPORATION, CASHFLOW | ) |
| TECHNOLOGIES, INC., BI CAPITAL, | ) |
| LLC, and RICH DAD OPERATING | ) |
| COMPANY, LLC, | ) |
| | ) |
| Defendants. | ) |

## JOINT FINAL PRETRIAL MEMORANDUM

Plaintiff Tracy L. Zubrod, trustee, and Defendants Robert T. Kiyosaki, Kim Kiyosaki, Pele-Kala Corporation, Cashflow Technologies, Inc., BI Capital, LLC, and Rich Dad Operating Company, LLC, by and through their respective undersigned counsel, respectfully submit this Joint Final Pretrial Memorandum ("Memorandum").

## A.    Jurisdiction and Parties.

On August 20, 2012, Rich Global, LLC ("Debtor" or "Rich Global"), a Wyoming limited liability company (an "LLC"), filed a voluntary petition for relief under Chapter 7 of the U.S. Bankruptcy Code ("Code") in the U.S. Bankruptcy Court for the District of Wyoming. Tracy L. Zubrod ("Trustee" or "Plaintiff") is the trustee of the Debtor's bankruptcy estate.

On August 19, 2014, the Trustee commenced this civil proceeding as an adversary proceeding in the Bankruptcy Court. On November 6, 2016, this Court withdrew the reference for all purposes. (Doc. No. 37.)

The Defendants in this civil proceeding are Robert T. Kiyosaki ("Robert") and Kim Kiyosaki ("Kim") (together, the "Kiyosakis"); Pele-Kala Corporation ("Pele-Kala"), a Nevada corporation; Cashflow Technologies, Inc. ("CTI"), a Nevada corporation; BI Capital, LLC ("BI

Capital"), a dissolved Nevada LLC;[1] and Rich Dad Operating Company, LLC ("RDOC"), a Nevada LLC.

This civil proceeding arises in and relates to the Debtor's bankruptcy case. The Court has subject matter jurisdiction over this civil proceeding pursuant to 28 U.S.C. § 1334(b) and (e). Defendants do not contest the Court's jurisdiction. Pursuant to 28 U.S.C. § 1409(a), venue is proper in this district. Defendants do not contest venue.

**B.    General Nature of the Claims and Contentions of the Parties.**

    1.    **Trustee's Statement of the General Nature of her Claims and Contentions.[2]**

        a.    **Overview.**

At all relevant times, the Kiyosakis were direct or indirect owners of several related entities ("Rich Dad entities") that did business as the "Rich Dad Company." The principal brand of the Rich Dad Company was and is "Rich Dad."

During late 2005 and early 2006, the Kiyosakis and their then-business partner, Sharon Lechter ("Lechter"), reached an agreement with Learning Annex,[3] whereby Learning Annex would receive compensation for services related to the development of a "free seminar business" that would be presented by a third party, Whitney/Tigrent,[4] under the Rich Dad brand. The amount of compensation was not fixed and there was no enforceable contract between Rich Dad and Learning Annex. Nevertheless, Learning Annex provided the agreed upon services.

On February 2, 2006, the Kiyosakis and Lechter sent an email to Learning Annex terminating their relationship. They stated, "Everything is off" and "We are stopping our negotiations with Russ Whitney [the principal of Whitney/Tigrent]." However, this was false. The Kiyosakis and Lechter continued negotiating with Whitney/Tigrent and in July 2006 they finalized agreements with Whitney/Tigrent. Under those agreements, the seminars were to be presented by Rich Dad Education, LLC ("RD Education" or "RDE"), a Wyoming LLC. On August 3, 2006, BI Capital formed the Debtor to own a 49% interest in RDE. RDE agreed to pay the Debtor 10% of RDE's gross income as a royalty for granting RDE a sublicense to use the Rich Dad brand. The 10% royalty was highly lucrative. From March 1, 2007 through May 14, 2010, the Debtor received $42,376.634.00 in royalty payments from RDE.

In early October of 2006, after reading a press release that described the agreements, Learning Annex's principal, Bill Zanker, contacted Lechter and Whitney/Tigrent and demanded a share of the new enterprise. After Learning Annex was rebuffed, it filed suit in New York and

---

[1] See Order Granting in Part and Denying in Part Defendant [BI Capital]'s Motion to Dismiss, Doc. No. 156.

[2] Part B.1. of this Memorandum sets forth the Trustee's assertions. Defendants were not involved in the preparation of Part B.1.

[3] Learning Annex Holdings, LLC, Learning Annex, LLC, and Learning Annex, L.P. are individually and collectively referred to, herein, as "Learning Annex."

[4] The original name of this entity was Whitney Information Network, Inc. During 2009, the name was changed to Tigrent, Inc.

alleged numerous claims for relief. The suit was removed to the U.S. District Court for the Southern District of New York ("SDNY"). The suit was commenced on December 29, 2008, and Defendants learned about the suit sometime in January 2009.

The SDNY granted summary judgment against Learning Annex on most of its claims, including its contract claim. However, Learning Annex's claim for quantum meruit was presented to a jury. Following the trial on July 5-13, 2011, the jury found the Debtor liable to Learning Annex and a large judgment was entered against the Debtor. The jury specifically found that an "agreement" existed between the Rich Dad side and Learning Annex, based on writings that were sufficient to satisfy the New York statute of frauds. In addition, the jury concluded that interest should run on Learning Annex's claim from March 1, 2007 forward. A second trial, limited to the amount of damages, was held in April of 2012. The second jury awarded damages based on 33% of the royalties received by the Debtor from RDE. Final judgment was entered in favor of Learning Annex and against the Debtor on July 17, 2012 in the amount of $23,687,957 ("Learning Annex Judgment").

Meanwhile, in March of 2007, the relationship between Lechter and the Kiyosakis had deteriorated to the point that she stopped coming into the Rich Dad offices. In July of 2007, Lechter resigned her management positions, but she retained her one-third ownership interest in the Rich Dad entities. Lechter claimed that prior to her resignation the Rich Dad entities were run as a joint venture and that, pursuant to past practice and agreements, she was entitled to distributions of one-third of net profits of the joint venture on a quarterly basis. To apply pressure on Lechter in connection with buyout negotiations, the Kiyosakis stopped all distributions from the Rich Dad entities. As a result, on October 12, 2007, Lechter filed suit in Nevada ("Lechter Lawsuit"), seeking (among other things) the appointment of a receiver for the Debtor and the rest of the Rich Dad entities.

In late December 2007, while the Lechter Lawsuit was pending, the Kim Kiyosaki executed licensing and management agreements that required (i) the Debtor to pay 95% of its gross income to BI Capital and (ii) BI Capital to pay 95% of its gross income to CTI. Both agreements imposed the 95% fees retroactively. The principal purpose of these agreements was to provide a legal justification of terminating distributions of the Debtor's funds to Lechter. The Kiyosakis knew full well that these agreements would (and did) cause double taxation of the revenues the Debtor was receiving from RDE, but their desire to freeze-out Lechter was paramount.

The Lechter Lawsuit was settled in late August 2008 and dismissed on September 3, 2008. The main component of the settlement was a $9 million buyout of Lechter's interests in the Rich Dad entities. With Lechter out of the way, there was no further need to move funds from the Debtor through BI Capital to CTI, and the Kiyosakis were strongly motivated to end the double taxation of revenues. Accordingly, in December of 2008, Kim Kiyosaki revised the fee agreement between BI Capital and CTI to drop the fee from 95% to 30%, *retroactively* to January 1, 2008, thereby fixing the double taxation problem for all of 2008. Nevertheless, the Kiyosakis left in place the agreement that required the Debtor to pay 95% of its gross revenues to BI Capital until approximately January of 2009. Effective January 1, 2009, new and only slightly less onerous fee agreements were executed between the Debtor, on one hand, and CTI (25% fee) and RDOC (40% fee) (the successor entity to BI Capital as sole member of the Debtor) on the other hand. The

retroactive reduction of the BI Capital/CTI fees, from 95% to 30%, clearly demonstrates that the 95% fee was a sham in the first place.

While the Learning Annex Lawsuit was pending, the Kiyosakis and their subordinates engineered numerous transactions intended to deplete the Debtor's assets. Most significantly, in mid-2010, they terminated the Debtor's right to license the Rich Dad brand to the seminar business, and caused that license to be transferred to RDOC. Thereafter, RDOC received millions of dollars in revenue from the seminar business. The 2010 transaction put the Debtor out of business, but it did not end the Kiyosakis efforts to deplete the Debtor's remaining assets. Those efforts continued to the Petition Date in the Debtor's bankruptcy case.

Although the Debtor received $42,376.634.00 in royalties from March 1, 2007 through May 14, 2010, the Debtor had assets of only roughly $2 million when it filed its Chapter 7 case on August 20, 2012. The vast majority of the $42 million was transferred to Defendants. The Trustee brings this civil action to recover assets (the Debtor's funds) from Defendants in an amount sufficient to pay the Learning Annex Judgment and all administrative expenses of the bankruptcy estate in full. Notably, the value of the assets diverted from the Debtor actually exceeds the amount of the Learning Annex Judgment and the administrative expenses of the Estate. However, any surplus funds recovered by the Trustee would simply be returned to the Debtor's owner, RDOC, pursuant to the 11 U.S.C. § 726(a)(6).

### b.    Claims for Relief.[5]

On August 20, 2014, the Trustee filed her First Amended Complaint ("FAC"), which set forth 27 claims for relief – denoted as "Counts." By Order dated September 26, 2018 (Doc. No. 156), the Court dismissed certain claims against BI Capital.[6] BI Capital was the sole defendant in regard to Counts 15 and 16; accordingly, those Counts were dismissed in their entity. By Order dated November 27, 2018, the Court granted partial summary judgment against the Trustee, and dismissed Counts 3, 5, 10, 15, and 18 (Count 15, having been previously dismissed).

The remaining 21 Counts include an alter ego claim, a successor liability claim, seven fraudulent transfer claims, four breach of warranty claims, and eight additional claims. These remaining claims are described below.

### Count 1 - Alter Ego – Piercing the Debtor's Veil.

The Trustee contends that the Debtor's entity veil should be pierced and that the Kiyosakis, CTI, BI Capital, and RDOC should all be held liable for the amount of the Learning Annex Judgment, plus all administrative expenses of the bankruptcy estate. The Trustee alleges, primarily, that Defendants utilized the Debtor for fraudulent purposes, the Debtor was intentionally undercapitalized, and the financial affairs of the Debtor were extensively commingled with those of Defendants.

---

[5] In regard to all claims, the Trustee seeks an award of costs. In regard to all monetary claims, the Trustee also seeks prejudgment interest.

[6] BI Capital's Motion to Dismiss was granted as to Counts 3, 5, 6, 7, 8, 15 and 16. BI Capital's Motion to Dismiss was denied as to Counts 1, 4, 14, and 27.

**Count 2 – Successor Liability.**

The Trustee seeks to hold RDOC liable for the amount of the Learning Annex Judgment, plus all administrative expenses of the bankruptcy estate.  In 2010, while the Learning Annex Lawsuit was pending, significant assets of the Debtor were fraudulently transferred to its parent, RDOC, without consideration.  These included:  (a) the Debtor's right to license the Rich Dad brand to the free seminar business, (b) approximately $1.6 million in royalties owed to the Debtor, and (c) approximately $3.3 million of other assets (transferred pursuant to a fictitious sale).  The Debtor was put out of business.  RDOC proceeded to carry on a business that was substantially similar to the Debtor's business.

**Count 4 – Fraudulently Incurred Obligation – 2007 RG Fee Agreement.**

The Trustee seeks to avoid the 2007 RG Fee Agreement (95% of gross income) as a fraudulently incurred obligation.  The primary relief sought by the Trustee is a declaration that the 2007 RG Fee Agreement is avoided, *ab initio*.

**Count 6 – Breach of Warranty – 2007 RG Fee Agreement.**

If the 2007 RG Fee Agreement is not void or voided pursuant to Count 4 (fraudulently incurred obligation), then the Trustee seeks, in the alternative, a declaration that BI Capital breached its warranty in the 2007 RG Fee Agreement and that the Debtor's obligations thereunder are either void or subordinated to all other liabilities of the Debtor – i.e., the Learning Annex Judgment and the administrative expenses of the bankruptcy estate.

**Count 7 – Recharacterization of the BI Capital Payable as Equity.**

The "BI Capital Payable" was the amount owed, from time to time, by the Debtor to BI Capital, pursuant to the 2007 RG Fee Agreement.  If the 2007 RG Fee Agreement is not void or voided pursuant to Count 4 (fraudulently incurred obligation), then the Trustee seeks, in the alternative, a declaration that any value that BI Capital actually provided to the Debtor in exchange for the BI Capital Payable should be recharacterized as the infusion of equity.   If the BI Capital Payable were so-recharacterized, then all transfers of value by the Debtor to BI Capital or RDOC on account of the BI Capital Payable will be treated as equity distributions.

**Count 8 – Subordination of 2007 RG Fee Agreement.**

RDOC has filed Proof of Claim No. 2 in the amount of $2,205,217.43.  Claim No. 2 is based, in part, upon obligations of the Debtor arising under the 2007 RG Fee Agreement.  The Trustee seeks judgment subordinating Proof of Claim No. 2 to the Learning Annex claim.  (To the extent Count 8 originally sought relief beyond the relief stated herein, Count 8 is withdrawn.)

**Court 9 – Fraudulently Incurred Obligations – 2009 RG Licensing Agreement and
2009 RG Management Agreement.**

The Trustee seeks to avoid the 2009 RG Licensing Agreement (25%) and 2009 RG Management Agreement (40%) as fraudulently incurred obligations.   The primary relief sought by the Trustee is a declaration that these agreements are avoided, *ab initio*.

**Count 11 - Breach of Warranty – 2009 RG Licensing Agreement and 2009 RG Management Agreement.**

If the 2009 RG Licensing Agreement and 2009 RG Management Agreement are not void or voided pursuant to Count 9 (fraudulently incurred obligations), then the Trustee seeks, in the alternative, a declaration that CTI and RDOC breached their warranties in the 2009 RG Licensing Agreement and 2009 RG Management Agreement and that the Debtor's obligations thereunder are either void or subordinated to all other liabilities of the Debtor – i.e., the Learning Annex Judgment and the administrative expenses of the bankruptcy estate.

**Count 12 – Recharacterization of the RDOC Payable as Equity.**

The "RDOC Payable" was the amount owed, from time to time, by the Debtor to RDOC, pursuant to the 2009 RG Management Agreement. If the 2009 RG Management Agreement is not void or voided pursuant to Count 9 (fraudulently incurred obligation), then the Trustee seeks, in the alternative, a declaration that any value that RDOC actually provided to the Debtor in exchange for the RDOC Payable should be characterized as the infusion of equity. If the RDOC Payable were so-recharacterized, then all transfers of value by the Debtor to RDOC on account of the RDOC Payable will be treated as equity distributions.

**Count 13 - Subordination of 2009 RG Management Agreement.**

RDOC has filed Proof of Claim No. 2 in the amount of $2,205,217.43. Claim No. 2 is based, in part, upon obligations of the Debtor arising under the 2009 RG Management Agreement. The Trustee seeks judgment subordinating Proof of Claim No. 2 to the Learning Annex claim. (To the extent Count 13 originally sought relief beyond the relief stated herein, Count 13 is withdrawn. For the avoidance of doubt, the Trustee seeks no relief against CTI in Count 13.)

**Count 14 – Fraudulent Transfers – BI Capital Transfers-**

The "BI Capital Transfers" are transfers made by the Debtor to or for the benefit of BI Capital during 2007 and 2008. In Count 14, the Trustee primarily seeks to avoid the BI Capital Transfers as fraudulent transfers and recover the transfers or the value thereof from BI Capital and the Kiyosakis.

**Count 17 – Fraudulent Transfers – RDOC Transfers.**

The "RDOC Transfers" are transfers made by the Debtor to or for the benefit of RDOC during the period 2009 – 2012. In Count 17, the Trustee primarily seeks to avoid the RDOC Transfers as fraudulent transfers and recover the transfers or the value thereof from RDOC and the Kiyosakis.

**Count 19 – Breach of Warranty – 2009 RG Management Agreement.**

In Count 19, the Trustee contends that the RDOC Transfers were made in breach of the warranty provision contained in the 2009 RG Management Agreement. The Trustee primarily seeks judgment against RDOC in the amount of the RDOC Transfers.

6

**Count 20 – Disallowance of RDOC's Proof of Claim.**

In Count 20, the Trustee seeks disallowance of Proof of Claim No. 2, filed by RDOC, pursuant to 11 U.S.C. § 502(b) because RDOC's claim is unenforceable under the Debtor's agreements and under state law.  In addition, the Trustee seeks disallowance of Proof of Claim No. 2 pursuant to § 502(d) because RDOC is an entity from which property is recoverable under §§ 550 and 553.

**Count 21 – Fraudulent Transfers – CTI Transfers.**

The "CTI Transfers" are transfers made by the Debtor to or for the benefit of CTI during the period 2008 – 2012.  In Count 21, the Trustee primarily seeks to avoid the CTI Transfers as fraudulent transfers and to recover the transfers or the value thereof from RDOC and the Kiyosakis.

**Count 22 – Breach of Warranty – 2009 RG Licensing Agreement.**

In Count 22, the Trustee contends that the CTI Transfers were made in breach of the warranty provision contained in the 2009 RG Licensing Agreement.  The Trustee primarily seeks judgment against CTI in the amount of the CTI Transfers.

**Count 23 – Preferential Transfer – CTI Setoff**

Counts 23 and 24 are for alternative claims.  In Count 23, the Trustee seeks to avoid the CTI setoff, pursuant to 11 U.S.C. § 553, and to recover approximately $1.5 million for CTI as a preference.

**Count 24 – Fraudulent Transfer – CTI Setoff.**

In Count 24, the Trustee seeks to a determination that the CTI setoff was invalid because the "Offset Claim" utilized by CTI to reduce its liability to the Debtor was not a valid claim for reasons set forth in the Trustee's other claims for relief (see FAC, ¶442).  In Count 24, the Trustee contends that the extinguishment of the Debtor's $1.5 million receivable from CTI was a fraudulent transfer.  The Trustee seeks judgment against CTI in the amount thereof.

**Count 25 – Account Receivable.**

In Count 25, the Trustee recalculates the amount due on the CTI Loan, increasing the CTI Loan by the amount of offsets and deductions the Trustee contends should be disallowed for reasons stated in other claims for relief.   The Trustee seeks a judgment for the recalculated balance due on the CTI Loan.

**Count 26 – Fraudulent Transfers – Kiyosakis Transfers.**

The "Kiyosaki Transfers" are transfers made by the Debtor to or for the benefit of Kiyosakis during the period 2007 – 2012.  In Count 26, the Trustee primarily seeks to avoid the Kiyosaki Transfers as fraudulent transfers and recover the transfers of the value thereof from the Kiyosakis.

**Count 27 – Avoidance of Transfers to Subsequent Transferees**

In Count 27, the Trustee seeks to avoid all subsequent transfers of property that were the subject of an initial transfer that is avoided pursuant to any of the Trustee's other claims for relief, except to the extent the subsequent transferee gave value, in good faith, without knowledge of the potential voidability of the transfer.

2.      **Defendants Statement of their Defenses and Contentions.**[7]

a.      **Overview.**

Robert is the best-selling author of the "Rich Dad Poor Dad" series, as well as a public speaker on personal finance topics. He and his wife, Kim, own companies that are direct or indirect parents to a group of entities. Those entities include RDOC, CTI, and, formerly, BI Capital and Rich Global. Ignoring the discovery and evidence in this case, Plaintiff's theory of the case paints the Kiyosakis as puppet masters who designed their business enterprises and conformed all of their actions to a single goal: to defraud Learning Annex. Plaintiff quixotically imagines that the specter of fraudulent intent grows from every sheet of paper and act.

The defenses to these imagined frauds are simple and true: the complained-of acts were business transactions in the ordinary course for the Rich Dad enterprises and, until Learning Annex obtained a jury verdict in its favor, that company was never a motivating factor for Rich Dad business decisions. Rather, the dominant motivating factors were the benefit of the owners of the enterprises and the minimization of tax burdens. Plaintiff naively and baselessly decries these legitimate business considerations as some species of evil.

Zanker and Learning Annex had no substantial involvement in the Rich Dad entities' business. Learning Annex made a single introduction in 2005, and a multi-party partnership between Rich Dad, Whitney/Tigrent, and Learning Annex was contemplated in 2005-2006. In 2005, CTI began discussing a possible arrangement with third parties, including Whitney/Tigrent and Learning Annex, whereby they would found and operate a new educational seminar business. But Lechter notified Zanker on February 2, 2006, that the Rich Dad entities were terminating their anticipated business relationship with Learning Annex due to ongoing issues in the relationship.

Zanker responded on February 14, 2006: "Learning Annex and Bill Zanker will accept whatever you deem appropriate, if anything, at your discretion for the introduction of Russ Whitney or [Whitney/Tigrent] to the Rich Dad organization." This email conclusively ended the dialogue between Learning Annex and anyone from the Rich Dad enterprises. Plaintiff has admitted that Learning Annex made no demand for payment in writing between February 2, 2006 and when the Learning Annex Lawsuit was filed in December 2008 — other than, to the extent it was a "demand," the email suggesting payment of "whatever you deem appropriate, if anything, at your discretion."

---

[7] Part B.2. of this Memorandum sets forth Defendants' assertions.  The Trustee was not involved in the preparation of Part B.2.

The Learning Annex Lawsuit, which the Rich Dad entities first learned of in late January 2009, was an unanticipated shock to Defendants. Defendants had no idea that Learning Annex would assert a claim against Defendants and, particularly, against Rich Global.

Rich Global had been formed in 2006, after the relationship with Learning Annex ended. Defendants had not heard a peep — written or otherwise — from Zanker in more than three years. Defendants simply did not know that this claim was coming.

Contemporaneous evidence confirms this lack of knowledge. For example, during the course of a lawsuit between Lechter and the Kiyosakis in 2007-2008, Lechter and the Kiyosakis each retained consultants to value Lechter's interests in the Rich Dad entities. Neither consultant considered or assigned any value to any claim by Learning Annex against Rich Global (or, for that matter, against any other Rich Dad entity). Furthermore, the settlement agreement between Lechter and the Kiyosakis/Rich Dad entities made no provision for payment to, or indemnification of any claim by Zanker or Learning Annex, nor was such a provision even contemplated. This is not the behavior of people hiding from an impending Learning Annex claim.

During the majority of its time in operation, Rich Global contracted with other entities to obtain management services for itself and vital licenses for the intellectual property it needed to license to Rich Dad Education — the source of 100% of Rich Global's revenues. Rich Global agreed to pay BI Capital, RDOC, and CTI, respectively, certain sums at various periods of its existence in exchange for services and/or licenses to be provided by Defendants.

Rich Global was a company without creditors or serious debts. All of Rich Global's notable business dealings were conducted with Whitney/Tigrent or with other Rich Dad entities. During the entirety of its existence (until Learning Annex obtained a judgment against it in July 2012), Rich Global never had a creditor or owed debt, other than the sums it paid to BI Capital, RDOC, and CTI under their respective licensing and/or management agreements. At no point, until that judgment was entered, was there any question about Rich Global's ability to pay its bills as they became due.

The Learning Annex Lawsuit was a long shot. After summary judgment had been entered on its baseless contract claim, Learning Annex had only equitable claims for quantum meruit left. At best, Learning Annex could only be owed the fair value of the services it had provided — which, again, was merely a single introduction.

During the Learning Annex Lawsuit, the Kiyosakis and the Rich Dad entities continued to give little or no credence to Learning Annex's claim, believing that it had no merit and could not result in significant — if any — liability. This belief was reinforced by events such as Rich Global's partner in the joint venture, Whitney/Tigrent, settling Learning Annex's claims against it and against RDE for a mere $100,000 and by significant victories in motion practice. Also, McGladrey & Pullen, LLP, auditor for the Rich Dad entities, ascribed a remote likelihood of loss to the Learning Annex claim, so that no reserve for potential loss was necessary.

However, following a trial, a jury returned a quantum meruit verdict against Rich Global on July 13, 2011. After a second trial to determine the amount of damages, Learning Annex

secured an approximately $24 million judgment (approximately 33% of gross revenues) against Rich Global in July 2012. All for *an introduction*.

Plaintiff takes this jackpot judgment and mechanically backdates it to 2007 (the date of Rich Global's first revenues), arguing the liability should be accrued as of that early date for fraudulent transfer purposes. Plaintiff is simply ignoring the fact that Rich Global was completely unaware of any claim against it during the entire relevant period.

This is a case about Plaintiff: (a) misconstruing ordinary business activities as intentional frauds, and (b) twisting the law of constructive fraud and solvency into something unrecognizable. Such straining is necessary for Plaintiff to succeed because Learning Annex failed to provide Defendants notice that it had a claim *against Rich Global* during the relevant times. There simply was no intentional fraud. Additionally, once the claim was made, a substantial judgment was so unlikely that — under a proper contingent liability analysis — Rich Global was a solvent company until a verdict was rendered in 2011. These inconvenient — and case-dispositive — facts cannot be wished away by Plaintiff.

### b.   Defendants' Positions on Plaintiffs' Claims for Relief.[8]

The FAC has 21 remaining claims for relief, including an alter ego claim, a successor liability claim, eight fraudulent transfer/fraudulently incurred obligation claims, four breach of warranty claims, and seven additional claims. The defenses to these claims are described below.

### Count 1: Alter Ego — Piercing Rich Global's Veil.

Plaintiff contends that Rich Global's entity veil should be pierced and that the Kiyosakis, CTI, BI Capital, and RDOC should all be held liable for the amount of the Learning Annex Judgment, plus all administrative expenses of the bankruptcy estate. Plaintiff will not and cannot prove that the robust protections for the corporate form in Wyoming, in particular for an LLC, will be disregarded. Rich Global cannot have been used to defraud Learning Annex, as it was formed *after* Defendants' substantial interactions with Learning Annex. Allegations of fraud and intentional undercapitalization (and, if Plaintiff intends to raise these issues after ignoring them in the summary judgment briefing, abandonment of corporate formalities and commingling of finances) are baseless.

### Count 2: Successor Liability.

Plaintiff seeks to hold RDOC liable for the amount of the Learning Annex Judgment, plus all administrative expenses of the bankruptcy estate. Plaintiff's allegations of a "fictitious sale" are baseless. A substantially adjusted relationship was necessary due to RDE's dire financial condition, and RDOC has a right to pursue that business with intellectual property it controls. Rich Global's sublicense for intellectual property was nonexclusive, and the termination of its licensor relationship with RDE was not a transfer of any kind. Regarding the receipt of some monies due

---

[8] In regard to all claims, Plaintiff seeks an award of costs. In regard to all monetary claims, Plaintiff also seeks prejudgment interest.

to Rich Global, Defendants will demonstrate the correct amounts due at trial. The full amounts were not and are not due to Rich Global.

**Count 3:** Dismissed by Order Granting Defendants' Motion for Partial Summary Judgment dated November 27, 2018 (Doc. No. 177).

### Count 4: Fraudulently Incurred Obligation — 2007 RG Fee Agreement.

Plaintiff seeks to avoid the 2007 RG Fee Agreement as a fraudulently incurred obligation. The 2007 RG Fee Agreement was not fraudulent. It reflected the economic realities of Rich Global's need to obtain vital intellectual property licenses (its sole source of revenue) and management services. In any case, Plaintiff cannot avoid the 2007 RG Fee Agreement.

**Count 5:** Dismissed by Order Granting Defendants' Motion for Partial Summary Judgment dated November 27, 2018 (Doc. No. 177).

### Count 6: Breach of Warranty — 2007 RG Fee Agreement.

Plaintiff seeks, in the alternative, a declaration that BI Capital breached its warranty in the 2007 RG Fee Agreement and that Rich Global's obligation to RDOC under that agreement is avoided or subordinated. Such relief is not available because, *inter alia*, BI Capital did not breach any warranty, RDOC did not breach any warranty, Rich Global and all of its members consented to the acts alleged to be a breach, and avoidance of Rich Global's obligations under the agreement would not be an available remedy for any breach.

### Count 7: Recharacterization of the BI Capital Payable as Equity.

Plaintiff seeks a declaration that any value that BI Capital actually provided to Rich Global in exchange for the BI Capital Payable should be recharacterized as the infusion of equity. Such a recharacterization is not relief available to Plaintiff.

### Count 8: Subordination of 2007 RG Fee Agreement.

Plaintiff seeks judgment subordinating Proof of Claim No. 2 to the Learning Annex claim. Proof of Claim No. 2 should not be subordinated.

### Court 9: Fraudulently Incurred Obligation — 2009 RG Licensing Agreement and 2009 RG Management Agreement.

Plaintiff seeks to avoid the 2009 RG Licensing Agreement and 2009 RG Management Agreement as fraudulently incurred obligations. These agreements were not fraudulent, and they cannot be avoided.

**Count 10:** Dismissed by Order Granting Defendants' Motion for Partial Summary Judgment dated November 27, 2018 (Doc. No. 177).

**Count 11: Breach of Warranty — 2009 RG Licensing Agreement and 2009 RG Management Agreement.**

Plaintiff seeks, in the alternative, a declaration that CTI and RDOC breached their warranties in the 2009 RG Licensing Agreement and 2009 RG Management Agreement and that Rich Global's obligations thereunder are either void or subordinated. Such relief is not available because, *inter alia*, CTI and RDOC did not breach any warranty, Rich Global and all of its members consented to the acts alleged to be a breach, and avoidance of Rich Global's obligations under the agreements would not be an available remedy for any breach.

**Count 12: Recharacterization of the RDOC Payable as Equity.**

Plaintiff seeks, in the alternative, a declaration that any value that RDOC actually provided to Rich Global in exchange for the RDOC Payable should be characterized as an infusion of equity. Such a recharacterization is not relief available to Plaintiff.

**Count 13: Subordination of 2009 RG Management Agreement.**

Plaintiff seeks judgment subordinating Proof of Claim No. 2 (RDOC's claim) to the Learning Annex claim. Proof of Claim No. 2 should not be subordinated. To the extent this claim is asserted against CTI as well as against RDOC, there is no basis for holding CTI (which has filed no proof of claim) liable.

**Count 14: Fraudulent Transfer — BI Capital Transfers.**

Plaintiff primarily seeks to avoid certain transfers as fraudulent transfers and recover the transfers or the value thereof from BI Capital and the Kiyosakis. The transfers were not fraudulent and should not be avoided.

**Count 15:** Dismissed by Order dated September 26, 2018 (Doc. No. 156).

**Count 16:** Dismissed by Order dated September 26, 2018 (Doc. No. 156).

**Count 17: Fraudulent Transfer — RDOC Transfers.**

Plaintiff primarily seeks to avoid certain transfers as fraudulent transfers and recover the transfers or the value thereof from RDOC and the Kiyosakis. The transfers were not fraudulent and should not be avoided.

**Count 18:** Dismissed by Order Granting Defendants' Motion for Partial Summary Judgment dated November 27, 2018 (Doc. No. 177).

**Count 19: Breach of Warranty — 2009 RG Management Agreement.**

Plaintiff contends that the RDOC Transfers were made in breach of the warranty provision contained in the 2009 RG Management Agreement and seeks to recover the value of the transfers. Such relief is not available because RDOC did not breach any warranty and, *inter alia*, Rich Global and all of its members consented to the acts alleged to be a breach.

**Count 20: Disallowance of RDOC's Proof of Claim.**

Plaintiff seeks disallowance of Proof of Claim No. 2, filed by RDOC, pursuant to 11 U.S.C. §§ 502(b) and 502(d). Proof of Claim No. 2 should not be disallowed.

**Count 21: Fraudulent Transfer — CTI Transfers.**

Plaintiff primarily seeks to avoid certain transfers as fraudulent transfers. The transfers were not fraudulent and should not be avoided.

**Count 22: Breach of Warranty — 2009 RG Licensing Agreement.**

Plaintiff contends that the CTI Transfers were made in breach of the warranty provision contained in the 2009 RG Licensing Agreement and seeks to recover the value of the transfers. Such relief is not available because CTI did not breach any warranty and, *inter alia*, Rich Global and all of its members consented to the acts alleged to be a breach.

**Count 23: Preferential Transfer — CTI Setoff**

Plaintiff seeks to avoid and recover funds involved in a certain setoff transaction, which she attempts to characterize as a transfer. The so-called transfer was not a transfer, and it should not be avoided or recovered.

**Count 24: Fraudulent Transfer — CTI Setoff.**

Plaintiff seeks a determination that a certain setoff transaction, which she attempts to characterize as a transfer, was a fraudulent transfer and seeks to recover the value of the transfer. The so-called transfer was not a transfer, was not fraudulent, and should not be avoided or recovered.

**Count 25: Account Receivable.**

Plaintiff recalculates the amount due on a loan based on adjusted loan amounts that would be caused by success in her other claims. The recalculation should not occur because Defendants should succeed on the other claims.

**Count 26: Fraudulent Transfer — Kiyosaki Transfers.**

Plaintiff primarily seeks to avoid certain transfers as fraudulent transfers and recover the amounts of those transfers. The transfers were not fraudulent and should not be avoided.

**Count 27: Avoidance of Transfers to Subsequent Transferees.**

Plaintiff seeks to avoid all subsequent transfers of property that were the subject of an initial transfer that is avoided pursuant to any of Plaintiff's other claims for relief. The transfers were not fraudulent and should not be avoided. If any transfers are avoided, Plaintiff is limited to a single recovery.

C.      **Uncontroverted Facts.**

The parties agree that the following facts are true.

1.      Rich Global, a Wyoming LLC, filed a voluntary petition in bankruptcy under Chapter 7 of the Bankruptcy Code on August 20, 2012 ("Petition Date").

2.      Plaintiff is the Chapter 7 trustee of Rich Global's bankruptcy estate.

3.      Robert is a resident of the State of Arizona.

4.      Kim is a resident of the State of Arizona.

5.      CTI is a Nevada corporation.

6.      Pele-Kala is a Nevada corporation.

7.      BI Capital is a dissolved Nevada LLC.

8.      RDOC is a Nevada LLC.

9.      In 1997, Robert and Lechter released an educational book, *Rich Dad Poor Dad*.

10.     *Rich Dad Poor Dad* became a #1 best seller on *The New York Times* Best Seller List.

11.     Prior to September of 2008, the shareholders of CTI were (a) Kala Corporation, a Nevada corporation, wholly owned by Robert; (b) Pele Corporation, a Nevada corporation, wholly owned by Kim; and (c) Lechter.  Each owned 1/3 of the shares of CTI.

12.     On October 30, 2000, articles of organization for BI Capital were filed.

13.     Prior to September of 2008, Robert, Kim, and Lechter each owned 1/3 of the membership interests of BI Capital.

14.     Rich Global's Articles of Organization and Rich Global's Operating Agreement both provide that Rich Global would be member-managed.

15.     BI Capital sublicensed Rich Global to use certain intellectual property (the "Rich Dad IP") owned by CTI, which BI Capital had a license to use. The license and sublicense were terminable and nonexclusive.

16.     On January 6, 2006 Articles of Organization were filed for Rich Dad Education LLC ("RD Education" or "RDE"), a Wyoming LLC.

17.     On July 18, 2006, Rich Global and Whitney Information Network, Inc. (together with its affiliates and successors, "Whitney/Tigrent") entered into a *Limited Liability Company Agreement of Rich Dad Education* ("2006 RD Education Operating Agreement").

18.    Pursuant to the 2006 RD Education Operating Agreement, Rich Global and Whitney/Tigrent became 49% and 51% members of RDE, respectively.

19.    On July 18, 2006, Rich Global and RDE entered into a written *Licensing Agreement* ("2006 RD Education Licensing Agreement"), whereby Rich Global sublicensed to RDE certain of its rights to use the Rich Dad IP as licensee under Rich Global's license from BI Capital.

20.    In exchange for the sublicense, RDE agreed to pay Rich Global 10% of its gross revenues as a licensing fee.

21.    From March 1, 2007 through May 14, 2010, Rich Global received the following payments from RDE:

| Period | Amounts |
|--------|---------|
| 2007 | $10,241,314 |
| 2008 | $16,332,199 |
| 2009 | $14,043,331 |
| 2010 | $ 1,759,790 |
| Total | $42,376,634 |

22.    On July 23, 2007, Lechter resigned from all of her management positions with the Rich Dad entities effective as of July 23, 2007.

23.    On October 12, 2007, Lechter commenced a lawsuit in the District Court of Clark County, Nevada ("Lechter Lawsuit").

24.    On December 18, 2007, CTI and BI Capital executed the *Cashflow Technologies, Inc. – BI Capital, LLC Licensing and Management Agreement* ("2007 BI Capital Fee Agreement"), pursuant to which BI Capital agreed to pay CTI 25% of its gross income as an intellectual property licensing fee (for the rights to the terminable, nonexclusive Rich Dad IP licenses Rich Global needed to sublicense to RDE pursuant to the 2006 RD Education Licensing Agreement) and 70% of its gross income as a management fee.

25.    The 2007 BI Capital Fee Agreement was effective "*nunc pro tunc*" to December 29, 2006.

26.    On December 18, 2007, BI Capital and Rich Global executed the *BI Capital, LLC – Rich Global, LLC Licensing and Management Agreement* ("2007 RG Fee Agreement"), pursuant to which Rich Global agreed to pay BI Capital 25% of its gross income as a licensing fee (for the rights to the terminable, nonexclusive Rich Dad IP licenses Rich Global needed to sublicense to RDE pursuant to the 2006 RD Education Licensing Agreement) and 70% of its gross income as a management fee.

27.    The 2007 RG Fee Agreement was effective "*nunc pro tunc*" to April 20, 2007.

28.    In December of 2007, Rich Global's sole member was BI Capital.

15

29.     On February 24, 2008, Lechter filed a First Amended Complaint in the Lechter Lawsuit.

30.     On August 27, 2008, Lechter, the Kiyosakis, CTI, and others entered into a *Settlement Agreement and Mutual Release* ("Lechter Settlement Agreement").

31.     In the Lechter Settlement Agreement, the Kiyosakis agreed to acquire all Lechter's interests in the Rich Dad entities for $9 million. The parties also agreed that certain other payments would be made to Lechter and the Kiyosakis.

32.     Pursuant to the Lechter Settlement Agreement, Lechter's interest in CTI was redeemed by CTI and her direct/indirect interests in BI Capital and other Rich Dad entities were transferred, directly or indirectly, to the Kiyosakis.

33.     The Lechter Lawsuit was dismissed, with prejudice, on September 3, 2008.

34.     On December 29, 2008, Learning Annex filed a 19-claim lawsuit against Rich Global, CTI, Whitney/Tigrent, RDE, and others in the New York Supreme Court ("Learning Annex Lawsuit"). The lawsuit was served on Rich Global and CTI in April 2009. Rich Global and CTI first became aware of the Learning Annex Lawsuit in late January 2009.

35.     The defendants removed the Learning Annex Lawsuit to the U.S. District Court for the Southern District of New York ("SDNY").

36.     On October 13, 2010, Learning Annex dismissed all of its claims against Whitney/Tigrent and RDE in exchange for a settlement payment of $100,000 from Whitney/Tigrent.

37.     On January 26, 2011, the SDNY entered partial summary judgment in favor of the remaining defendants and against Learning Annex, dismissing all but three of the remaining claims asserted by Learning Annex.

38.     Among the dismissed claims was the breach of contract claim against Rich Global and CTI.

39.     The surviving claims included a quantum meruit claim against CTI and Rich Global.

40.     On July 13, 2011, the jury in the Learning Annex Lawsuit rendered a verdict in favor of Learning Annex and against CTI and Rich Global in the amount of $14,688,194 on the quantum meruit claim.

41.     On January 11, 2012, the SDNY granted judgment as a matter of law dismissing all claims against CTI and granted a new trial as to damages on the quantum meruit claim against Rich Global.

42.     The SDNY's dismissal of the claim against CTI was ultimately upheld by the Second Circuit Court of Appeals.

16

43.     On April 30, 2012, following the second trial on damages, the jury rendered a verdict in favor of Learning Annex and against Rich Global in the amount of $15,863,696.

44.     Following the second trial, Rich Global filed a motion for judgment as a matter of law or, in the alternative, for a new trial.

45.     On July 13, 2012, the SDNY denied Rich Global's motion.

46.     On July 17, 2012, the SDNY entered final judgment in favor of Learning Annex and against Rich Global in the amount of $15,863,696.00, along with interest from March 1, 2007 through July 16, 2012 in the amount of $7,824,261.21, for a total sum of $23,687,957.21 ("Learning Annex Judgment").

47.     On December 18, 2008, BI Capital (Rich Global's former parent) was formally dissolved.

48.     On December 24, 2008, BI Capital, RDOC, and Rich Global entered into an *Assignment of BI Capital, LLC – Rich Global, LLC Licensing and Management Agreement*, pursuant to which BI Capital assigned the 2007 RG Fee Agreement to RDOC.

49.     On December 24, 2008, BI Capital and CTI entered into the *Cashflow Technologies, Inc. – BI Capital LLC Restated Licensing and Management Agreement*.

50.     On December 16, 2008, Kala Corporation and Pele Corporation merged as Pele-Kala.

51.     As of December 16, 2008, the sole shareholder of CTI was Pele-Kala Corporation, which was wholly owned by the Kiyosakis.

52.     Effective on January 1, 2009, the *Cashflow Technologies, Inc. and Rich Global, LLC Licensing Agreement* ("2009 RG Licensing Agreement") was executed.

53.     Effective on January 1, 2009, the *Rich Dad Operating Company, LLC and Rich Global, LLC Management Agreement* ("2009 RG Management Agreement") was executed.

54.     On May 26, 2010, Rich Global, RDOC, Whitney/Tigrent, and RDE entered into a *Rich Dad Education, LLC Settlement Agreement and Release* ("2010 RDE Settlement Agreement" or "2010 RDE Settlement").

55.     Pursuant to the 2010 RDE Settlement Agreement, the 2006 RD Education Licensing Agreement was terminated.

56.     Pursuant to the 2010 RDE Settlement Agreement, Rich Global's 49% interest in RDE was redeemed by RDE.

57.     RDOC and Whitney/Tigrent executed the *Rich Dad Operating Company, LLC Licensing Agreement*, pursuant to which RDOC sublicensed the Rich Dad IP owned by CTI to Whitney/Tigrent, and Whitney/Tigrent agreed to pay licensing fees.

58.     Effective January 1, 2009, a payable owed by Rich Global to BI Capital for accrued licensing and management fees became payable to RDOC ("RDOC Payable").

59.     On May 30, 2012, Rich Global made book entries reflecting the sale of the Whitney/Tigrent Shares to RDOC for $77,400 in cash.

60.     Rich Global's petition was filed on August 20, 2012 at 11:50 A.M.

61.     Rich Global filed its *Statement of Financial Affairs* ("SOFA") and *Schedules of Assets and Liabilities* ("Schedules") with its petition on the Petition Date.

62.     The SOFA and Schedules were signed (electronically) by RDOC as manager of Rich Global.

63.     Mr. Michael Sullivan, acting in his capacity as Chief Executive Officer of RDOC, signed (electronically) for RDOC.

**D.      Contested Facts.**

**1.      Plaintiff's Separate Statement of Contested Facts.**

The Trustee believes that the following facts, among others, are contested by Defendants. Most of these facts were the subject of specific allegations in the First Amended Complaint (FAC) that were not admitted by the Defendants.

1.      Kim, Robert's wife, published Rich Woman and other financial educational books. (FAC ¶15)

2.      CTI was formed for the purpose of holding and managing the Rich Dad intellectual property rights.  (FAC ¶17)

3.      BI Capital was formed to hold certain of the Rich Dad intellectual property.  (FAC ¶20)

4.      Over the years, numerous other entities were formed by the Kiyosakis and Lechter to exploit the growing base of Rich Dad products, services, and intellectual properties.   The Kiyosakis and Lechter refer to these entities, together with CTI, BI Capital, and the Debtor, as "The Rich Dad Company."  (FAC ¶23)

5.      On August 3, 2006, BI Capital formed the Debtor, as a wholly-owned subsidiary, for the purpose of participating in a new educational seminar business with Whitney/Tigrent. (FAC ¶24)

6.      Learning Annex has been in business for more than 30 years.  Among other things, Learning Annex produces, markets, promotes, and conducts educational seminars, lectures, classes, workshops and expositions.  (FAC ¶31)

7.      Learning Annex began a relationship with the Kiyosakis in 2001, when Robert and Kim became featured speakers at Learning Annex expositions.  (FAC 33)

8.      On September 15, 2005, Lechter sent an email to William Zanker ("Zanker"), the principal owner and president of Learning Annex, authorizing Learning Annex "to develop and conduct free Rich Dad seminars with follow up courses in the United States and Canada." (FAC 35)

9.      Learning Annex introduced the Debtor and the Kiyosakis to Whitney/Tigrent. (FAC ¶¶36 and 37)

10.     Learning Annex and "The Rich Dad Organization" entered into a Memorandum of Understanding on September 7, 2005, in which the parties agreed to "develop and conduct the free seminar business with follow up fee based courses."  (FAC ¶37)

11.     On February 2, 2006, the Kiyosakis and Lechter sent an e-mail on behalf of "Robert, Kim and Sharon" to Zanker terminating their relationship with Learning Annex and copying Whitney/Tigrent.  In addition, the represented that "We are stopping our negotiations with . . . Russ Whitney."  (FAC ¶38)

12.     RDE was formed on January 9, 2006.  The original members of RDE were the Kiyosakis and Lechter.  On August 21, 2006, an amendment to RDE's Articles of Organization was filed changing the members to Whitney Information Network, Inc. (together with its affiliates and successors, "Whitney/Tigrent") and the Debtor.

13.     The Debtor's arrangement with Whitney/Tigrent was the very same arrangement conceived and designed by Learning Annex (i.e., a free seminar followed by a paid three-day program).  Likewise, the 10% royalty was the amount Learning Annex had suggested. (FAC ¶41)

14.     In late September 2006, Zanker saw a press release announcing that Rich Dad and Whitney/Tigrent had formed Rich Dad Education for the purpose of presenting seminars.

15.     In early October 2006, Zanker called Lechter and told her that she owed him money and that what the Kiyosakis and Lechter had done was "not fair."

16.     The Kiyosakis and Lechter refused to pay Learning Annex any money.  (FAC ¶44)

17.     In May of 2007, Zanker met with Mr. Whitney and demanded money in connection with the RDE arrangement.

18.     The second jury in the Learning Annex Lawsuit found (in 2012) that Learning Annex was entitled to compensation in the amount of 33% of the gross revenues the Debtor received from RD Education under the 2006 RD Education Licensing Agreement.  (FAC, ¶53)

19.     At the first trial (in 2011), the jury was instructed that, if it found in favor of Learning Annex, it must determine the date from which interest should begin running.  The first jury was specifically instructed:

That date should be the earliest ascertainable date on which the claim existed.  If you cannot ascertain that date with precision, the computation should be from the earliest time at which it may be said that damages were incurred.

(FAC ¶55)

20.     In its verdict, the first jury found that the date from which interest should be calculated on the damages awarded to Learning Annex for its *quantum meruit* claim was March 1, 2007.  The Learning Annex Judgment determined that commencing on March 1, 2007, the Debtor owed Learning Annex 33% of each dollar the Debtor received from RDE.  (FAC ¶¶56-58)

21.     Disputes developed between Lechter and Robert in 2005 and buyout negotiations took place in 2006 and 2007.  (FAC ¶¶60 and 61)

22.     In July 12 and 13, 2007, Lechter received Notices of Special Meetings of the members of the Rich Dad limited liability companies and of the shareholders of CTI.  (FAC ¶62)

23.     On October 12, 2007, Lechter commenced a lawsuit against the Kiyosakis, CTI, BI Capital, and the Debtor (and other Rich Dad entities) in the District Court of Clark County, Nevada ("Lechter Lawsuit").  (FAC ¶64)

24.     By the time the Lechter Lawsuit was commenced, the Kiyosakis were aware of the threatened claims of Learning Annex.  (FAC ¶65)

25.     On December 18, 2007, Kim executed the *Cashflow Technologies, Inc. – BI Capital, LLC Licensing and Management Agreement* ("2007 BI Capital Fee Agreement"), pursuant to which BI Capital agreed to pay CTI 25% of its gross income as an intellectual property licensing fee and an additional 70% of its gross income as a management fee, for a total of 95% of its gross income.  (FAC ¶68(a))

26.     On December 18, 2007, Kim executed the BI Capital, LLC – Rich Global, LLC Licensing and Management Agreement ("2007 RG Fee Agreement"), pursuant to which the Debtor agreed to pay BI Capital 25% of its gross income as a licensing fee and an additional 70% of its gross income as a management fee, for a total of 95% of its gross income.  Kim signed the 2007 RG Fee Agreement as "managing member" of the Debtor.  (FAC ¶68(b))

27.     Lechter was not timely notified of the execution of the 2007 BI Capital Fee Agreement of the 2007 RG Fee Agreement.  During late 2007 and early 2008, Lechter was denied access to the books and records of the Rich Dad entities.  (FAC ¶70)

28.     In January 17, 2008, Lechter requested access to the records of the *Rich Dad* entities, including "New contracts entered into in 2007 and 2008 by any of The Rich Dad Companies."  (FAC ¶71)

29.     On February 24, 2008, Lechter filed a First Amended Complaint, which referenced her January 17, 2008 request and noted that access had not yet been granted.  The First Amended Complaint added a claim for access to the books and records of CTI and BI Capital.  (FAC ¶72)

30.    On March 12, 2018, the 2007 BI Capital Fee Agreement and 2007 RG Fee Agreement were disclosed to Lechter.  (generally, FAC ¶73)

31.    On December 4, 2008, RDOC was organized under the laws of the State of Nevada.   The sole members of RDOC are the Kiyosakis.  (FAC ¶82(a))

32.    The Debtor became a wholly-owned subsidiary of RDOC in December of 2008. (FAC ¶82(b))

33.    In December, 2008, all assets and liabilities of BI Capital were transferred to and assumed by RDOC.   (FAC ¶82(d))

34.    Pursuant to the 2009 RG Licensing Agreement, the Debtor agreed to pay CTI 25% of its gross income as a licensing fee.  (FAC ¶82(g))

35.    Pursuant to the 2009 RG Management Agreement, the Debtor agreed to pay RDOC 40% of its gross income as a management fee. (FAC ¶82(g))

36.    Disputes arose between the Debtor and Whitney/Tigrent regarding accounting and management of RD Education in 2009 and 2010. In 2009 and 2010 the parties were renegotiating the structure of the free seminar business.  (FAC ¶84)

37.    Pursuant to the 2010 RDE Settlement Agreement, the 2006 RD Education Licensing Agreement was terminated, thus ending the Debtor's role as sub-licensor of the *Rich Dad* intellectual property.  (FAC ¶88(a))

38.    Pursuant to the 2010 RDE Settlement Agreement, the Debtor's 49% interest in RD Education was redeemed by RD Education, thus terminating the Debtor's ownership of an interest in RD Education.  (FAC ¶88(b))

39.    The Debtor's income stream from the free seminar business was transferred to RDOC through the 2010 RDE Settlement.   The Debtor's last recorded income from RDE was received on May 14, 2010.  (FAC ¶89)

40.    The Debtor's initial sole member, BI Capital, invested nothing in exchange for its membership interest in the Debtor.  (FAC ¶92)

41.     During 2006, the Debtor received no cash revenues.   During 2007, the Debtor's cash basis income was $10,318,512.  This sum consisted of $10,241,314 in license fees received from RD Education under the 2006 RD Education Licensing Agreement and $77,198 in interest the Debtor earned on its cash balances.  (FAC ¶¶93 and 95)

42.    The Kiyosakis controlled the Debtor's cash.  (FAC ¶97)

43.    In April 2007 the Debtor made cash payments to the Kiyosakis and Lechter in the amount of $175,000 each, for a total of $525,000.00.  Until December 2008, the Debtor's financial records continued to reflect "capital accounts" for each of the Kiyosakis and Lechter, with negative balances of $175,000, each, as a result of the April 2007 payments.  (FAC ¶98-99)

44.     On November 7, 2007, the Debtor wired $1 million to CTI for CTI's use in making a payment to Donald Trump.  The 2007 Trump Transfer was unrelated to the Debtor's business.  The 2007 Trump Transfer was recorded as a non-interest bearing "loan" from the Debtor to CTI.  (FAC ¶100)

45.     In December of 2007, the Debtor paid BI Capital a total of $9,285,319, in two transfers; one on December 27, 2007 and the other on December 31, 2007.  The sum of the payments did not conform to the terms of the 2007 RG Fee Agreement.  After its receipt of the December 2007 payments from the Debtor, BI Capital paid $9,029,618 to CTI before year-end 2007.  (FAC ¶¶101-102)

46.     During 2008, the Debtor's total cash basis income was $16,442,397.  This sum consisted of $16,332,199 in license fees received from RD Education under the 2006 RD Education Licensing Agreement and $110,198 in interest and dividends the Debtor earned on its cash balances and marketable securities.  (FAC ¶107)

47.     From January 1, 2008 through August 31, 2008, the Debtor recognized gross cash basis income of $12,298,583, comprised of $12,205,122 from RD Education and $93,461 in earned interest.  (FAC ¶109)

48.     The Debtor made no payments to BI Capital from January 1, 2008 through August 31, 2008.  (FAC ¶110)

49.     As of August 31, 2008, the Debtor's financial records reflected cash and marketable securities of $12,792,345 and a payable to BI Capital in the amount of $11,683,313 ("BI Capital Payable").  (FAC ¶112)

50.     A $50,000 check dated February 15, 2008 from RD Education payable to the Debtor was endorsed by the Debtor and deposited to CTI's bank account on March 14, 2008 ("RDE Check Transfer").  The 2008 RDE Check Transfer was never recorded in the Debtor's books.  (FAC ¶113)

51.     The Debtor's 2008 general ledger reflects that $10,104,813 was applied on September 3, 2008 to reduce the BI Capital Payable (which was then $11,683,313).  (FAC ¶121)

52.     CTI's general ledger reflects (a) a $9,000,000 reduction in its receivables from BI Capital, (b) a $5,400,000 loan to the Kiyosakis, and (c) a $3,600,000 entry for the redemption of Lechter's interest in CTI.  (FAC ¶122)

53.     BI Capital's general ledger reflects (a) a $10,104,813 reduction in its receivable from the Debtor (i.e., the BI Capital Payable) and (b) a $10,104,813 reduction in BI Capital's payables to CTI; all effective as of September 3, 2008.  (FAC ¶122)

54.     The Debtor's $10,104,813 reduction in the BI Capital Payable, along with a September 5, 2008 cash transfer from the Debtor, reduced the BI Capital Payable from $11,686,313, as of August 31, 2008, to $911,075 at the close of business on September 5, 2008.  (FAC ¶123)

55.     As of September 7, 2008, using then-available cash and marketable securities, the Debtor could have paid off the BI Capital Payable in full.  (FAC ¶124)

56.     By means of adjusting journal entries made effective as of December 31, 2008, the Debtor's September 3, 2008 payments of $10,104,813 were reclassified on the Debtor's general ledger, with corresponding reclassifications on the general ledgers of BI Capital and CTI.  The $10,104,813 was no longer treated as a reduction of the BI Capital Payable.  The $10,104,813 was treated as the sum of (a) a non-interest bearing short-term loan to CTI in the amount of $9,862,613 ("CTI Loan") and (b) a receivable from Goldpress Publishing, LLC, in the amount of $242,200 ("Goldpress Receivable").   As a result of the reclassification, the BI Capital Payable increased to $12,609,732 at the close of business on December 31, 2008. The Debtor never had any business dealings with Goldpress Publishing, LLC.  (FAC ¶¶125-128)

57.     On December 29, 2008, Kim authorized the Debtor to make a $1,600,000 non-interest bearing loan to CTI.  The $1,600,000 was added to the balance of the CTI Loan, bringing the 2008 year-end balance of the CTI Loan to $11,462,613.  (FAC ¶¶129-131)

58.     The Debtor's 2008 year-end balance of cash and marketable securities was $2,372,530. (FAC ¶138)

59.     During 2009, the Debtor's total cash basis income was $14,059,920.  This sum included $14,043,331 in license fees received from RD Education under the 2006 RD Education Licensing Agreement and $17,340 in interest the Debtor earned on its cash balances, offset by $751 in realized losses from the Debtor's marketable securities. (FAC ¶139)

60.     Effective on January 1, 2009, the Debtor stopped reporting monthly accruals of management fees to RDOC and licensing fees to CTI in the amounts of 40% and 25% of its gross income, respectively, pursuant to the 2009 RG Management Agreement and the 2009 RG Licensing Agreement.  (FAC ¶141)

61.     Throughout 2009, payments totaling $1,544,479 were made directly from the Debtor to the Kiyosakis and recorded as "member distributions" – yet again ignoring the fact that the Kiyosakis were not members of the Debtor.  A summary of these payments is as follows:

| Date | Amount |
|------|--------|
| 1/22/09 | $500,000 |
| 7/31/09 | $129,348 |
| 8/26/09 | $89,507 |
| 9/22/09 | $108,082 |
| 10/14/09 | $500,000 |
| 11/2/09 | $104,512 |
| 12/9/09 | $113,030 |
| Total | $1,544,479 |

(FAC ¶144)

62.     The January 22, 2009, payment of $500,000 to the Kiyosakis was for year-end bonuses.  All of these payments were reclassified as notes receivable from the Kiyosakis on the books of the Debtor during 2010.  (FAC ¶¶145 and 146)

63.     During April 2009, the Debtor wired a total of $2,718,250 to RDOC, in two transfers.  The RDOC Payable was reduced by this amount.  (FAC ¶147)

64.     On October 1, 2009 and December 2, 2009, the Debtor wired funds in the amounts of $200,000 and $50,000, respectively to Rich Dad's Cashflow Franchise ("Franchise") and recorded a non-interest bearing receivable from Franchise in the amount of $250,000. (FAC ¶148)

65.     During 2009, legal and related professional fees of $530,903 were paid by RDOC.  $530,903 was charged to the Debtor and added to the balance of the RDOC Payable.  (FAC ¶151)

66.     During 2009, the Debtor's obligation to RDOC for management fees pursuant to the 2009 RG Management Agreement totaled $5,468,063.   The Debtor's obligation for management fees in 2009 was recorded in a single entry on the Debtor's books on December 31, 2009 to increase the amount payable under the RDOC Payable by $5,468,063.  (FAC ¶¶152-153)

67.     Over the course of 2009, the Debtor transferred a total of $11,681,250 to RDOC.  This sum included the two transfers during April 2009 in the total amount of $2,718,250, which was used to pay the Kiyosakis' 2008 taxes.  (FAC ¶154)

68.     Over the course of 2009, the Debtor transferred a total of $11,681,250 to RDOC.  These payments were applied to reduce the amount payable under the RDOC Payable.  As a result of all these transactions, the balance of the RDOC Payable was reduced from $12,084,732 at December 31, 2008 to $6,402,447 at December 31, 2009.  (FAC ¶¶154-155)

69.     During 2009, the Debtor's obligation to CTI for licensing fees pursuant to the 2009 RG License Agreement totaled $3,417,539.  The Debtor's obligation for licensing fees in 2009 were recorded in a single entry of $3,417,539 on December 31, 2009.   This sum was subtracted from the CTI Loan.  (FAC ¶¶156-157)

70.     During 2009, the Debtor made payments to CTI of $1,336,000.  These payments were added to the balance of the CTI loan.  As of December 31, 2009, the balance of the CTI Loan (owed by CTI to the Debtor) was $9,371,009.   (FAC ¶¶158-159)

71.     In February 2010, payments totaling $201,874 were made directly from the Debtor to the Kiyosakis and recorded as member distributions ("2010 Kiyosaki Distributions").  The 2010 Kiyosaki Distributions were never reclassified.   (FAC ¶161)

72.     Between January and April of 2010, the Debtor transferred $250,000 to Franchise, increasing the balance of the non-interest bearing Franchise Receivable to $500,000. (FAC ¶162)

73.     As part of the 2008-2009 reorganization of the Rich Dad entities, the day-to-day management of the Rich Dad entities was assumed by RDOC, and the Kiyosakis determined that it was necessary to transfer the assets needed to support the day-to-day operations from CTI to RDOC.  In 2010, the Kiyosakis reduced the Debtor's net worth by means of a retroactive "sale"

of the Operational Assets by CTI to the Debtor and a "distribution" of the Operational Assets to RDOC. The transfer of the Operational Assets from CTI to RDOC was recorded on the books of CTI and RDOC on January 1, 2010. The value assigned to the Operational Assets was $3,358,920. (FAC ¶164-167)

74.     On March 31, 2010, the amount of the CTI Loan was reduced by $3,358,920 and the amount of the Debtor's "fixed assets" account was increased by $3,358,920. On March 31, 2010, the amount of the Debtor's fixed assets account was reduced by $3,358,920 and the Debtor's equity distributions account was increased by $3,358,920. (FAC ¶¶164-167)

75.     Although executed on May 26, 2010, the "effective date" of the 2010 RDE Settlement Agreement was March 16, 2010. (FAC ¶178)

76.     The Debtor had no employees and was operated by RDOC. No assets were actually transferred to the Debtor as part of this "sale." By making an equity "distribution" to RDOC, instead of causing RDOC to pay for the Operational Assets (by reducing the RDOC payable), the Debtor's net worth was diminished by $3,358,920. (FAC ¶168-170)

77.     Pursuant to the 2010 RDE Settlement Agreement, the Debtor received (i) 9.9% of Whitney/Tigrent's outstanding common stock ("Whitney/Tigrent Shares") and (ii) a database of contacts ("Contacts Database"). The Debtor booked the value of the Whitney/Tigrent Shares at $200,694. The Contacts Database was never recorded on the Debtor's books. (FAC ¶174(a))

78.     Pursuant to the 2010 RDE Settlement Agreement, an escrow account at U.S. Bank. N.A. ("Escrow Account") was created into which Whitney/Tigrent was required to make regular deposits. Whitney/Tigrent made an initial deposit of funds into the Escrow Account in the amount of $1,904,469. From January 2019 through May 2010, the Debtor was owed unpaid licensing fees in the amount of $1,904,469. Prior to the 2010 RDE Settlement, the $1,904,469 in unpaid licensing fees had been recorded on the Debtor's books as a receivable. After the 2010 RDE Settlement was consummated, a journal entry was recorded on the Debtor's books to reverse the receivable. The $1,904,469 was eventually released from the Escrow Account to RDOC. (FAC ¶175-177)

79.     The 2010 RDE Settlement stripped the Debtor of all income-producing activities, its membership interest in RD Education, and the 2010 RDE Receivable. (FAC ¶180)

80.     In an October 17, 2011 letter sent to the SDNY, the Debtor's counsel falsely stated, "Tigrent agreed to redeem Rich Global's 49% interest in the joint venture [RD Education] for $3.5 million plus a 9.9% interest in Tigrent, in the form of Tigrent common stock". The Debtor's books and records contain no evidence of the Debtor's receipt of $3.5 million from Whitney/Tigrent. A $3.5 million receivable related to Whitney/Tigrent does appear on the books of RDOC. (FAC ¶183)

81.     The professional fees and associated costs for the Learning Annex lawsuit were for the benefit of both CTI and the Debtor. The Kiyosakis caused the Debtor to bear all of the legal and professional fees for the defense of both the Debtor and CTI in the Learning Annex Lawsuit. The professional fees and associated costs for the 2010 RDE Settlement were primarily for the benefit of RDOC, and certainly not for the benefit of the Debtor. (FAC ¶¶150 and 184-185)

25

82.     On December 15, 2010, the Debtor transferred $500,000 to Overlook Apartments ("2010 Overlook Transfer"). The 2010 Overlook Transfer was initially recorded on the books of the Debtor as a short term loan to Overlook Apartments. After the 2010 RDE Settlement and the corresponding loss of the Debtor's right to revenue from RD Education, the Debtor was out of business. After the 2010 RDE Settlement, it had no reason to make a loan to anyone. The Kiyosakis had a financial interest in the Overlook Apartments at the time, or as a result of, the $500,000 transfer. (FAC ¶¶ 187-190)

83.     On December 20, 2010, Kim caused the Debtor to transfer $476,300.00 in its securities account at Credit Suisse to RDOC ("2010 Credit Suisse Transfer"). (FAC ¶191) After making the 2010 Overlook Transfer and the 2010 Credit Suisse Transfer, totaling $976,300, the Debtor was left with $4,617 in its operating accounts and $16,877 in its marketable securities account. (FAC ¶193)

84.     Having been cut off from the seminar business as a result of the 2010 RDE Settlement, the Debtor's only source of income in 2011 was $77,224 of interest income recorded on the Kiyosaki Loans. Pursuant to the back-dated notes, the interest income from the Kiyosaki Loans was not paid to the Debtor in cash. Instead, it was accrued and recorded on the Debtor's books as interest receivable from the Kiyosakis. (FAC ¶194)

85.     During 2011, the Debtor was charged with legal and professional fees of more than $1.1 million even through CTI remained a party to the Learning Annex Lawsuit throughout the entirety of 2011. To pay these fees, cash transfers totaling $1,065,000 were made by CTI to the Debtor during 2011. These amounts were applied to reduce the amount of the CTI Loan. (FAC ¶201-202)

86.     Between April and August of 2011, CTI made cash transfers to RDOC totaling $600,000. The Debtor recorded the $600,000 transfers from CTI to RDOC as a $600,000 reduction of the CTI Loan and a $600,000 reduction of the RDOC Payable. The balance of the CTI Loan decreased from $5,864,157 at December 31, 2010 to $4,199,157 at December 31, 2011.  (FAC ¶¶203-204)

87.     During 2011, RDOC made cash advances of $54,967 to the Debtor, which funds were used by the Debtor for legal and professional fees in defense of the Learning Annex Lawsuit. (FAC ¶205)

88.     In 2012, aside from defending lawsuits, the Debtor's principal activities consisted of transferring assets in preparation of a bankruptcy filing. (FAC ¶210)

89.     On May 30, 2012, the Debtor made book entries reflecting the sale of the Whitney/Tigrent Shares to RDOC for $77,400 in cash. The sale resulted in a $123,294 loss to the Debtor. (FAC ¶212)

90.     During 2012, the Debtor recorded expenses of $2,724,095 for legal and professional fees in defense of the Learning Annex Lawsuit and the Crewe Lawsuit. In order to fund the legal fees, the Debtor obtained $2,727,200 from CTI in partial repayment of the CTI Loan. CTI made the payments totaling $2,727,200 between January and June of 2012. (FAC ¶¶213-215)

91.     Following receipt of these cash payments from CTI, the balance of the CTI Loan reflected on the Debtors books and records was reduced from $4,199,157 at December 31, 2011 to $1,471,957 at June 30, 2012. (FAC ¶216)

92.     On August 13, 2012, a "Trial Balance Summary for 2012" ("August 13 Trial Balance") was generated.  The August 13 Trial Balance reflected that the following assets and liabilities (among others) remained on the Debtor's books:

| Description | Assets | Liabilities |
|---|---|---|
| CTI Loan | $1,471,956.75 | |
| Franchise Receivable | $481,650.42 | |
| Goldpress Receivable | $242,200.00 | |
| Prepaid Legal Fees | $261,500.27 | |
| RDOC Payable | | $3,919,373.98 |

(FAC ¶217-218)

93.     Through a series of book entries, all of the assets listed in the August 13 Trial Balance vanished between August 13, 2014 and the Petition Date, August 20, 2014.  (FAC ¶219)

94.     The Debtor's records reflect that on August 20, 2012 at 9:42 A.M. the Debtor assigned the Goldpress Receivable to RDOC in consideration for a $242,200 reduction of the RDOC Payable ("2012 Goldpress Receivable Transfer").   The 2012 Goldpress Receivable Transfer was recorded as if it had occurred on July 31, 2012.  As a result of the 2012 Goldpress Receivable Transfer, the balance of the RDOC Payable was reduced to $3,677,174.  (FAC ¶222, 220, 221)

95.     On August 20, 2012, at 9:51 A.M., RDOC sold $1,471,956.75 of the RDOC Payable to CTI for the sum of $197,590.97, which was 13.424% of $1,471,956.75.  Handwritten notes of the Rich Dad accounting staff reflect that the 13.424% payment was justified based on RDOC's anticipated share of dividends in the anticipated bankruptcy case – i.e. $3,677,174 was 13.424% of the total anticipated claims of $27,393,161.86 (which included the claims of RDOC, Learning Annex, and two law firms). (FAC ¶223-224)

96.     Immediately after the sale of debt by RDOC to CTI, but just before the 11:50 A.M. filing of the petition, CTI offset the newly "purchased" $1,471,956.75 debt against the outstanding $1,471,956.75 balance of the CTI Loan, bringing the balance to $0.00.  (FAC ¶225)

97.     Immediately before the petition was filed, the Debtor wrote off the $481,650 balance of the Franchise Receivable.  The handwritten notes that accompany this write-off indicate that the receivable would only be written off on the Debtor's books.  At the beginning of 2012, Franchise owed funds to both CTI and RDOC.  Neither CTI nor RDOC wrote off any of their Franchise receivables during 2012, per their respective general ledgers.  (FAC ¶226)

98.     On June 28, 2012, the Debtor paid $350,000 by wire transfer to the New York law firm, Paul, Weiss, Rifkind, Wharton, & Garrison LLP.  Through a journal entry dated July 31, 2012, the Debtor reclassified the $350,000 payment as a "prepaid expense".  The Debtor initially

recorded the Paul Weiss payment as "legal expense."  The Debtor reversed its reclassification through a second journal entry, also dated as of July 31, 2012.  The second journal entry reclassified the $350,000 retainer payment as "legal expense" thus removing an asset from the Estate.  (FAC ¶¶227-229)

99.     On behalf of the Debtor, RDOC failed to disclose the following transfers of property of the Debtor (among others):

        a.     The December 15, 2010 transfer of $500,000 to Overlook Apartments.

        b.     The December 20, 2010 transfer of $476,300 from the Credit Suisse account to RDOC (i.e., the 2010 Credit Suisse Transfer).

        c.     The May 30, 2012 sale of Whitney/Tigrent Shares to RDOC for $77,000.

        d.     The June 28, 2012 payment of $350,000 to Paul Weiss.

        e.     The August 20, 2012 sale of the $242,200 Goldpress Receivable to RDOC.

(FAC ¶231)

100.     On behalf of the Debtor, RDOC failed to disclose the $1,471,856.75 setoff by CTI on August 20, 2012.  (FAC 232)

101.     The Debtor failed to disclose the following assets on its Schedule B:

        a.     The $350,000 retainer held by Paul Weiss.

        b.     The $481,850.42 Franchise Receivable.

        c.     The Contacts Database.

(FAC ¶233)

102.     At all pertinent times prior to the Petition Date, the Kiyosakis had complete dominion and control over Pele-Kala Corporation, CTI, BI Capital, RDOC, and the Debtor.  Since they were commonly controlled by the Kiyosakis, Pele-Kala Corporation, CTI, BI Capital, and RDOC, themselves, had complete dominion and control over the Debtor.  (FAC ¶235-236)

103.     Until the Trustee was appointed, the Debtor had no member or manager other than the one of the entities identified as Defendants in this lawsuit.  (FAC ¶239)

104.     Defendants are all insiders of the Debtor.  (FAC ¶248)

105.     At numerous times the Kiyosakis held themselves out as the sole members of the Debtor.  One or both of the Kiyosakis occasionally signed transactional documents as "members" of the Debtor.   In addition, the Kiyosakis received monetary distributions directly from the Debtor

as "members" of the Debtor.  The Kiyosakis ultimately controlled how all of the Debtor's transactions were characterized in the Debtor's books and records.  (FAC ¶250)

106.    Transactions were frequently characterized in a manner that personally benefitted the Kiyosakis, but did not reflect the true economic reality of the transactions and were not in the best interests of the Debtor or its creditors.  The Kiyosakis recharacterized transactions after the fact, sometimes months or years after the transactions were originally booked.  (FAC ¶250)

107.    The Kiyosakis ultimately had complete managerial control over CTI, BI Capital, RDOC, and the Debtor.  The Debtor sometimes had other management personnel, but such personnel were not independent of the Kiyosakis.  (FAC ¶250)

108.    The Kiyosakis caused the Debtor to act for their sole benefit.  (FAC ¶250)

109.    The Debtor's purpose was to serve as a passive conduit of funds received from RDE.  Neither BI Capital nor RDOC contributed any capital to the Debtor.  (FAC ¶250)

110.    The Debtor's assets consisted solely of a license of Rich Dad intellectual property, along with funds and other assets passively generated from the Debtor's sublicense of the intellectual property to RD Education.   (FAC ¶250)

111.    The Kiyosakis caused the Debtor to pay the personal obligations of the Kiyosakis.  (FAC ¶250)

112.    The Kiyosakis directed the Debtor to make transfers with little or no consideration.  (FAC ¶250)

113.    The Debtor never made any payments to Learning Annex, and it never set aside any reserves to satisfy Learning Annex's claim.  (FAC ¶250(i))

114.    RDOC operated at the same physical location as the Debtor. (FAC ¶257)

115.    Each of Defendants were officers, managers, and/or controlling members of Debtor, or were closely affiliated with and/or controlled entities that directly or indirectly owned the Debtor during the times and events for which claims arise herein.  (FAC ¶264)

116.    The 2007 RG Fee Agreement Obligations were incurred after the Debtor had been sued by Lechter and threatened with suit by Learning Annex.  (FAC ¶276)

117.    The 2007 RG Fee Agreement Obligations were incurred to require the transfer to BI Capital and RDOC of substantially all of the Debtor's assets, as it required the transfer of 95% of Debtor's gross income.  (FAC ¶277)

2.      **Defendants' Separate Statement of Facts.**

1.      In the mid-1990s, the Kiyosakis, to share their theories of using investment to develop self-sustaining cash flow, created a board game — named CA$HFLOW® — that allowed players an opportunity to simulate investment decision-making in a no-risk manner. An intellectual property attorney, Michael Lechter (Lechter's husband), patented the design and execution of the teaching methods embodied in the game for Robert.

2.      While creating the game, Robert spent considerable time writing various investment stories and lessons he had learned over the course of his life from a friend's father, whom he referred to as his "rich dad." Robert's stories contrasted the financial lessons he learned from his own father, referred to as his "poor dad." With Lechter's editing assistance, these stories became Robert's worldwide bestseller *Rich Dad, Poor Dad*.

3.      *Rich Dad, Poor Dad* was published by Michael Lechter's publishing company and debuted on the New York Times Bestseller list in 1999, a rare feat for a self-published book.

4.      This led to Robert appearing on the Oprah Winfrey show in 2000, which in turn led to a major publishing house picking up *Rich Dad, Poor Dad* and subsequent writings by Robert.

5.      Due to the success of the Rich Dad brand and pursuant to a common business practice, the Kiyosakis and Lechter formed multiple entities to manage the massive revenue growth and to keep intellectual property assets (the "Rich Dad IP") separate from business operations.

6.      Maintaining separate legal entities for separate business products and services isolates cash flow and profit centers. The creation of multiple entities also fulfills tax-planning objectives and offers "pass-through" taxation treatment.

7.      One such entity, CTI, was formed in 1997 to promote the CA$HFLOW® board game and the *Rich Dad, Poor Dad* book. Since its creation, CTI has owned all of the Rich Dad IP and has been in the business of developing and selling financial education products, including board games, books, audio tapes, video tapes, online educational media, personal coaching, public speaking, and events and seminars.

8.      Another such company, BI Capital, was formed in October 2000 primarily for the purpose of managing royalty payments to authors of the "Rich Dad's Advisors" series of books and managing the Rich Dad-branded educational activities.

9.      CTI and BI Capital entered into a licensing agreement through which CTI granted BI Capital a license to use the Rich Dad IP in consideration for a royalty of 10% of BI Capital's gross income from use of the Rich Dad IP.

10.      Other Rich Dad entities, such as Rich Global, RDE, and RDOC, were created for similar specific business purposes.

11.      For the most part, the Rich Dad entities were originally owned (directly or indirectly) in 1/3 shares by Robert, Kim, and Lechter.

12.     From the 1990s until her resignation in 2007, Lechter managed and operated all of the Rich Dad entities on a day-to-day basis.

13.     The Kiyosakis served as the face of the Rich Dad brand and collectively had almost no involvement in the operations of the Rich Dad entities.

14.     The "Rich Dad Company" is merely an informal trade name occasionally used for entities owned directly or indirectly by the Kiyosakis (and, formerly, by Lechter). There is no such entity as the "Rich Dad Company."

15.     Learning Annex, which produced and promoted educational seminars and related activities, began a relationship with the Kiyosakis in 2000, when they were featured speakers at Learning Annex promotional real estate and wealth "expos."

16.     Beginning in 2005, in the hopes of expanding the "Rich Dad" brand, CTI began discussing a possible arrangement with third parties, including Learning Annex and Whitney/Tigrent, whereby they would found and operate a new educational seminar business.

17.     In pursuit of this potential expansion, Learning Annex and CTI entered into a Memorandum of Understanding dated September 7, 2005 (the "MOU") in which the parties agreed to "develop and conduct the free seminar business with follow up fee based courses."

18.     The MOU expressly stated that it was "not a binding legal obligation," and that a "legally binding agreement" would be required before either party were bound to the other.

19.     The enterprise between Learning Annex and CTI did not advance as anticipated.

20.     The Kiyosakis and CTI's CEO, Lechter, developed distrust of and lack of confidentiality in Learning Annex's president, Zanker, and decided to no longer proceed with Learning Annex.

21.     On February 2, 2006, Lechter terminated the MOU and the Rich Dad entities' relationship with Learning Annex in an email stating, in part, "Everything is off. We no longer want to be in business with you."

22.     Learning Annex acknowledged that the relationship was ended and that it was not entitled to any compensation for any role it had performed related to the free seminar business.

23.     In a February 14, 2006 email from Learning Annex, Zanker stated, "Learning Annex and Bill Zanker will accept whatever you deem appropriate, if anything, at your discretion for the introduction of Russ Whitney or [Whitney/Tigrent] to the Rich Dad organization."

24.     Later, the Kiyosakis and Lechter pursued the free seminar business with Whitney/Tigrent.

25.     Between Lechter's February 2, 2006 email terminating the Rich Dad/Learning Annex relationship and the filing of the Learning Annex Lawsuit in December 2008, neither Zanker nor Learning Annex made oral or written demands for payment to Lechter, the Kiyosakis,

or the Rich Dad entities (other than, to the extent it was a "demand," the February 14, 2006 email asking for "whatever you deem appropriate, if anything, at your discretion").

26.     Zanker attended events with Lechter and the Kiyosakis between the February 2, 2006 email and the filing of the Learning Annex Lawsuit but did not make any demands for payment or discuss the Rich Dad and Whitney/Tigrent deal.

27.     RDE was formed to present financial education seminars based on the Rich Dad philosophy and principles, using the Whitney/Tigrent "free seminar" business model.

28.     Under that approach, students were recruited through initial free educational programs. At those programs, the students were encouraged to register for a second three-day seminar, followed by more advanced training.

29.     The Kiyosakis' decision to further expand the Rich Dad brand and enter the free seminar business created the need for a new Rich Dad entity.

30.     Lechter made the decision to form Rich Global for the purpose of acting as the business partner to Whitney/Tigrent, and she determined that BI Capital would be its sole member.

31.     Under the Rich Dad Education, LLC Limited Liability Company Agreement by and between Rich Global and Whitney/Tigrent, dated July 18, 2006, RDE's profits were split between Whitney/Tigrent and Rich Global, 51% and 49%, respectively.

32.     Rich Global licensed to RDE the Rich Dad IP trademarks, expertise, customer lists, etc. for use in RDE's business. In return, Rich Global was entitled to a royalty in the amount of 10% of RDE's gross revenue.

33.     Whitney/Tigrent licensed to RDE its trademarks, expertise, customer lists, etc. for use in RDE's business. In return, Whitney/Tigrent was entitled to a royalty of 10% of RDE's gross revenue.

34.     Whitney/Tigrent operated and managed RDE, using Whitney/Tigrent's personnel, facilities, administrative functions, etc. In return for acting as manager of RDE, Whitney/Tigrent was entitled to monthly reimbursements of actual expenses, plus an administrative fee equal to 15% of RDE's net revenue.

35.     In 2007, Lechter sought to have the Kiyosakis buy her interests in the Rich Dad companies and resigned from her role in managing CTI and the other Rich Dad entities.

36.     After negotiations failed to produce an acceptable resolution, Lechter filed the Lechter Lawsuit against the Kiyosakis and, "as nominal defendants, solely in a derivative capacity," CTI, BI Capital, and Rich Global (and other Rich Dad entities).

37.     In the Lechter Settlement Agreement, which settled the Lechter Lawsuit, the parties indemnified each other for certain specified claims. The Lechter Settlement Agreement made no provision for payment or indemnification of any claim by Zanker or Learning Annex, nor was such a provision even contemplated.

38.     On September 3, 2008, in connection with the Lechter Settlement Agreement, Rich Global: wired $9,000,000 to Lechter, wired $755,615 to Lechter, and transferred $349,198 to Robert (the "Lechter Settlement Payments").

39.     The Lechter Settlement Payments were originally recorded as a reduction in accounts payable from BI Capital. After an audit, the Lechter Settlement Payments were reclassified at 2008 year end as a $242,200 receivable from Goldpress and a $9,862,613 loan to CTI. The loan to CTI was later reclassified as an intercompany receivable. This receivable was reflected in the audited Consolidated Financial Report of Cashflow Technologies, Inc. and Related Entities as of December 31, 2008.

40.     Due to the establishment of a receivable, the total asset value of Rich Global was unchanged by these transactions. The entire value of the receivable was ultimately either collected or offset against a payable. Therefore, reasonably equivalent value was received.

41.     Throughout the entirety of the dispute with Lechter, from her resignation through settlement, Lechter was an owner (directly or indirectly) of the Rich Dad entities.

42.     Lechter was never a creditor of Rich Global.

43.     After Lechter's resignation, the Kiyosakis relied on attorneys and accountants to manage day-to-day operation of the Rich Dad entities.

44.     In late 2008, after the Kiyosakis consolidated control over the Rich Dad entities through the Lechter settlement, and based on expert legal and accounting advice, the Kiyosakis authorized a restructuring of the entities to resolve several issues: address lingering tax liabilities, simplify the entities' structures for easier management and accounting, and completely separate the Rich Dad entities from the Kiyosakis' personal assets.

45.     Prior to the restructuring, CTI was subject to double taxation, which is generally considered tax inefficient. A key consideration for this restructuring was changing CTI's status from a Subchapter C corporation to a Subchapter S corporation, thereby eliminating the double taxation of CTI's profits.

46.     The initial phase of the restructuring consisted primarily of merging Kala Corporation and Pele Corporation into a single entity (Pele-Kala) to create a single shareholder for CTI. The merger permitted CTI to make a qualified subsidiary ("Q-Sub") election to change its tax status from a Subchapter C corporation to a Subchapter S corporation.

47.     The restructuring also saw the dissolution of several LLCs that served no purpose and that had existed primarily to distribute cash out of CTI into pass-through LLCs to avoid double taxation. With the CTI Q-Sub election, the double taxation concerns no longer applied. There was no need to create multiple LLCs to distribute cash from the former C-corporation and into the pass-through entities.

48.     Another important tax consideration was to avoid the potential loss of the "Bush tax cuts" rate of 15% for dividends as a result of the 2008 presidential election by issuing all dividends while the lower tax rates were still in effect.

49.     Another reason for the restructuring was to clean up a variety of promissory notes owed by the Kiyosakis to various Rich Dad entities, as well as various intercompany promissory notes owed among Rich Dad entities. Such notes are common in closely held companies. These notes existed in part to memorialize cash transfers to the Kiyosakis, including those used to fund the Lechter Settlement Payments.

50.     As with the entity changes, the principle motivations for resolving the notes were ease of administration, eliminating unnecessarily complex transactions, and minimizing the tax consequences. The promissory notes were resolved by offsetting the amounts due with dividends or distributions from the payee entity.

51.     Through the 2009 restructuring, CTI was converted to an intellectual property holding company. RDOC was created to take its place as the operating company.

52.     According to the Accounting Personnel and Entity Timeline created by Neil Dubé, an attorney for CTI, RDOC was formed in December of 2008 and was "created to act as the operating entity for the Rich Dad enterprise and to consolidate various lines of business back into a single entity for ease of management and administration."

53.     RDOC was substituted for BI Capital (which was dissolved as part of the restructuring) as Rich Global's sole member.

54.     Although the Kiyosakis approved the restructuring of the Rich Dad entities, they relied on the analysis and recommendations of their attorney/accountants for all operations decisions.

55.     Without any notice or prior demand, on December 29, 2008, Learning Annex filed the 19-claim Learning Annex Lawsuit.

56.     Before learning of the Learning Annex Lawsuit in late January 2009, Rich Global, CTI, the Kiyosakis, and Lechter had no idea that Learning Annex or Zanker was asserting a claim against, or a right to payment from, Rich Global.

57.     In the Learning Annex Lawsuit, Learning Annex claimed that Rich Global's arrangement with Whitney/Tigrent (i.e., RDE) was the same arrangement conceived and designed by Learning Annex (i.e., a free seminar followed by a paid three-day program).

58.     The United States District Court for the Southern District of New York entered summary judgment dismissing all but three of Learning Annex's claims, including its contractual theory, finding that there was no contract between the parties.

59.     No finding ever indicated that the 33% figure ultimately used to calculate the quantum meruit damages against Rich Global was a discrete "obligation" or had been agreed to by any party.

60.     During the Learning Annex Lawsuit, the Kiyosakis and the Rich Dad entities, as well as their attorneys, believed that Learning Annex's claim against Rich Global had no serious merit and would result in no liability.

61.     Rich Global's partner in the joint venture, Whitney/Tigrent, settled Learning Annex's claims against it and RDE for a mere $100,000.

62.     The consolidated financial statements of CTI and the Rich Dad entities for 2006, 2007, and 2008 were audited by McGladrey & Pullen, LLP, certified public accountants, in 2009.

63.     The auditors' note respecting the Learning Annex Lawsuit recites that, as of September 2, 2009, Whiteny/Tigrent, RDE, Rich Global, and CTI "believe the lawsuit is without merit . . . ."

64.     On June 28, 2012, Rich Global paid $350,000 by wire transfer to the New York law firm Paul, Weiss, Rifkind, Wharton, & Garrison LLP as a retainer for Rich Global's anticipated appeal of the Learning Annex Judgment. Through a journal entry dated July 31, 2012, Rich Global classified the $350,000 payment as a prepaid expense.

65.     In 2009, Rich Global's operating partner in RDE, Whitney/Tigrent was facing potentially catastrophic financial issues that could have exposed Rich Global and the Rich Dad brand to substantial liabilities if Whitney/Tigrent failed. As a consequence, the RDE relationship was restructured.

66.     The free seminar business is operated as follows:

•     In the "free preview" or "introductory" seminar, 10% to 25% of the time is dedicated to educating the attendees and the remainder is spent attempting to sell the attendees other seminars that frequently run for a three-day period ("Basic Classes").

•     During the three-day Basic Classes, approximately 30% to 40% of the time is spent on education and the remainder is dedicated to informing the attendees of the benefits of obtaining more intensive training (the "Advanced Classes").

67.     From an accounting perspective, the seminar business is burdened by a concept known as "Deferred Revenue." Deferred Revenue is the cash actually received for Advanced Classes that were sold but have not yet been earned, because the student has not taken the class.

68.     Although Deferred Revenue is booked as an asset, it is intended to show the amount of revenue that is not recognized until the earlier of: (1) the student attends the class; (2) the student is provided with an agreed-upon alternative instruction method related to class attendance, e.g., a DVD or webinar (items 1 and 2 are collectively referred to as "Student Fulfillment"); or (3) the term during which the student is allowed to complete the classes has expired (item 3 is generally referred to as "Breakage").

69.     Even though a prospective seminar attendee may have paid for coursework, he or she may not actually ever complete the class. The effect of this tendency is that the seminar company must not only sell the seminar itself, but must also sell it a second time for the attendee actually to take the class.

70.     When Russell Whitney (founder of Whitney/Tigrent) was ousted from Whitney/Tigrent, the company faced many significant issues, including more than $10 million in

credit card "holdbacks" related to the lack of RDE seminar Student Fulfillment and more than $90 million in Deferred Revenue.

71.     The difficulties facing Whitney/Tigrent were reflected in its SEC Form 10-Q filings in 2010. In the 10-Q filing for the period ending June 30, 2010, Whitney/Tigrent issued a warning that it had "insufficient working capital to meet operating needs, raising substantial doubt about the ability of the Company to continue as a going concern."

72.     If Whitney/Tigrent had failed, the negative impact upon the Rich Dad brand would have been disastrous. Whitney/Tigrent's failure would have led to the collapse of the RDE enterprise. With the associated bad publicity, the Kiyosakis could have been portrayed as irresponsible or, worse, dishonest. With that would have followed a complete loss of consumer trust in RDE and the Rich Dad-branded organizations. Seminar and product sales would then likely have plummeted and the Rich Dad brand equity would have suffered long-term damage.

73.     To avoid the dire consequences of an RDE/Tigrent failure, on May 26, 2010, RDE, Rich Global, RDOC, and Whitney/Tigrent entered into a settlement agreement and series of other agreements restructuring their relationship. The goal of these agreements was to ensure Whitney/Tigrent's viability as a continuing operation and to provide student fulfillment for the approximately $90 million in Deferred Revenue.

74.     The Rich Dad entities did not have the infrastructure to service these obligations and needed Whitney/Tigrent to fulfill the services.

75.     The 2010 Reorganization (signed May 26, 2010 but effective March 16, 2010) ("2010 RDE Settlement Agreement") redeemed Rich Global's interest in RDE and dissolved RDE (Rich Global's only revenue stream).

76.     Pursuant to the 2010 RDE Settlement Agreement, Rich Global obtained (i) 9.9% of Whitney/Tigrent's outstanding common stock and (ii) a database of valuable customer/client contacts.

77.     The 2010 Reorganization resulted in RDOC having a direct relationship with Whitney/Tigrent in accordance with the overall concept of simplification wherever possible.

78.     RDOC then executed agreements to sublicense the Rich Dad IP directly to Whitney/Tigrent and to take over the Rich Dad side of the RDE free seminar business ("2010 Whitney/Tigrent Licensing Agreement" and "2010 Whitney/Tigrent Cooperation Agreement").

79.     The 2010 Reorganization did not involve any transfer of assets from Rich Global to RDOC.

80.     RDOC never agreed to assume Rich Global's debts.

81.     RDOC and Rich Global did not merge or consolidate, and RDOC is not a mere continuation of Rich Global.

82.     Rich Global was not dissolved following the 2010 Reorganization.

83.     The monetary motivations of the 2010 Reorganization were the economic reality that RDE was unable to generate a profit and the fact that Whitney/Tigrent was in financial distress.

84.     From the inception of each Rich Dad entity, corporate formalities were substantially maintained at all relevant times by independent outside managers of the Rich Dad entities and the legal, accounting, and other professionals employed by these companies.

85.     Intercompany loans were based on reasonable market terms and were fully documented.

86.     The corporate and financial records, as well as bank accounts, of the Rich Dad entities were maintained separately and properly, and all required tax filings were made.

87.     All of the Rich Dad entities maintained separate bank accounts, general ledgers, and receivables, which were tracked through each entity's own books and records.

88.     Kim was only ever minimally involved in running the Rich Dad entities, Robert was completely uninvolved other than the occasional high-level decision, and the Kiyosakis turned their businesses over to others to manage and control on a day-to-day basis.

89.     BI Capital paid a management fee to CTI and maintained its separateness from all other Rich Dad entities.

90.     RDOC manages its own business and makes distributions and loans to the Kiyosakis. All loans are properly segregated on the financial statements and accrue interest. RDOC maintains its own bank accounts, general ledger, and receivables, which it tracks through its own books and records.

91.     CTI originally had its own accounting department and employees. Subsequently, these services were provided through a management agreement with RDOC.

92.     Rich Global operated under an operating agreement and maintained its own bank and brokerage accounts, general ledger, and books and records.

93.     During the majority of its time in operation, Rich Global contracted with other entities to obtain management services for itself and licenses for the Rich Dad IP it needed to license to RDE.

94.     These agreements included: the 2007 RG Fee Agreement, the 2009 RG Management Agreement, and the 2009 RG Licensing Agreement. Rich Global agreed to pay BI Capital, RDOC, and CTI, respectively, certain sums in exchange for services and/or licenses.

95.     Specifically, the licensing provided was to pay for the rights to the terminable, nonexclusive Rich Dad IP licenses Rich Global needed to sublicense to RDE pursuant to the 2006 RD Education Licensing Agreement.

96.     The 2009 RG Management Agreement required Rich Global to pay a management fee, for the complete management of its business interests and operations, that was substantially reduced from the fee it had owed under the 2007 RG Fee Agreement.

97.     Reasonable value was given and received under all management and licensing fee agreements Rich Global entered.

98.     Rich Global's expenses were paid from its own revenue.

99.     This lawsuit alleges that certain transfers made and obligations incurred by Rich Global (collectively, the "Transactions") were fraudulent. The Transactions include, inter alia, the approximately $10.1 million total Lechter Settlement Payments, certain distributions and loans to the Kiyosakis and other entities (including a $1.6 million loan to CTI in December 2008), and payments (including $2.7 million that Plaintiff labels the "2009 Kiyosaki Tax Transfer") that were applied to reduce amounts owed to RDOC and CTI for unpaid licensing/management fees.

100.    None of the Transactions involved substantially all of Rich Global's assets.

101.    Rich Global did not retain post-transfer control of any transferred property.

102.    Rich Global never removed or concealed assets.

103.    Rich Global received reasonably equivalent value for all of the Transactions.

104.    In 2006 through 2008, the Rich Dad IP was licensed from the parent company, BI Capital. The license fees were set at a market rate.

105.    During the entirety of its existence (until Learning Annex acquired a judgment against it in July 2012), Rich Global never had a creditor or owed debt, other than the sums it paid to BI Capital, RDOC, and CTI under their respective licensing and/or management agreements.

106.    At no point, until the Learning Annex Judgment was entered, was there any question about Rich Global's ability to pay its bills as they became due.

107.    Rich Global's accounting records indicated that Rich Global was solvent prior to July 13, 2011, when the first jury in the Learning Annex Lawsuit returned a verdict against Rich Global. Rich Global and its member, RDOC, believed that Rich Global was solvent until that point, based on their belief that the Learning Annex Lawsuit was without merit and would not result in significant (if any) liability.

108.    Although occasionally accounting entries by Rich Global may have been temporarily misclassified, they were regularly corrected and properly characterized.

109.    For example, sums paid by Rich Global in April 2007 to its indirect members the Kiyosakis and Lechter were temporarily labeled "distributions" before being properly classified as loans to BI Capital (of which the Kiyosakis and Lechter were direct members).

110.    On January 22, 2009, Rich Global made payments to the Kiyosakis for year-end bonuses, which were reclassified as notes receivable from the Kiyosakis on the books of Rich Global during 2010.

111.    Deposition testimony by Lechter and by Neil Dubé confirmed that Rich Global's corporate formalities were observed.

112.    In August 2012, Rich Global assigned the $242,200 receivable from Goldpress to RDOC. According to internal notes on the transaction, this was done because Goldpress was dissolved in the 2008/2009 Reorganization and RDOC had absorbed all of its assets and liabilities.

113.    The receivable was moved as owed from one related party (Goldpress) to another related party (RDOC). The amount of the receivable was not changed, and reasonably equivalent value was received. In fact, as Goldpress had been dissolved years prior, Rich Global may have received more than reasonably equivalent value, as nothing could have been collected from Goldpress. The receivable was offset against a payable owed to RDOC, providing reasonably equivalent value.

114.    In August 2012, RDOC sold $1,471,957 of its receivable from Rich Global to CTI. After this sale, Rich Global had a receivable from CTI and a payable to CTI in the exact same amounts and these two accounts were offset. The transaction that led to this offset was the sale of the receivable by RDOC to CTI. However, Rich Global was not involved in this transaction and therefore had no expectation of reasonably equivalent value for the sale. The receivable was then offset against a payable owed to CTI, providing reasonably equivalent value.

115.    In April 2009, $2,718,250 was transferred directly to the Kiyosakis. The accounting entry was a reduction in the RDOC intercompany payable. The related party payable relates to the management of Rich Global. The margins at Rich Global from 2006 through 2012 were in line with industry indications. Payments of accounts payable is a reasonable and common business practice. The reduction in the related payable reflects reasonably equivalent value. As the economic and accounting effects are the same as if the funds were transferred to RDOC and then transferred to the Kiyosakis, Rich Global received equivalent value for this transaction.

116.    At the end of 2009, Rich Global owed CTI $3,417,539 related to the 2009 RG Licensing Agreement. Rather than distribute the cash, Rich Global reduced the intercompany receivable from CTI by the same amount as the payable, effectively offsetting the amount owed to and the amount owed from CTI. This related party payable relates to the licensing of the valuable Rich Dad IP that was the driver of revenue generated by RDE. The licensing fees were at market rates.

117.    The end result would not have been any different if the cash were transferred to CTI then back to Rich Global. The reduction in the related payable reflects reasonably equivalent value. As the economic and accounting effects are the same as if the funds were transferred to CTI and then transferred back to Rich Global, Rich Global received equivalent value for this transaction.

118.    At various dates in 2009 and 2010, cash was transferred from Rich Global to Franchise. The total of these transactions was $500,000. For each transfer, the offsetting entry in

the general ledger was a receivable from Franchise. By establishing a receivable, the total asset value of Rich Global was unchanged by these transactions.

119.    In August 2012, $481,650 of the Franchise receivable balance was written off as uncollectible. Because the ultimate uncollectibility was not foreseeable at the time of the transfers, reasonably equivalent value was received.

120.    In early 2010, two payments were made to the Kiyosakis totaling $201,874. These transfers were recorded as distributions to RDOC. A distribution is a disbursement of assets for the benefit of the owner. The offsetting accounting entry is a reduction in equity. Therefore, no reasonably equivalent value is expected for a distribution. The only expectation is that the company have the ability to make the distribution, which is tested through the solvency of the company.

121.    Rich Global was solvent on the date of the early 2010 distributions and had net income of $4.3 million in 2009 to fund the distributions. Therefore, the distributions were appropriate.

122.    In 2010, there were two asset transfer entries involving Rich Global, each for $3,358,920. The first transferred various assets from CTI into Rich Global and reduced the receivable from CTI. This provided reasonably equivalent value, as the reduction in the receivable was offset by an increase in assets, meaning the total value of assets was unchanged. The second journal entry was a distribution. Because Rich Global was solvent on the date of this distribution and had net income of $4.3 million in 2009 to fund the distribution, the distribution was appropriate.

123.    Although a December 15, 2010 transfer of funds from Rich Global to Overlook Apartments was initially recorded as a loan to Overlook Apartments, 16 days later the amount was reclassified as a reduction in the RDOC intercompany payable. The related party payable relates to the management of Rich Global. The margins at Rich Global from 2006 through 2012 were in line with industry indications.

124.    A routine payment of $476,300 was made to RDOC for the intercompany payable at the end of 2010. The only difference from the other transfers is that it was paid out of the Credit Suisse investment account instead of the operating cash account. The related party payable relates to the management of Rich Global. The margins at Rich Global from 2006 through 2012 were in line with industry indications.

125.    In late 2011, an individual named Robert Crewe commenced a class action lawsuit against Rich Global, RDOC, and CTI in the SDNY ("Crewe Lawsuit"). Robert Crewe, who had attended an RDE free workshop followed by a purchased RDE seminar, alleged claims related to his dissatisfaction with the RDE courses. The Crewe Lawsuit was dismissed on August 3, 2012.

126.    In May 2012, Rich Global sold the Whitney/Tigrent shares for $77,400 in cash. This equals $0.06 per share, which was the listed market price on morningstar.com for that date. Therefore, reasonably equivalent value was received. This sale was of an asset and not a transfer to satisfy an antecedent debt.

40

127. The six promissory notes that remained owed by the Kiyosakis to Rich Global at the time Rich Global's Petition was filed were all paid by the Kiyosakis in cash during the course of the Chapter 7 bankruptcy case, for a total payment of $1,746,536.85.

**E.    Contested Issues of Law.**

1.    **Joint List of Contested Issues of Law.**

**Alter Ego/Veil Piercing**

1.    Whether the 2016 version of Wyo. Stat. Ann. § 17-29-304 applies to this case, based on the provision in Wyo. Stat. Ann. § 17-29-1103(a) providing that the Wyoming LLC Act chapter retroactively "applies to domestic limited liability companies in existence on July 1, 2010."

2.    Whether the 2016 version of Wyo. Stat. Ann. § 17-29-304 applies to this case, regardless of Wyo. Stat. Ann. § 17-29-1103(a), because it is a procedural amendment under *Aden v. State*, 761 P.2d 88 (Wyo. 1988).

3.    Whether the fraud element under an alter ego analysis encompasses constructive fraud and, if so, whether that constructive fraud is limited to situations in which a legal or equitable duty was breached.

4.    Whether fraud in an alter ego/veil piercing analysis may be established by proof that the LLC made a transfer with the actual intent to hinder, delay, or defraud a creditor.

**Fraudulent Transfer/Fraudulently Incurred Obligation**

5.    Whether Lechter had a "right to payment," within the meaning of Ariz. Stat. Ann. 44-1001(2), from Rich Global so as to qualify as a creditor of Rich Global for purposes of supporting Plaintiff's claims under the Uniform Fraudulent Transfer Act ("UFTA").

6.    Whether, for fraudulent transfer purposes, a holder of equity in an entity is not a creditor for fraudulent transfer purposes unless presently entitled to a direct distribution.

7.    Whether the quantum meruit liability of Rich Global to Learning Annex was a contingent liability for solvency valuation purposes prior to July 13, 2011, when the first jury returned its verdict, so that hindsight cannot be used in valuing the liability.

8.    Whether any portions of Plaintiff's claims under the UFTA are barred by the statute of limitations and, if so, which portions.

9.    Whether the balance sheet test is the test to be used to determine a debtor's solvency under the Bankruptcy Code and the UFTA.

10.    Whether, pursuant to Ariz. Rev. Stat. Ann. § 44-1007(A)(2), a transfer or obligation may only be avoided under the UFTA to the extent necessary to satisfy the creditor's claim.

11.     Whether, pursuant to Ariz. Rev. Stat. Ann. § 44-1008, a creditor may obtain judgment under the UFTA for the lesser of: (a) the value of the asset transferred at the time of the transfer, or (b) the amount necessary to satisfy the creditor's claim.

**Breach of Warranty**

12.     Whether Plaintiff's claims related to breach of the Warranties are barred by the doctrine of *in pari delicto*.

13.     Whether mutual breach by Rich Global of the Warranties bars Plaintiff from recovering under her breach of warranty claims.

14.     Whether avoidance of only one party's obligations under a contract (or subordination of those obligations) is an available remedy under Arizona law for breach of contract/warranty.

**Recharacterization of Debt to Equity**

15.     Whether, in the Tenth Circuit, recharacterization of debt to equity is an available remedy where the challenged debt was payment for services received, rather than a loan.

**Preferential Transfer**

16.     Whether a setoff may be considered a "transfer" under 11 U.S.C. § 547.

17.     Whether the 2012 CTI Offset was barred by 11 U.S.C. § 553(a)(2)(B) and, if so, what Plaintiff's remedy is.

2.     **Trustee's Separate Statement of Contested Issues of Law.**

1.     Whether the Learning Annex Claim was a noncontingent claim from and after March 1, 2007.

2.     Whether the use of hindsight – including the use of the Learning Annex Judgment (an all ramifications thereof) – is legally permitted and/or required in connection with the solvency analysis in this case.

3.     **Defendants' Separate Statement of Contested Issues of Fact and Law.**

**Alter Ego/Veil Piercing**

1.     Whether Plaintiff can support her claim that Rich Global was an alter ego by proving both fraud and inadequate capitalization (the latter of which is, when alone, insufficient basis to impose alter ego liability), the only two bases for alter ego Plaintiff argued in her Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment re: Alter Ego Claim (Doc. 138).

2.     If the 2016 version of Wyo. Stat. Ann. § 17-29-304 applies, whether, looking only at the four factors permitted under Wyo. Stat. Ann. § 17-29-304(c) and not considering the factors

barred from consideration by Wyo. Stat. Ann. § 17-29-304(d), Rich Global was the alter ego of any Defendant.

3.      If the 2016 version of Wyo. Stat. Ann. § 17-29-304 does not apply, whether, looking at the factors identified in *GreenHunter Energy, Inc. v. W. Ecosystems Tech., Inc.*, 337 P.3d 454, 470 (Wyo. 2014), the "exceptional circumstances" identified in that case as permitting alter ego liability exist here.

4.      If Rich Global is found to have been an alter ego, which Defendant(s) was/were its alter ego(s).

### Successor Liability

5.      Whether Rich Global transferred all of its principal assets to RDOC as necessary for a successor liability claim.

6.      Whether RDOC expressly or impliedly agreed to assume Rich Global's debts.

7.      Whether Rich Global and RDOC had a de facto merger or consolidation.

8.      Whether RDOC is a mere continuation of Rich Global.

9.      Whether Rich Global transferred its principal assets to RDOC for the fraudulent purpose of avoiding liability for its debts.

### Fraudulent Transfer/Fraudulently Incurred Obligation

10.      For each of the challenged transfers and obligations underlying Plaintiff's claims under the UFTA and 11 U.S.C. § 548 (collectively, the "Transactions"), whether they were made or incurred with actual intent to hinder, defraud, or delay any creditor of Rich Global.

11.      Whether Rich Global was insolvent at the time of each of the Transactions.

12.      Whether any of the Transactions caused Rich Global to become insolvent.

13.      Whether, at the time of each of the Transactions, Rich Global: (a) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

14.      For each of the Transactions, whether they were made or incurred for reasonably equivalent value, under the facts and circumstances.

15.      Whether any of the Transactions were made to or for the benefit of an insider of Rich Global under an employment contract and not in the ordinary course of business.

16.      Whether a setoff of a debt that was owed by a bankruptcy debtor at the time the setoff was made may be considered a "transfer" under the UFTA and 11 U.S.C. § 548.

17.     Whether the so-called "2012 CTI Transfer" underlying Count 24 of the FAC, through which CTI set off a payable that was owed at the time by Rich Global against CTI's debt to Rich Global, became a "transfer" under the UFTA and 11 U.S.C. § 548 based on Plaintiff's after-the-fact attempt in this lawsuit to avoid the contracts under which Rich Global incurred its debt to CTI.

**Breach of Warranty**

18.     Whether RDOC, CTI, or BI Capital breached the respective warranties they made to Rich Global (collectively, the "Warranties") in the 2007 RG Fee Agreement, the 2009 RG Licensing Agreement, and the 2009 RG Management Agreement, as those Warranties are interpreted under Arizona law.

19.     Whether in the Warranties, as interpreted under Arizona law, RDOC, CTI, or BI Capital warranted Rich Global's performance (as opposed to merely their own performances) under the 2007 RG Fee Agreement, the 2009 RG Licensing Agreement, or the 2009 RG Management Agreement.

20.     Whether the quantum meruit judgment entered in 2012 constituted an "obligation" Rich Global owed to Learning Annex within the scope of the Warranties, as interpreted under Arizona law, before then.

21.     If so, whether RDOC, CTI, or BI Capital's "performance" under the 2007 RG Fee Agreement, the 2009 RG Licensing Agreement, and the 2009 RG Management Agreement "place[d]" Rich Global in breach of that obligation to Learning Annex, as interpreted under Arizona law.

22.     If RDOC, CTI, or BI Capital breached any of the Warranties, what Rich Global's damages from those breaches were.

**Recharacterization of Debt to Equity**

23.     If, in the Tenth Circuit, recharacterization of debt to equity is an available remedy where the challenged debt was payment for services received, rather than a loan, whether the true nature of the debt owed by Rich Global to BI Capital and then to RDOC for licenses and management services under the 2007 RG Fee Agreement was that of an investment that should be recharacterized as equity.

**Equitable Subordination**

24.     Whether RDOC engaged in inequitable conduct that injured Learning Annex or gave RDOC an unfair advantage as to its claim against Rich Global, and whether subordination would be consistent with the provisions of the Bankruptcy Code, so that the portion of RDOC's proof of claim that consists of debt incurred by Rich Global under the 2007 RG Fee Agreement should be subordinated.

25.     Whether RDOC engaged in inequitable conduct that injured Learning Annex or gave RDOC an unfair advantage as to its claim against Rich Global, and whether subordination

would be consistent with the provisions of the Bankruptcy Code, so that the portion of RDOC's proof of claim that consists of debt incurred by Rich Global under the 2009 RG Licensing Agreement and 2009 RG Management Agreement should be subordinated.

26.     Whether, under 11 U.S.C. § 510(c)(1), a claim for equitable subordination may be brought against a party that does not have an allowed claim (and has not filed a proof of claim at all), and, if so, what the remedy may be for such a claim.

27.     If an equitable subordination claim against CTI may be brought, whether CTI engaged in inequitable conduct that injured Learning Annex or gave CTI an unfair advantage as to any nonfiled claim CTI may have against Rich Global, and whether subordination would be consistent with the provisions of the Bankruptcy Code, so that the portion of any nonfiled claim CTI may have that consists of debt incurred by Rich Global under the 2009 RG Licensing Agreement and 2009 RG Management Agreement should be subordinated.

### Disallowance of Proof of Claim

28.     Whether RDOC's claim against Rich Global is unenforceable, due to agreement or applicable law, and thus RDOC's proof of claim should be disallowed.

29.     Whether the estate may recover property from RDOC under 11 U.S.C. §§ 542, 550, or 553, and thus RDOC's proof of claim should be disallowed.

30.     Whether RDOC is a transferee of a transfer avoidable under 11 U.S.C. §§ 544, 547, or 548, and thus RDOC's proof of claim should be disallowed.

### Preferential Transfer

31.     Whether the so-called "2012 CTI Transfer" underlying Count 23 of the FAC, through which CTI set off a payable that was owed at the time by Rich Global against CTI's debt to Rich Global, became a "transfer" under 11 U.S.C. § 547 based on Plaintiff's after-the-fact attempt in this lawsuit to avoid the contracts under which Rich Global incurred its debt to CTI.

32.     If so, whether the 2012 CTI Transfer is a preferential transfer that should be avoided under 11 U.S.C. § 547.

### Account Receivable

33.     Whether, based on Plaintiff's other claims, all noncash payments/deductions made by CTI toward the debt it owed Rich Global should be avoided, leaving CTI with a debt owed to Rich Global that it must pay to Plaintiff.

## F.     Agreed Applicable Propositions of Law

**Count 1:**     Wyoming law governs Plaintiff's claims for alter ego/piercing Rich Global's veil. The veil of an LLC may only be pierced under exceptional circumstances. *GreenHunter Energy, Inc. v. W. Ecosystems Tech., Inc.*, 337 P.3d 454, 462, 465 (Wyo. 2014). There are two potentially applicable tests for this claim under Wyoming law.

Under the test set forth in *GreenHunter*, alter ego liability may be imposed when: (1) the LLC is not only owned, influenced and governed by its members, but the required separateness has ceased to exist due to misuse of the LLC; and (2) the facts are such that an adherence to the fiction of its separate existence would, under the particular circumstances, lead to injustice, fundamental unfairness, or inequity. The factors to be considered include: (1) fraud, (2) inadequate capitalization, (3) the degree to which the business and finances of the company and the member are intermingled, and (4) additional factors presented on a case-by-case basis. *Id.*). Under this test, "[n]o single category, except fraud, alone justifies a decision to disregard the veil of limited liability; rather, there must be some combination of them, and of course an injustice or unfairness must always be proven."  *Id.* at 463-64.

The 2016 version of Wyo. Stat. Ann. § 17-29-304 statutorily modified the *GreenHunter* analysis. When it applies, Wyo. Stat. Ann. § 17-29-304(c) provides that a court being asked to pierce the LLC veil and impose alter ego liability:

> shall consider only the following factors no one (1) of which, except fraud, is sufficient to impose liability: (i) Fraud;  (ii) Inadequate capitalization; (iii) Failure to observe company formalities as required by law; and (iv) Intermingling of assets, business operations and finances of the company and the members to such an extent that there is no distinction between them.

Wyo. Stat. Ann. § 17-29-304(d) provides that, in conducting an analysis under Wyo. Stat. Ann. § 17-29-304(c):

> [A] court shall not consider factors intrinsic to the character and operation of a limited liability company, whether a single or multiple member limited liability company. Factors intrinsic to the character and operation of a limited liability company include but are not limited to:
> (i) The ability to elect treatment as a disregarded or pass-through entity for tax purposes;
> (ii) Flexible operation or organization including the failure to observe any particular formality relating to the exercise of the company's powers or management of its activities;
> (iii) The exercise of ownership, influence and governance by a member or manager;
> (iv) The protection of members' and managers' personal assets from the obligations and acts of the limited liability company.

The parties dispute the applicability of Wyo. Stat. Ann. § 17-29-304 to this case.

**Count 2:**      The general rule is that, when a corporation sells or otherwise transfers all of its principal assets to another, the acquiring entity is not liable for the debts of the transferring entity. However, most jurisdictions recognize up to four exceptions to that general rule:

1.      where the successor expressly or impliedly agreed to assume such debts;

46

   2.  where the transaction was really a consolidation or a merger of the two corporations;

   3.  where the transferee corporation is merely a continuation of the transferor corporation; and

   4.  where the transaction was made for the fraudulent purpose of escaping liability for such debts.

*See, e.g.*, *Village Builders 96, L.P. v. U.S. Laboratories, Inc.*, 112 P.3d 1082, 1087 (Nev. 2005); *West Texas Refining & Development Co. v. Commissioner of Internal Revenue*, 68 F.2d 77, 81 (10th Cir. 1933); *Schumacher v. Richards Shear Co., Inc.*, 451 N.E. 2d 195, 198 (N.Y. Ct. App. 1983); *Warne Investments, Ltd. v. Higgins*, 195 P.3d 645, 650 (Ariz. App. 2008); *A.R. Teeters & Associates, Inc. v. Eastman Kodak Co.*, 836 P.2d 1034, 1039 (Ariz. App. 1992).

  **Counts 4, 9, 14, 17, 21, 24, 26, 27:** Arizona law governs Plaintiff's state-law fraudulent transfer claims brought under 11 U.S.C. §§ 544(a) and 544(b). Specifically, the applicable law is Arizona's version of the Uniform Fraudulent Transfer Act (the "UFTA").

  Pursuant to Ariz. Rev. Stat. § 44-1004, a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation under any of the following:

   1.  With actual intent to hinder, delay or defraud any creditor of the debtor.

   2.  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

     (a)  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

     (b)  Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

In determining actual intent under paragraph 1, above, consideration may be given, among other factors, to whether:

   1.  The transfer or obligation was to an insider.

   2.  The debtor retained possession or control of the property transferred after the transfer.

   3.  The transfer or obligation was disclosed or concealed.

   4.  Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

5.      The transfer was of substantially all of the debtor's assets.

6.      The debtor absconded.

7.      The debtor removed or concealed assets.

8.      The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

9.      The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

10.      The transfer occurred shortly before or shortly after a substantial debt was incurred.

11.      The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Pursuant to Ariz. Rev. Stat. § 44-1005, a transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

The UFTA defines a "creditor" as one who has a "claim" and defines a "claim" as a "right to payment." Ariz. Rev. Stat. Ann. § 44-1001.

Claims under Ariz. Rev. Stat. §§ 1004(A)(2) and 44-1005 (constructive fraud) must be brought within four years of the challenged transaction. Ariz. Rev. Stat. Ann. § 44-1009(2). Claims under Ariz. Rev. Stat. § 1004(A)(1) (actual fraud) must be brought within four years of the challenged transaction or within one year of when the fraudulent nature of the transactions was, or reasonably could have been, discovered by the claimant. Ariz. Rev. Stat. Ann. § 44-1009(1).

Pursuant to 11 U.S.C. § 548(a)(1), the trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within two years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

In determining whether there was fraudulent intent under § 548, courts consider similar badges of fraud to those enumerated under the UFTA. *In re Taylor*, 133 F.3d 1336, 1339 (10th Cir. 1998).

11 U.S.C. § 550(a) provides that when a transfer is avoided under section 544 or 548, the trustee may recover the property, or, if the court so orders, the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made, or (2) any immediate or mediate transferee of such initial transferee.  Section 550(b) provides a defense to an immediate or mediate transferee if that party took for value, in good faith, and without knowledge of the voidability of the transfer avoided. Pursuant to 11 U.S.C. § 550(d), the trustee is entitled to only a single satisfaction under § 550(a).

In valuing a debtor's liabilities for purposes of a solvency determination under the UFTA and § 548, hindsight cannot be used to value contingent liabilities. Rather, contingent liabilities must be valued by estimating, based on information known or reasonably knowable at the valuation date, the likelihood that an event triggering liability will occur, and discounting the amount of the debtor's potential exposure by that probability. *See, e.g.*, *Matter of Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988); *In re R.M.L., Inc.*, 92 F.3d 139, 156 (3rd Cir. 1996); *In re Commercial Fin. Services, Inc.*, 350 B.R. 520, 541 (Bankr. N.D. Okla. 2005).

**Counts 6, 11, 19, 22:**  In an action based on breach of contract (e.g., breach of warranty), the plaintiff has the burden of proving the existence of a contract, breach of the contract, and resulting damages. *Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App. 2004).

Arizona law governs the interpretation of the agreements at issue in Plaintiff's breach of warranty claims.

Under Arizona law, a court must interpret a contract by looking at the plain meaning of the words in context of the contract as a whole. *ELM Ret. Ctr., LP v. Callaway*, 246 P.3d 938, 941-42 (Ariz. App. 2010). The court must interpret it "in such a way as to reconcile and give meaning to all of its terms, if reconciliation can be accomplished by any reasonable interpretation." *Gfeller v. Scottsdale Vista N. Townhomes Ass'n*, 969 P.2d 658, 660 (Ariz. App. 1998). The primary goal of contractual interpretation is to discover the intent of the contracting parties and make it effective. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1138 (Ariz. 1993).

49

**Counts 7, 12:** Recharacterization of debt to equity is an equitable bankruptcy remedy that allows courts to ignore a party's characterization of a transaction and, instead, give effect to the transaction's true substance. *In re Alternative Fuels, Inc.* 789 F.3d 1139, 1146-47 (10th Cir. 2015). "The funds advanced are no longer considered a loan which must be repaid in bankruptcy proceedings as corporate debt, but are instead treated as a capital contribution," with the practical effect being "subordination, since a corporation repays capital contributions only if and when it has satisfied all other obligations." *Id.* at 1147 (internal quotation marks omitted). In considering whether to allow a recharacterization of debt to equity, the following factors are used to distinguish true debt from camouflaged equity:

1.   the names given to the certificates evidencing the indebtedness;

2.   the presence or absence of a fixed maturity date;

3.   the source of payments;

4.   the right to enforce payment of principal and interest;

5.   participation in management flowing as a result;

6.   the status of the contribution in relation to regular corporate creditors;

7.   the intent of the parties;

8.   "thin" or adequate capitalization;

9.   identity of interest between the creditor and stockholder;

10.   the source of interest payments;

11.   the ability of the corporation to obtain loans from outside lending institutions;

12.   the extent to which the advance was used to acquire capital assets; and

13.   the failure of the debtor to repay on the due date or to seek a postponement.

*Id.* at 1149; *In re Hedged-Investments Associates, Inc.*, 380 F.3d 1292, 1298 (10th Cir. 2004). Those factors are not exclusive, and no single factor is dispositive. *Alternate Fuels*, 789 F.3d at 1149.

**Counts 8, 13:** Pursuant to 11 U.S.C. § 510(c)(1), the Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." Three requirements must be met for a court to exercise its equitable subordination power:

1.   inequitable conduct on the part of the claimant sought to be subordinated;

50

2.      injury to the other creditors of the bankrupt or unfair advantage for the claimant resulting from the claimant's conduct; and

3.      consistency with the provisions of the Bankruptcy Code.

*In re Alternate Fuels, Inc.*, 789 F.3d 1139, 1154 (10th Cir. 2015); *In re Hedged-Investments Associates, Inc*. 380 F.3d 1292, 1300 (10th Cir. 2004).

**Count 20:**      Pursuant to 11 U.S.C. § 502(b)(1), the court may disallow a claim to the extent that the claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law, other than because such claim is contingent or unmatured.

Pursuant to 11 U.S.C. § 502(d), a proof of claim of an entity may be disallowed if property is recoverable from the entity under section 542, 550 or 553 of the U.S. Bankruptcy Code or if the entity is a transferee of a transfer avoidable under section 544, 547, or 548 of the Code, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 542, 550 or 553 of the Code.

**Count 23:**      Under 11 U.S.C. § 553(a)(2)(B), a creditor may not offset a mutual debt owed to the debtor against the creditor's claim to the extent that the claim was transferred to the creditor, by an entity other than the debtor, less than 90 days before the bankruptcy petition date and while the debtor was insolvent.

Pursuant to 11 U.S.C. § 553(c), for purposes of § 553, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

Pursuant to 11 U.S.C. § 547(b), the Trustee may avoid any transfer of an interest of the debtor in property when such transfer was:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—
        (A) on or within 90 days before the date of the filing of the petition; or
        (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—
        (A) the case were a case under chapter 7 of this title;
        (B) the transfer had not been made; and
        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Pursuant to 11 U.S.C. § 547(f), for purposes of § 547, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

**Count 25:**      11 U.S.C. § 542(b) provides that an entity that owes a debt to the bankruptcy estate that is matured, payable on demand, or payable on order shall pay it to the trustee, except to the extent it may be offset under the Bankruptcy Code.

**G.      Exhibits.**

The parties will file their exhibit lists by December 28, 2018.

The parties agree to exchange copies of all exhibits no later than January 15, 2019.

Any counsel requiring authentication of an exhibit must so notify in writing the offering counsel within seven (7) business days after the exhibit is made available to opposing counsel for examination.  Failure to do so is an admission of authenticity.

Exhibits listed in the lists to be filed by the parties by December 28, 2018 may be admitted into evidence unless opposing counsel has filed timely separate written objections, with copies of the disputed exhibit and authority.

**H.      Depositions.**

The parties anticipate offering testimony of several witnesses via deposition.  The parties have agreed that any party proposing to offer all or any portion of a deposition shall notify opposing counsel by January 15, 2019 of the portions of the transcripts being designated (unless the necessity for using the deposition develops unavoidably thereafter).  If objection is to be made, or if additional portions of a deposition are to be requested, opposing counsel will notify offering counsel by January 29, 2019 of such objections or requests.

After receiving any objections, the Court will rule regarding the objections and the parties will prepare their videotaped selections of the various depositions accordingly for presentation at trial.

**I.      Discovery.**

Discovery has been completed and there are no outstanding issues regarding discovery.

**J.      Witnesses.**

1.      Plaintiff's witness list is attached hereto as Exhibit A.

2.      Defendants' witness list is attached hereto as Exhibit B.

**K.      Amendments to the Pleadings.**

There are no requests to amend the pleadings.

52

**L.      Motions in Limine.**

The parties have not filed, and do not plan to file, any motions in limine.

**M.      Pending Motions.**

The following motions are pending and outstanding:

1.      Defendants' Motion for Partial Summary Judgment Re: Warranty Claims (Motion – Doc. 53, Response – Doc. 56, Reply – Doc. 57, Supplement – Doc. 128, Response to Supplement – Doc. 136)

2.      Defendants' Motion for Partial Summary Judgment Re: Alter Ego Claim (Motion – Doc. 122, Response – Doc. 138, – Reply Doc. 153)

3.      Defendants' Motion for Partial Summary Judgment Re: Fraudulent Transfer Claims (Motion – Doc. 125, Response – Doc. 139, Reply – Doc. 155)

**N.      Jury Instructions — not applicable.**

**O.      Other Matters.**

None.

**P.      Trial Setting.**

Trial is to the court.  Trial is scheduled to last three weeks; but in light of Defendants' waiver of their jury demand, the parties anticipate the trial will last two weeks.

Plaintiff plans to have Ms. Zubrod, Mr. Zanker, Mr. Kutner, Mr. Laufer, and Mr. Donovan available to testify in court during her case in chief.  Plaintiff plans to call various Defendants and their witnesses to the extent that they are made available during Plaintiff's case in chief.  If they are not made available during Plaintiff's case in chief, Plaintiff plans to offer their testimony via videotaped depositions or by transcripts of deposition.

Defendants intend to call the Kiyosakis, Mr. Sullivan, Mr. Lotzar, Mr. Wheelwright, Mr. Koch, Mr. Humpage, Mr. May, Mr. Dubé, Mr. Kotzin, and Mr. Elsaesser to testify in court during the defense. Mr. Sullivan will be present during Plaintiff's case in chief; Defendants currently do not anticipate that the other witnesses will be. Defendants intend to offer testimony by Mr. Rapoport and Ms. Lechter via videotaped deposition/transcript.

**Q.      Settlement.**

All settlement efforts have been exhausted and the case cannot reasonably be expected to settle.

Dated this 10th day of December 2018.

**SPENCER FANE LLP**
By: */s/ Jamie N. Cotter*
Philip A. Pearlman, CO #11426
Ronald L. Fano, CO #20797
Jamie N. Cotter, WY #7-4721
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203
Telephone: (303) 839-3800
ppearlman@spencerfane.com
rfano@spencerfane.com
jcotter@spencerfane.com
*Attorneys for Tracy L. Zubrod, Trustee*

**MARKUS WILLIAMS YOUNG & ZIMMERMANN
LLC**
By: */s/ John F. Young*
Jennifer Salisbury (WY #7-5218)
John F. Young (Pro Hac Vice Admission)
1700 Lincoln Street, Suite 4550
Denver, Colorado 80203
Telephone: (303) 830-0800
Facsimile: (303) 830-0809
jsalisbury@markuswilliams.com
jyoung@markuswilliams.com
*Attorneys for Rich Dad Operating Company, LLC, Pele-
Kala Corporation, and BI Capital, LLC*

**DICKINSON WRIGHT PLLC**
By: */s/ Robert A. Shull*
Robert A. Shull (Pro Hac Vice Admission)
Michael R. Scheurich (Pro Hac Vice Admission)
Bradley A. Burns (Pro Hac Vice Admission)
Amanda E. Newman (Pro Hac Vice Admission)
Casandra C. Markoff (Pro Hac Vice Admission)
Avenue, Suite1400
Phoenix, Arizona 85004
Telephone: (602) 285-5000
Facsimile: (602) 285-5100
rshull@dickinsonwright.com
mscheurich@ dickinsonwright.com
bburns@dickinsonwright.com
anewman@dickinsonwright.com
cmarkoff@dickinsonwright.com
*Attorneys for Rich Dad Operating Company, LLC, Pele-
Kala Corporation, and BI Capital, LLC*

**BAILEY STOCK HARMON COTTAM LOPEZ LLP**
By: */s/ Henry F. Bailey, Jr.*
Henry F. Bailey, Jr. (WY #5-1681)
Dale W. Cottam (WY #6-2719)
221 E. 21st Street
Cheyenne, Wyoming 82001
Telephone: (307) 638-7745
Facsimile: (307) 638-7749
hank@performance-law.com
dale@performance-law.com
*Attorneys for Robert Kiyosaki and Kim Kiyosaki*

*and*

**BALLARD SPAHR LLP**
By: */s/ Theodore J. Hartl*
Theodore J. Hartl (WY #7-5623)
1225 17th Street, Suite 2300
Denver, Colorado 80202-5596
Telephone: (303) 292-2400
Facsimile: (303) 573-1956
hartlt@ballardspahr.com
*Attorneys for Cashflow Technologies, Inc.*

## Exhibit A: Plaintiff's List of Witnesses

1.    Tracy L. Zubrod

2.    William ("Bill") Zanker

3.    Patrick Donovan

4.    Joel Laufer

5.    John Rapoport

6.    James May

7.    Anthony Humpage

8.    Lee Kutner

9.    Sharon Lechter

10.   Mark Macy (may call)

11.   Charles Lotzar

12.   Michael Sullivan

13.   Kim Kiyosaki

14.   Robert Kiyosaki

15.   Neil Dubé

16.   Any witness necessary for authentication of an exhibit.

17.   Any witness necessary for rebuttal or impeachment.

## Exhibit B: Defendants' List of Witnesses

1.     Robert Kiyosaki

2.     Kim Kiyosaki

3.     Michael Sullivan

4.     Charles Lotzar

5.     Neil Dubé

6.     Tom Wheelwright

7.     Jack Koch

8.     Sharon Lechter (via video deposition)

9.     Anthony Humpage

10.      James May

11.      John Rapoport (via video deposition)

12.      Lynton Kotzin

13.      Ford Elsaesser

Defendants object to Plaintiff's designations Nos. 16 and 17 in its Exhibit A to the Joint Pretrial
Statement as inadequate, as no names are provided for those designations.