James R. Belcher
Wyoming Bar # 5-2556
Crowley Fleck PLLP
111 West 2nd Street Suite 220
Casper, Wyoming 82601
Telephone:  (307) 265-2279
Facsimile:  (307) 265-2307

Attorneys for Creditors Learning Annex
Holdings, LLC, Learning Annex, LLC,
and Learning Annex L.P.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF WYOMING

-----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re** | **:** | |
| | **:** | |
| **RICH GLOBAL, LLC** | **:** | **Case No. 12-20834 (PJM)** |
| | **:** | |
| **Debtor.** | **:** | |

-----------------------------------------------------------------x

## OBJECTION OF LEARNING ANNEX HOLDINGS, LLC, LEARNING ANNEX, LLC AND LEARNING ANNEX L.P. TO TRUSTEE'S MOTION TO APPROVE SETTLEMENT OF DISPUTES BETWEEN THE TRUSTEE AND ROBERT KIYOSAKI, KIM KIYOSAKI, PELE-KALA CORPORATION, CASHFLOW TECHNOLOGIES, INC., BI CAPITAL, LLC, AND RICH DAD OPERATING COMPANY, LLC

Creditors Learning Annex Holdings, LLC, Learning Annex, LLC, and Learning Annex L.P. (collectively "Learning Annex"), through their attorneys Crowley Fleck PLLP, hereby object to the motion (the "Motion") by Trustee Tracy Zubrod (the "Trustee") for approval of a proposed settlement with Robert and Kim Kiyosaki ("the Kiyosakis"), Pele-Kala Corporation ("Pele-Kala"), Cashflow Technologies, Inc. ("CTI"), BI Capital, LLC ("BI Capital"), and Rich Dad Operating Company, LLC ("RDOC") (collectively "Defendants"), filed on January 8, 2019.

## **PRELIMINARY STATEMENT**

1.      Defendants have a long history of shortchanging their partners and creditors. Now, on the eve of a trial that would finally subject Defendants to liability for their past wrongs, Defendants and the Trustee have agreed to a proposed settlement that severely undervalues the claims brought on behalf of the Estate and its sole non-insider creditor, Learning Annex. This Court should recognize the proposed settlement for what it is – Defendants' latest attempt to deprive Learning Annex of its judicially determined share in the lucrative free seminar business it helped create – and reject the proposed settlement as unreasonable and not in the best interests of the estate or its creditors.

2.      Learning Annex holds a $23.6 million unsecured claim against the estate of Rich Global, LLC ("Debtor") based on a final judgment entered by the United States District Court for the Southern District of New York.  The judgment compensated Learning Annex for being wrongfully cut out of a business deal it conceived. While the Debtor and Defendants received *at least* ████████ through 2017 and continue to receive millions of dollars from the free seminar business, Learning Annex has received nothing.  Learning Annex's only recourse is its claim in the Debtor's Chapter 7 case.

3.      Prior to Learning Annex's lawsuit, Debtor had more than ample assets and revenue streams to pay Learning Annex's share of the revenues Debtor was receiving

from the seminar business.  By 2010, however – after Learning Annex filed its lawsuit and a previous suit by the Kiyosaki's former business partner had been filed – the Debtor transferred to Defendants, for virtually nothing, the bulk of its assets, including its right to receive future revenues and license valuable intellectual property.  These transfers and obligations were made to frustrate the Debtor's creditors, and in both purpose and effect they were fraudulent transfers.  They were effectuated through a series of suspect transactions orchestrated by Defendants that abused the corporate form and created successor liability for the Learning Annex judgment.

4.      The Motion seeks approval of a settlement that would resolve all of the Trustee's claims – which seek combined damages in excess of $60 million – for $7.5 million, with no certainty of payment.  Even a cursory review of the record makes plain that this severely undervalues the Trustee's claims.  These include approximately $6 million in claims related to fraudulent transfers made during the Learning Annex litigation and on the eve of bankruptcy.  The Trustee's counsel has rightly described those claims as "low-hanging fruit."   In effect, the Trustee proposes to settle her remaining claims – which also have substantial merit – for $1.5 million, which is a nearly 95% discount from her stated maximum additional recovery of $21.5 million (after accounting for recovery of the $6 million in "low-hanging fruit"), and an even greater discount from the over $54 million in additional damages the Trustee seeks.

5.      The proposed settlement also provides that even if Defendants fail to pay, the Trustee *still* is required to release Defendants from liability on most claims, and is left only with a $7.5 million judgment to enforce.  Thus, the settlement not only severely undervalues the Trustee's claims, but also gives away the Trustee's leverage.  There is no

justification for these significant concessions and steep discounting given the strength of the Trustee's claims and the extensive damages sought.

6.      An additional and critical flaw of the Trustee's approach is that she ignores the value of claims based on the Debtor's transfer of the valuable right to license Rich Dad's intellectual property.  This transfer – during the Learning Annex litigation and for almost no consideration – is also low-hanging fruit.  The associated value could satisfy all of the Estate's claims.

7.      Purported concerns regarding financing of the Estate do not justify the proposed settlement.  Indeed, even if successful on only some of her claims, the Trustee will have ample resources to fully satisfy the administrative expenses of the estate. Regardless, Learning Annex has sought and obtained financing from a litigation funder who has agreed to fund the Trustee's continued prosecution of the claims.

8.      Nor is the proposed settlement in the interest of the Estate's sole non-insider creditor, Learning Annex, to whom reasonable deference is required.  Here, the Trustee proposes to settle tens of millions of dollars of claims for a small fraction and acknowledges that this decision was made with no input from Learning Annex.  That Learning Annex secured funding for the Trustee to continue the litigation demonstrates its belief in the value of the Estate's claims.

9.      Controlling precedent makes clear that it is an abuse of discretion to approve a settlement in these circumstances.  *Reiss v. Hagmann*, 881 F.2d 890, 892–93 (10th Cir. 1989) (rejecting settlement and citing sole creditor's offer to fund future litigation expenses).  The Trustee's Motion should be denied.

## BACKGROUND

### I.    Learning Annex's Claim

10.    Learning Annex's $23.6 million claim against the Debtor estate stems from a lawsuit filed in the Southern District of New York by Learning Annex against the Debtor in April 2009.   Learning Annex, which is in the business of promoting and conducting educational seminars, sued for being cut out of an enormously successful educational seminar business it conceived and brought to Robert and Kim Kiyosaki. Learning Annex has received nothing for its role in developing this lucrative business, except a judgment against the Debtor obtained after years of litigation.

11.    In July 2011, a jury found liability for *quantum meruit* and unjust enrichment stemming from the Debtor's wrongful conduct and awarded Learning Annex over $14 million in damages, totaling $20,620,614.71 after pre-judgment interest.   In April 2012, after a re-trial solely on the issue of damages, a second jury awarded Learning Annex over $15 million plus interest on the *quantum meruit* claims.   On July 17, 2012, the Court entered final judgment in favor of Learning Annex (including interest) in the amount of $23,687,957.21 – forming the basis of Learning Annex's $23,690,999.41 claim in this case.   ECF Claim 1-1 (Judgment).

### II.    The Debtor's Creation and Abandonment

12.    The Debtor is part of the lucrative Rich Dad empire owned by the Kiyosakis that began with the 2000 release of *Rich Dad Poor Dad*, a book about becoming financially independent co-written by Robert Kiyosaki and his then partner Sharon Lechter, which has sold over 40 million copies.

13.    Defendant CTI is the owner of Rich Dad's approximately 89 active and valuable registered trademarks and trademark applications.   Defendant RDOC, a Nevada corporation, is the sole member of the Debtor.

14.    The Debtor was formed in 2006 to receive the profits from the Rich Dad seminar business conceived by Learning Annex.  After cutting out Learning Annex, the Debtor entered into a partnership with a company named Whitney (subsequently renamed Tigrent and now Legacy Education Alliance) to put on the seminars.  In July 2006, the Debtor agreed with Whitney and Rich Dad Education (a venture created and jointly owned by Whitney and Rich Dad) to license the Rich Dad name and logo to the seminar business.  The agreement confirmed that the Debtor "has the right to grant licenses with respect to use of certain intellectual properties."  The material licensed included the trade name "Rich Dad Education," the Rich Dad logo and other trademarks.  In return, the Debtor received royalties from the Rich Dad seminar business. Ex. 1 (2006 Licensing Agreement at 7).

15.    The Rich Dad seminar business earned roughly ███████████ in revenue from 2007 to 2013.  The Debtor received over $42 million in royalties between March 2007 and April 2010 alone.  Ex. 2 ███████████████████████████████████ ███████████████████████████████████████████████████.

16.    Beginning in late December 2007, after a lawsuit was filed by the Kiyosakis' former partner, Sharon Lechter, the Defendants embarked on a series of highly suspect financial transactions which were designed to, and had the effect of, stripping the Debtor of its assets and future streams of revenue to thwart the Debtor's creditors, namely Lechter and Learning Annex.

17.    In May 2010, just as the Learning Annex litigation intensified, Rich Dad transferred the royalty stream from the free seminar business, as well as the right to license the Rich Dad intellectual property, out of the Debtor. Ex. 3 (2010 Tigrent 8-K). Specifically, on May 26, 2010, the licensing agreement between the Debtor, Rich Dad

Education and Tigrent was terminated.  In return for its "interest" in Rich Dad Education, the Debtor apparently received 9.9% of Tigrent stock, which was worth only ▮▮▮▮ at the time.  *See id.* (2010 Tigrent 8-K, Ex. 10.2); ▮▮▮▮▮▮▮▮▮.  On the same day, RDOC and Tigrent entered into a new licensing agreement stating that RDOC "owns or otherwise possesses *exclusive* licenses for certain [Rich Dad] copyrights, trademarks, patents, and other valuable rights, and the right to license those rights to others."  *See* Ex. 3 (2010 Tigrent 8-K, Ex. 10.1).  It further provided that all future royalties from the free seminar business were to be paid to RDOC and not to the Debtor.

18.      RDOC has earned significant profits from the free seminar business, including over ▮▮▮▮ in royalties from March 2010 through 2017. *See* ▮▮▮▮▮ ▮▮; Ex. 4 (2016 Legacy Education Alliance, Inc. 10-K); Ex. 5 (2018 Legacy Education Alliance, Inc. 10-K).  To this day, additional Rich Dad seminars continue to be held on a regular basis throughout the United States and abroad and generate additional royalties.

III.      **The Debtor's Bankruptcy Filing**

19.      Just one month after final judgment was entered in favor of Learning Annex, the Debtor filed for bankruptcy in the District of Wyoming on August 20, 2012.

20.      As the initial bankruptcy filings demonstrate, once the assets from the free seminar business were transferred out of the Debtor during the Learning Annex litigation, the Debtor's revenue plummeted to zero.  As for the $42 million that the Debtor had received from the free seminar business through April 2010, the evidence marshaled by the Trustee makes clear that these funds were transferred to Defendants in a series of suspect intercompany transfers and agreements effectuated during the lead up-to and pendency of the Learning Annex lawsuit, and that the Debtor received little or no consideration in return for these assets.[1]

---

[1]      The disposition of the Debtor's assets is detailed at length in the Trustee's expert's report. ▮▮▮▮▮

21.     Learning Annex is the sole non-insider creditor against the Debtor's bankruptcy estate.  Defendant RDOC has filed a proof of claim for approximately $2.2 million, but the Trustee and Learning Annex have objected, and the Trustee seeks to disallow that claim in Count 20 of the First Amended Complaint ("FAC").[2]

## IV.     The Kiyosakis' Embrace "Asset Protection" to Thwart Creditors

22.     Defendants' efforts to defraud Learning Annex are not surprising.  The Kiyosakis have taught others to engage in similar schemes through the promotion of their "advisors," including Garrett Sutton, Esq., a lawyer who specializes in "asset protection." *See* Ex. 6 (excerpt from the Rich Dad website promoting Mr. Sutton).  Robert Kiyosaki's Rich Dad website links to Mr. Sutton's webpage, where Mr. Kiyosaki describes Mr. Sutton as his "corporate advisor for asset protection." Ex. 7 (testimonial of R. Kiyosaki).

23.     In a book authored by Mr. Sutton, "Own Your Own Corporation" – published under the Rich Dad Advisors brand and for which Mr. Kiyosaki authored the forward – Mr. Sutton advocates asset protection strategies as an "incentive" for creditors to settle.  (Excerpt from Chapter 6 of Rich Dad Advisors' "Own Your Own Corporation," book available at http://www.amazon.com/Own-Your-Corporation-Companies-Everyone/dp/0446678619).  On his website, Mr. Sutton advocates incorporating in Wyoming or Nevada and taking advantage of state laws as a way to force judgment creditors to settle for "pennies on the dollar."  Ex. 8 (excerpt from blog of Garret Sutton).

## V.     The Trustee's Adversary Proceeding and Relevant Procedural History

24.     The Trustee's Adversary Proceeding, filed on August 19, 2014, includes claims for: (i) alter ego liability against the Kiyosakis, CTI, BI Capital and RDOC (Count 1); (ii) successor liability against RDOC (Count 2); (iii) avoidance of numerous fraudulently incurred obligations and fraudulent transfers made to the Defendants

---

[2]     *See* Objection of Trustee (DE 35); Objection of Learning Annex (DE 44).

(Counts 4, 9, 14, 17, 21, 24, 26, 27) (the "Fraudulent Transfer Claims"); (iv) breaches of warranties by the Debtor's contractual counterparties CTI and RDOC in connection with certain agreements (Counts 6, 11, 19, 22); and (v) recharacterization of certain transactions as equity infusions (Counts 7, 12). The First Amended Complaint ("FAC") also seeks to disallow RDOC's proof of claim (Count 20).

25.     In late 2018, the Trustee opposed Defendants' three motions for partial summary judgment. Attached to and set forth in those opposition filings are hundreds of pages of compelling evidence that support the Trustee's claims.[3] The case was set for a trial on February 20, 2019, which was postponed as a result of the proposed settlement.

## VI.    The Trustee's Motion & Proposed Settlement Agreement

26.     On January 8, 2019, the Trustee filed the Motion seeking approval of the proposed settlement under which the Defendants agree to pay $7.5 million to the Estate and withdraw RDOC's proof of claim in exchange for resolution of all of the Estate's claims against Defendants. If Defendants fail to pay, the Trustee must still release Defendants from liability on most claims and for most potential damages, and would be entitled only to a $7.5 million judgment, with no assurance of payment. The proposed settlement was negotiated without any consultation with or deference to Learning Annex.

## OBJECTIONS

27.     As the proponent of settlement, the Trustee carries the burden to establish that the proposed settlement is "fair and equitable and should be approved." *In re Lake City R.V., Inc.*, 226 B.R. 241, 243–44 (Bankr. D. Idaho 1998).[4] The Court's decision regarding the approval of a proposed settlement "must be an informed one based upon an

---

[3]     *See Zubrod v. Kiyosaki* ("*Zubrod*"), No. 2:16-CV-00217-ABJ (D. Wyo.) (DE 136–142).

[4]     To the extent the Trustee's intention is to explain her reasoning for agreeing to the proposed settlement more fully in a supplemental filing or in an evidentiary hearing before the court, Learning Annex requests and reserves its right to supplement this objection.

objective evaluation of the developed facts." *Reiss v. Hagmann*, 881 F.2d 890, 892 (10th Cir. 1989); *see also Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised [herself] of all the facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.").

28.     A "major issue for the court's determination is whether the settlement is in the best interests of the estate, with special consideration given to the concerns of the estate's creditors." *In re Rivermeadows Assocs., Ltd.*, No. 95-20322, 1996 WL 194270, at *4 (Bankr. D. Wyo. Feb. 26, 1996) (noting that "the interest of the creditors is paramount to the interests of the debtor"); *see also Kopp v. All Am. Life Ins. Co. (In re Kopexa Realty Venture Co.)*, 213 B.R. 1020, 1022 (B.A.P. 10th Cir. 1997) ("In considering the propriety of the settlement it is appropriate for the court to consider … the interests of creditors in deference to their reasonable views."). Here, where Learning Annex is the sole creditor to the estate, its concerns warrant particular consideration. *See, e.g., Reiss*, 881 F.3d at 892–93 (noting lack of precedent for approving settlement opposed by all or sole creditor(s)). The court also should consider "the probable success of the underlying litigation on the merits, the possible difficulty in collection of a judgment, [and] the complexity and expense of the litigation." *Kopexa,* 213 B.R. at 1022.

**I.     The Proposed Settlement Significantly Undervalues the Trustee's Meritorious Claims and Is Not in the Best Interests of the Estate or its Creditors.**

29.     The Motion, on its face, is conclusory and does not meet the Trustee's burden. The Motion should be denied for three additional fundamental reasons: (1) it severely undervalues the claims considered by the Trustee; (2) the Trustee failed to account for valuable claims related to the Debtor's transfer of the right to license Rich

Dad's intellectual property; and (3) the Estate has no certainty the Defendants will pay

the settlement amount and, if Defendants fail to pay, the settlement nevertheless releases

the Estate's claims except for a $7.5 million judgment.    The settlement is therefore

unreasonable and is not in the best interests of the estate or its creditors. *Motorola, Inc. v.*

*Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F. 3d 452,

466 (2d Cir. 2007).

### A. The Trustee Severely Undervalued the Claims She Considered

30.    The Trustee states that the maximum recovery against Defendants would be

"in the neighborhood of around $27.5 million," which is apparently the sum of the

Learning Annex judgment and the unpaid balance of all administrative expenses of the

estate.  Motion at 5–6, 17.  The proposed settlement accepts $7.5 million in exchange for

a full release from all claims asserted by the Trustee, and reflects a steep, 73% discount

from the "maximum recovery" the Trustee describes.    It is an even steeper discount from

the total damages sought by the Trustee – which are in excess of $60 million, and which

should be the proper yardstick for assessing the proposed settlement.[5]

31.    The Trustee acknowledges that her likelihood of success on the transfers of

assets by the Debtor during the Learning Annex litigation and on the day of the

bankruptcy petition is high.  *See* Motion at 14.  Indeed, in discussions with Learning

Annex since the proposed settlement was announced, counsel to the Trustee has properly

described these claims as "low-hanging fruit" for which a favorable judgment is highly

likely given the timing of the transfers.  These transfers total at least $6 million, and

---

[5]    For example, if successful on either her alter ego claim or her successor liability claims related to the transfer
of the Debtor's right to license Rich Dad's intellectual property rights, the Trustee will be able to recover $23.6
million against some or all of the Defendants.  Likewise, if successful on some or all of her Fraudulent
Transfer Claims, which total over $40 million, the Trustee may also be able to satisfy all claims against the
estate.  As a result, the Trustee has multiple, independent paths to reaching her "maximum recovery" of $27.5
million—a key fact that the Trustee does not address in the Motion.

include a preferential set-off of an approximately $1.5 receivable from CTI effectuated hours before the Debtor filed its bankruptcy petition (Count 23), a transfer of at least $1.6 million to RDOC that was due to the Debtor and a $3.3 million equity distribution made by the Debtor to RDOC as part of the 2010 restructuring.

32.    The Trustee acknowledges that she has other claims that, *at minimum*, are worth an additional $21.5 million (and in fact much more).  This settlement resolves the bulk of the claims for a paltry $1.5 million or less than 7 cents on the dollar.  It would be reasonable only if the Trustee had little or no chance of success on her remaining claims. That is not the case.  While the Trustee has described some challenges to her claims that create litigation risk for which *some* discount may be appropriate, there is no basis to justify the steep discounts proposed here.  To the contrary, the evidentiary record and legal precedents supporting the Trustee's remaining claims strongly suggest that a full recovery is likely.  The Trustee's Fraudulent Transfer Claims, Alter Ego claim, and claims relating to the 2010 transfer of Rich Dad's IP from the Debtor to RDOC alone are particularly compelling and demonstrate that the proposed settlement is not reasonable.[6]

### 1. The Fraudulent Transfer Claims

33.    The Trustee's evidence shows that the Debtor, consistent with the Kiyosakis' "asset protection" strategies, incurred obligations and made transfers to thwart creditors' ability to collect on their claims, even before the Learning Annex litigation was pending, and thereby with the purpose and the effect of committing fraudulent transfers. Defendants were aware of Learning Annex's contingent claim before it filed and served its lawsuit, as well as the then-pending claims of the Kiyosakis' former partner Ms. Lechter.  In response, they moved tens of millions of dollars of funds and future revenue

---

[6]    Learning Annex does not attempt to address all of the Trustee's remaining claims and highlights this subset of claims solely for the purpose of illustrating examples of why the proposed settlement is clearly unreasonable.

streams from the Debtor to other Kiyosaki-owned entities to thwart collection of these claims. The result was exactly what Defendants intended – a shell company that had no assets to pay its creditors.

34.    The nature of the challenged transfers and incurred obligations cannot be explained by anything other than fraud. ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████ ██████████████. In the Adversary Proceeding, the Trustee has asserted that the "only conceivable explanation" for the transfers and obligations stripping the Debtor of its assets is "fraud." Pls.' Mem. in Opp. to Def.'s Mot. for Summ. J. Regarding Fraudulent Transfer Claims at 4, *Zubrod* (DE 139) ("FT Memo").

35.    In light of the settlement, the Trustee now suggests the opposite, contending that her recovery on the Fraudulent Transfer Claims is questionable because she might not be able to prove that Defendants were aware of the Learning Annex claim prior to the end of January 2009 or that Lechter qualified as a creditor at certain points in time, which are necessary to show that Defendants' purpose was to frustrate the Debtor's creditors. Motion at 10–12. But the evidence strongly belies this assertion:

- Lechter filed a lawsuit and was a creditor of the debtor by October 12, 2007, and videotape evidence of Charles Lotzar, an attorney for the Defendants, shows him stating in 2007 that the cash royalties accruing from the free seminar business should be moved to CTI to thwart Lechter's claims, *see* Motion Ex. 3 (Joint Final Pre-Trial Memorandum ("PTM") at 3, *Zubrod* (DE 184)); Trustee's Omnibus Statement of Facts in Opposition to All Three of Defendants Motions for Partial Summary Judgment ("Omnibus SUF") at 8, 107, *Zubrod* (DE 137-3);
- Demands for payment were made by Learning Annex as early as October 2006, *see* PTM at 31–32 ¶ 25; FT Memo at 16–17; Omnibus SUF at 5–7; and
- ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



36.    The Trustee has alternatively – and credibly – argued that, ███████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████   ███████
███████████   Thus, the Trustee has multiple avenues to target ███████████
of challenged transfers and obligations for recovery.

37.    The Trustee's expert has concluded that ███████████████
███████████████████████████████████   Given the strong arguments for

avoiding the challenged transfers as either actual or constructively fraudulent, it is not

reasonable to settle these high value claims at the steep discount the Trustee proposes.

### 2. The Alter Ego Claims

38.    There is also substantial evidence that Defendants acted as alter egos of the

Debtor and should be held jointly liable for its debts.   It is clear from the summary

judgment record alone that Defendants ignored corporate formalities, intermingled assets,

and the Kiyosakis and other Rich Dad executives treated them as one and the same.

Among other evidence, the Trustee marshaled facts that:

- The Debtor made numerous payments directly to the Kiyosakis recorded as "member distributions," and the Kiyosakis held themselves out as the sole members of the Debtor, signed documents as "members" of the Debtor, and controlled the Debtor's transactions and records even though the Kiyosakis were not members of the Debtor, PTM at 24 ¶ 71, 28–29 ¶ 105;
- The Kiyosakis used funds of the Debtor and Defendants to pay their own taxes, *see id.* at 24 ¶ 67;
- The Kiyosakis used $500,000 of the Debtor's funds to invest in an apartment complex that had no relation to the Debtor's business, *see id.* at 26 ¶ 82; and

- ████████████████████████████████████████████████ ████
████████

Based on this and other evidence, ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████ ████
████ ████████████████████████████████████
████████████████████████████████████
████████████████ ████████████ Wy. Stat. 17–29–304 (fraud "is sufficient to impose [alter ego] liability," and "inadequate capitalization" is a factor in favor).

39.    The Trustee now suggests that the outcome of her alter ego claims is uncertain because fraudulent transfers may not constitute "fraud" for purposes of alter ego liability.   But strong legal authority supports the Trustee's claims.   In *Husky International Electronics Inc v. Ritz*, 136 S. Ct. 1581 (2016), the Supreme Court recognized that the term "actual fraud . . . encompasses fraudulent conveyance schemes[] that can be effected without a false representation."   *Id.* at 1586.   In the same case, the Fifth Circuit held that if a defendant is found liable under a fraudulent transfer statute via the "actual fraud" prong, that finding is sufficient to establish fraud for alter ego liability. 832 F.3d 560, 566–67 (5th Cir. 2016).   Here, there is substantial evidence that Defendants abused the corporate form and acted with actual fraudulent intent to thwart their creditors, which, under *Husky*, supports a finding of alter ego liability ████
████████████████████████████████████████ ████████████
████

### B.    The 2010 Transfer of The Debtor's Right to License the Rich Dad IP

40.    An independent reason for denying the Motion is the Trustee's failure to account for highly valuable claims.   The Trustee has compelling claims relating to the

2010 reorganization that resulted in the transfer of the Debtor's right to license the Rich Dad intellectual property for use in the free seminar business, as well as the revenue stream generated from the attendant royalties, to RDOC for almost no consideration. This transfer of valuable IP rights – during the Learning Annex litigation – is subject to challenge as a fraudulent transfer (*see* Count 17) or, in the alternative, supports a finding of successor liability.  (*See* Count 4).   As with the other transfers during the Learning Annex litigation, these claims are low-hanging fruit.

41.



The Trustee's expert has likewise found that

and SEC filings confirm at least $20 million in additional revenues to RDOC through 2017—royalties that should have gone to the Debtor and which would have satisfied Learning Annex's judgment.   This transfer was clearly designed to and had the effect of thwarting Learning Annex's claim, was made for virtually no consideration, and there is a strong argument that it should be avoided.

42.    Alternatively, because RDOC received substantially all of the Debtor's assets as a result of the IP transfer, it is a successor in liability to the Debtor and should therefore be held responsible for the Debtor's debts.   The Trustee has presented significant evidence that supports this claim, including that:

- As part of the 2010 reorganization, the Debtor transferred the right to use the Rich Dad intellectual property supporting the free seminar business—its sole source of income—to RDOC, which became RDOC's sole source of income, *see* PTM at 4;

- The Kiyosakis managed the Debtor and also managed RDOC, see *id.* at 8, 14 ¶ 14, 28–29 ¶ 105, 29 ¶ 31–32, 34 ¶ 53; and
- RDOC has the same business address that the Debtor had. *See id.* at 29 ¶ 114.

43.    Defendants may argue that successor liability is not warranted because not "all" assets of the Debtor were transferred to RDOC or because the IP rights did not "transfer" as a technical matter, but that is an improper elevation of form over substance. *See, e.g., N. Fork Land & Cattle, LLP v. First Am. Title Ins. Co.*, 362 P.3d 341, 350, 352 (Wyo. 2015) (rejecting argument that it should take "an overly formalistic approach" that would "elevate form over substance").   Moreover, it is commonly held that to establish successor liability the transfer may be of all <u>or</u> substantially all assets, a standard that is certainly met here.   *See, e.g., Expedited Transp. Sys., Inc. v. Vieweg*, 529 S.E.2d 110, 115 (W. Va. 2000) (liability appropriate where "all or substantially all assets" transferred).

44.    As with the Trustee's alter ego claim, the Trustee's expert states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ It is inexplicable that the Trustee would purport to settle this action without even taking into account these high-value claims.

## C.    There is Minimal Collection Risk

45.    The Trustee has put forward no reason to doubt the ability to collect on a judgment against Defendants. Although the Motion references "*possible* difficulty in collection of a judgment," *see* Motion at 14–15 (emphasis added), the Trustee acknowledges that she "has not conducted asset investigations of any of the Defendants," and has "no significant information" regarding Defendants' net worth, and thus presents no basis to assume there is any significant collection risk. *Id.*

46.    In fact, the Kiyosakis have substantial assets.  They have boasted to the press about their exceptional wealth, claiming to be worth at least $80 million.  *See, e.g.,*

Ex. 9 (*New York Post* article).   As recently as 2016, Robert Kiyosaki boasted that he controls over 10,000 apartment units producing over $1 million in cash flow every month.   (May 2016 Robert Kiyosaki Interview – "A Bright Future for Millenials? A Conversation with Robert Kiyosaki" available at https://goodmenproject.com/business-ethics-2/conversation-robert-kiyosaki-kldg/).   Defendant RDOC continues to profit handsomely from the free seminar business as successor to the Debtor, and Defendant CTI continues to own the valuable Rich Dad intellectual property.   In short, most if not all of the Defendants retain significant and valuable assets or possess significant revenue streams, all of which could be used to satisfy a judgment.

47.      A further highly significant shortcoming of the proposed settlement is that Defendants' failure to pay will not render the settlement null and void, but instead simply entitle the Trustee to a judgment of $7.5 million.   Motion Ex. 2 *(*Settlement Agreement § 5).   This provision further dilutes the value of the proposed settlement, and essentially gives away – for no value at all – the Trustee's leverage in the event that Defendants fail to abide by the terms of the proposed settlement.   Any reasonable settlement agreement would be voided in the event of Defendants' default on their payment obligations and reset the Adversary Proceeding for trial of *all* of the Trustee's claims.

\*      \*      \*

48.      Given the size and strength of the Trustee's claims, the proposed settlement of $7.5 million is far below the bounds of any reasonable assessment of the value of those claims. *See, e.g.*, *In re Qmect, Inc*., 359 B.R. 270, 272–73 (Bankr. N.D. Cal. 2007) (refusing settlement where although the debtor faced an "uphill battle" in litigation, the chance of prevailing was not negligible and therefore, the amount of the proposed settlement was insufficient); *In re Nationwide Sports Distribs., Inc.*, 227 B.R. 455, 463

(Bankr. E.D. Pa. 1998) (refusing to approve settlement where there was no showing of little or no likelihood of success in the trustee's litigation brought against debtor); *In re Hydronic Enter., Inc.*, 58 B.R. 363, 367–68 (Bankr. D. R.I. 1986) (refusing to approve settlement of $105,000 claim for $10,000 because it was not fair given the value of claims and the probability of success); *cf. In re Rich Global*, 652 F. App'x. 625, 631 (10th Cir. 2016) (noting court should reject settlement if it falls below the lowest point in the range of reasonableness). Indeed, even if a 50% discount on the Trustee's projected damages for her alter ego or IP transfer claims ($23.6 million) or her fraudulent transfer claims (> ████████) were appropriate (which Learning Annex believes significantly understates the likelihood of success), the proposed settlement would need to be well in excess of $7.5 million to pass muster.

49.    Based on this record, the Trustee cannot meet her burden to show that the proposed settlement is fair and equitable. *See, e.g., In re Lion Capital Grp.*, 49 B.R. 163, 189 (Bankr. S.D.N.Y. 1985) (rejecting settlement because the Trustee has "glossed over" a "facially significant cause of action" and because "key facts relevant to others are not presented even in summary fashion"). As a result, the Motion should be denied.

## II.    The Complexity and Expense of Further Litigation Do Not Favor Settlement Given Learning Annex Has Procured Funding to Pay the Estate's Costs and Fees.

50.    Concerns regarding financing of the estate likewise do not support the proposed settlement. The Trustee reports that the Estate has current balances of nearly $370,000. Motion at 17. This amount is not so low that the Trustee should resolve the Estate's claims for pennies on the dollar to avoid further litigation expense. Indeed, the only litigation remaining is the trial itself (and appeal if necessary), and the Motion states that the Trustee's counsel, Spencer Fane, will continue to litigate the case (possibly on a contingent fee arrangement) in the event the proposed settlement is rejected. *Id.* at 18.

51.    In any event, Learning Annex has enlisted the litigation funding firm Burford Capital, which has agreed to provide up-front funding of up to $1 million for additional litigation costs and fees on a non-recourse basis.  *See* Ex. 10 (Term Sheet). This arrangement, which was proposed to the Trustee yesterday, would allow the Trustee to continue to prosecute the claims on behalf of the Estate at no upfront cost, thus obviating the Trustee's concerns regarding the estate's allegedly inadequate funding.  It is well recognized that such funding agreements are in the best interest of the estate, particularly where it has limited funds to support continued litigation.  *See, e.g., Reiss*, 881 F.2d at 892–93 (overturning bankruptcy court and district court approval of settlement and citing sole creditor's offer to fund future litigation expenses as basis); *In re Land Res., LLC*, 505 B.R. 571, 573, 587 (M.D. Fla. 2014) (approving litigation funding agreement whereby funder agreed to finance trustee's continued prosecution of claims as "win-win" for the estate).

## III.    The Proposed Settlement Is Not in the Interest of and Does Not Provide Any Deference to the Wishes of the Estate's Sole Creditor.

52.    The Trustee has an "overarching duty" to "maximize the value of the estate" for the benefit of debtor's creditors. *In re DVR, LLC*, 582 B.R. 507, 515 (Bankr. D. Colo. 2018).  Here, Learning Annex is the sole non-insider creditor to the estate, and the proposed settlement is clearly not in Learning Annex's interest.  To the contrary, the proposed settlement, if approved, would simply reward Defendants for their "asset protection" schemes and wrongful conduct and reduce the value of Learning Annex's $23.6 million judgment to, in the Trustee's estimation, $6.7 million.  *See* Motion at 18.

53.    Moreover, the manner in which the proposed settlement was negotiated – which the Trustee acknowledges involved no meaningful consultation with Learning

Annex – shows that the proposed settlement has been structured without *any* deference, much less "reasonable" deference, to creditors' interests.  *Kopexa*, 213 B.R. at 1022.

54.     Learning Annex strongly believes that continued litigation of the Trustee's claims is likely to result in a judgment far in excess of $7.5 million.  It has backed up that belief by arranging for third-party financing to fund the estate and continued litigation and preserve Learning Annex's opportunity to collect in full on its judgment.  Any downside risk resulting from an adverse outcome would affect Learning Annex only, and that is a risk that Learning Annex believes is minimal and is willing to bear.

55.     As the Tenth Circuit recognized in *Reiss*, it is an abuse of discretion to approve a proposed settlement that is actively opposed by the major creditors when the creditors have "offered to pay all . . . costs" and "the bankruptcy estate would incur no expense in pursuing the litigation."  *Reiss*, 881 F.2d at 892; *see also In re Remsen Partners, Ltd.*, 294 B.R. 557, 566, 571 (Bankr. S.D.N.Y. 2003) (refusing to approve settlement because it was not in the best interests of the creditors, where claim would be pursued at no cost to the estate and there was a good likelihood of success on the merits).

## CONCLUSION

For the foregoing reasons, Learning Annex respectfully requests that the Court deny the Motion and grant such other and further relief as may be just and proper.

Dated this 15th day of February, 2019     Respectfully submitted,

/s/ James R. Belcher

James R. Belcher
Crowley Fleck PLLP
111 West 2nd Street Suite 220
Casper, WY  82601

Attorneys for Learning Annex

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date this Objection was filed, I served a true and correct copy of the foregoing <u>**OBJECTION OF LEARNING ANNEX TO TRUSTEE'S MOTION TO APPROVE SETTLEMENT AGREEMENT WITH KIYOSAKIS**</u> via the Court's electronic mailing service (CM/ECF) on all of the persons registered for electronic service, including counsel for the Debtor, the Chapter 7 Trustee and the United States Trustee.


<u>/s/ James R. Belcher</u>

James R. Belcher