JENNIFER SALISBURY (WYOMING BAR NO. 7-5218)
JOHN F. YOUNG (PRO HAC VICE ADMISSION)
MARKUS WILLIAMS YOUNG & HUNSICKER LLC
1700 LINCOLN STREET, SUITE 4550
DENVER, COLORADO 80203
TELEPHONE: (303) 830-0800
FACSIMILE: (303) 830-0809
JSALISBURY@MARKUSWILLIAMS.COM
JYOUNG@MARKUSWILLIAMS.COM
*Attorneys for Rich Dad Operating Company, LLC,*
*Pele-Kala Corporation, and BI Capital, LLC*


ROBERT A. SHULL (PRO HAC VICE ADMISSION)
MICHAEL R. SCHEURICH (PRO HAC VICE ADMISSION)
BRADLEY A. BURNS (PRO HAC VICE ADMISSION)
AMANDA E. NEWMAN (PRO HAC VICE ADMISSION)
CASANDRA C. MARKOFF (PRO HAC VICE ADMISSION)
DICKINSON WRIGHT PLLC
1850 N. CENTRAL AVENUE, SUITE 1400
PHOENIX, AZ 85004
TELEPHONE: (602) 285-5000
FACSIMILE: (602) 285-5100
RSHULL@DICKINSONWRIGHT.COM
MSCHEURICH@DICKINSONWRIGHT.COM
BBURNS@DICKINSONWRIGHT.COM
ANEWMAN@DICKINSONWRIGHT.COM
CMARKOFF@DICKINSONWRIGHT.COM
*Attorneys for Rich Dad Operating Company, LLC,*
*Pele-Kala Corporation, and BI Capital, LLC*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re: | ) |
| | ) Case No.: 12-20834 |
| RICH GLOBAL, LLC | ) |
| | ) Chapter 7 |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

---

## REPLY TO LEARNING ANNEX'S OBJECTION TO MOTION TO APPROVE SETTLEMENT

---

# TABLE OF CONTENTS

I.   Introduction ................................................................................................................... 1

II.  Analysis .......................................................................................................................... 4

  A.   Learning Annex is not entitled to general deference; such considerations are limited to Learning Annex's reasonable views of its own interests. ......................................................... 4

  B.   Learning Annex relies on unsupported factual allegations that are belied by the evidence produced in the Litigation. ..................................................................................... 5

  C.   Learning Annex misconstrues both the amount at issue in the Litigation and the Trustee's statements about amounts she is confident of recovering. ...................................... 8

  D.   Learning Annex gives high value to a claim that *does not exist* in the Litigation. ........ 11

  E.   Learning Annex overvalues the Trustee's claims by ignoring the risk she faces in preceding with the Litigation. ................................................................................................ 13

    1.   Learning Annex ignores the substantial risk that the Trustee will lose her alter ego claim. ................................................................................................................................ 15

    2.   Learning Annex ignores the uphill battle the Trustee faces on fraudulent transfer claims and the fact that an adverse decision on her noncontingent liability theory would devastate her claims. ........................................................................................................ 18

  F.   Learning Annex's representation that it has secured funding for the Litigation is misleading and irrelevant. ..................................................................................................... 28

  G.   The Trustee would have significant default remedies under the proposed settlement. 30

  H.   Learning Annex ignores the fact that the proposed settlement includes withdrawal of RDOC's proof of claim. ......................................................................................................... 31

III. Conclusion .................................................................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 80 (S.D.N.Y. 2008), *aff'd,* 379 Fed. Appx. 10 (2d Cir. 2010)..............................................................................................................9

*Bradkin v. Leverton*, 257 N.E.2d 643 (N.Y. 1970) ...........................................................25

*Campos v. Wells Fargo Bank, N.A.*, 345 B.R. 678 (E.D. Cal. 2005)..................................27

*Chien v. Skystar Bio Pharm. Co.*, 623 F. Supp. 2d 255 (D. Conn. 2009), *aff'd,* 378 Fed. Appx. 109 (2d Cir. 2010) ............................................................................................................ 20

*Cousins v. Pereira (In re Cousins)*, 09 CIV 1190 RJS, 2010 WL 5298172 (S.D.N.Y. Dec. 22, 2010).............................................................................................................................. 2

*Estate of Turner v. C.I.R.*, 102 T.C.M. (CCH) 214 (T.C. 2011), *supplemented sub nom. Turner v. C.I.R.*, 138 T.C. 306 (2012) ............................................................................................ 8

*GreenHunter Energy, Inc. v. W. Ecosystems Tech., Inc.*, 337 P.3d 454 (Wyo. 2014) 15, 16, 17, 18

*Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581 L. Ed. 2d 655 (2016) ........................ 16

*In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325 (11th Cir. 2007)................................ 25

*In re All Media Properties, Inc.*, 5 B.R. 126 (Bankr. S.D. Tex. 1980), *aff'd,* 646 F.2d 193 (5th Cir. 1981) ......................................................................................................................... 26

*In re Balducci Oil Co., Inc.*, 33 B.R. 847 (Bankr. D. Colo. 1983) ............................................... 27

*In re Blair*, 588 B.R. 605 (Bankr. D. Colo. 2018) ............................................................ 24, 25

*In re Blehm*, 33 B.R. 678 (Bankr. D. Colo. 1983) ..............................................................26

*In re Bolon*, 538 B.R. 391 (Bankr. S.D. Ohio 2015) ..........................................................20

*In re Brooks Farms*, 70 B.R. 368 (Bankr. E.D. Wis. 1987)..................................................27

*In re Clark*, 91 B.R. 570 (Bankr. D. Colo. 1988) ...............................................................26

*In re Damas*, 504 B.R. 290 (Bankr. D. Mass. 2014) ..........................................................27

*In re Faasoa*, 576 B.R. 631 (Bankr. S.D. Cal. 2017) ..........................................................27

*In re Goodspeed*, 535 B.R. 302 (Bankr. D. Minn. 2015)......................................................10

*In re Hinson*, 65 B.R. 675 (Bankr. W.D. Tenn. 1986).........................................................27

*In re Kane & Kane*, 2013 WL 1197609 (Bankr. S.D. Fla. Mar. 25, 2013) (slip copy) ...............26

*In re Murphy*, 203 B.R. 972 (Bankr. S.D. Ill. 1997)...........................................................27

*In re Remillong*, 131 B.R. 727 (Bankr. D. Mont. 1991) .....................................................27

*In re Revco D.S., Inc.*, 118 B.R. 468 (Bankr. N.D. Ohio 1990)..............................................20

*In re Rich Glob., LLC*, 652 Fed. Appx. 625 (10th Cir. 2016).............................................5, 30

*In re Sabey*, 553 B.R. 883 (Bankr. D. Utah 2016).................................................................5

*In re Turner*, 335 B.R. 140 (Bankr. N.D. Cal. 2005), *modified on reconsideration,* 345 B.R. 674 (Bankr. N.D. Cal. 2006), *aff'd,* 02-44874, 2007 WL 7238117 (B.A.P. 9th Cir. Sept. 18, 2007) 7

*In re Vazquez*, 325 B.R. 30 (Bankr. S.D. Fla. 2005) ............................................................4

*In re Viscount Air Services, Inc.*, 232 B.R. 416 (Bankr. D. Ariz. 1998)....................................23

*In re Woller*, 483 B.R. 886 (Bankr. W.D. Wis. 2012) ..........................................................8

*Kopexa Realty Venture Co.*, 213 B.R. 1020 (B.A.P. 10th Cir. 1997)............................................4

*Lee v. Schweiker*, 739 F.2d 870 (3d Cir. 1984)..................................................................27

*Matter of Ritz*, 832 F.3d 560 (5th Cir. 2016 .....................................................................16

*Matter of Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir. 1988) ......................................25

*Neal v. Clark*, 251 P.2d 903 (Ariz. 1952) .......................................................................23

*Protocols, LLC v. Leavitt*, 549 F.3d 1294 (10th Cir. 2008).....................................................25

*Reiss v. Hagmann*, 881 F.2d 890 (10th Cir. 1989) .........................................................5, 29

*Stender v. Archstone-Smith Operating Tr.*, 910 F.3d 1107 (10th Cir. 2018)................................. 2

*Wellman v. Wellman*, 933 F.2d 215 (4th Cir. 1991) ....................................................... 9

## Statutes

11 U.S.C. § 364................................................................................................ 29

11 U.S.C. § 548.......................................................................................... 19, 23

11 U.S.C. § 550.............................................................................................. 9

Ariz. Rev. Stat. Ann. § 44-1001....................................................................... 19

Wyo. Stat. Ann. § 17-29-304...................................................................... 15, 17

## Other Authorities

Unif. Fraudulent Transfer Act, § 4, cmt.......................................................... 22

Creditor Rich Dad Operating Company, LLC ("RDOC") hereby replies to the Objection of Learning Annex Holdings, LLC, Learning Annex, LLC and Learning Annex L.P.[1] to Trustee's Motion to Approve Settlement of Disputes Between the Trustee and Robert Kiyosaki, Kim Kiyosaki, Pele-Kala Corporation, Cashflow Technologies, Inc., BI Capital, LLC, and Rich Dad Operating Company, LLC (Doc. 354) (the "Objection"). The Court should grant the motion to approve settlement (Doc. 336) (the "9019 Motion") filed by Trustee Tracy L. Zubrod (the "Trustee").

## I.      Introduction

The Trustee is seeking this Court's approval of her settlement of a lawsuit wherein multiple claims have already been dismissed and those that remain have hotly disputed flaws, are targeted by pending dispositive motions, and will pose a difficult battle for the Trustee at trial, if they survive that long.

There is a difference between what constitutes a reasonable settlement — the question before the Court on the 9019 Motion — and creditor Learning Annex receiving every single thing it desires. Learning Annex's Objection disregards numerous significant flaws and weaknesses in the Trustee's case and the controlling rules that govern reasonable settlements in these circumstances. As Learning Annex itself has previously pointed out to the Court, in this very case, in deciding a motion under Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019"),

> Courts are deferential to the judgment of a trustee; judicial review is not meant to supplant the judgment of a trustee. The function of the court is to "canvass the issues and see whether the settlement falls below the ***lowest point in the range of reasonableness***."

[Learning Annex's Reply to Objections to Trustee's Mot. to Approve Settlement, Doc. 89, at 3,

---

[1] These entities are collectively referred to herein as "Learning Annex."

1

¶ 8 (emphasis in original) (quoting *Cousins v. Pereira (In re Cousins)*, 09 CIV 1190 RJS, 2010 WL 5298172, at *3 (S.D.N.Y. Dec. 22, 2010); collecting other cases)]. Learning Annex took this position when it urged court approval of a settlement whereby Learning Annex purchased the estate's right to appeal a $23.7 million dollar judgment against Debtor Rich Global, LLC (the "Debtor") for a mere $100,000. The Court approved that agreement as reasonable.

Learning Annex, now faced with a significantly larger settlement (in a different context) that it does not personally favor, would have the Court ignore that settled law *previously relied on successfully by Learning Annex*. It is the Trustee, not Learning Annex, who should be heard regarding flaws in her claims. Instead of giving due deference to the Trustee's judgment and looking at whether the proposed settlement meets the minimal threshold of required reasonableness, Learning Annex would have the Court second-guess the Trustee and conduct the equivalent of a mini trial on the merits of the underlying litigation, based on one-sided, unsupported, untested, cherry-picked factual assertions and advocacy. Learning Annex should be ethically and judicially estopped from taking this position.[2]

The proposed settlement would resolve pending litigation brought by the Trustee on behalf of the Debtor against RDOC, Cashflow Technologies Inc. ("CTI"), BI Capital, LLC ("BI Capital"), Pele-Kala Corporation, Robert Kiyosaki, and Kim Kiyosaki (collectively,

---

[2] "Judicial estoppel is an equitable doctrine designed to protect the integrity of the judicial process by preventing parties from changing their legal positions in the same case based on the exigencies of the moment." *Stender v. Archstone-Smith Operating Tr.*, 910 F.3d 1107, 1115 (10th Cir. 2018) (quotations omitted). In deciding whether to find judicial estoppel, the court can consider whether the party is asserting a position "clearly inconsistent" with its prior position, whether it successfully convinced a court to accept the prior position, and whether it would be unfair to allow the party to change its position. *Id.* Learning Annex advocated for a highly deferential standard of review for a Rule 9019 motion for a settlement between the Trustee and Learning Annex and was successful with this Court and on appeal. It would be unfair to allow Learning Annex to now change position and advocate a *less deferential* standard in an attempt to defeat a settlement it does not support.

"Defendants"), in Case No. 16-cv-00217 now before the U.S. District Court for the District of Wyoming (the "Litigation"). The Trustee seeks approximately $27.5 million in the Litigation; the settlement would resolve these claims for payment of $7.5 million, plus interest.

This is not a case where the Trustee is acting hastily before the flaws or potential of her case are fully known. The Trustee, using her business judgment, has determined that the proposed settlement is reasonable, based on the risks of her central claims being lost on summary judgment and, if portions of the case survive, the risks of taking the Litigation to trial. In reaching this conclusion, she has had the benefit of more than four years of intense litigation over the claims, extensive discovery (including four separate turnover actions), two in-depth mediation sessions with a private mediator who conducted an outside evaluation of the claims, and a two-day *Daubert* hearing that delved into the qualifications, analyses, and opinions of each side's expert witness. She has also seen six of her claims dismissed after: (1) Defendants succeeded on a motion to dismiss and (2) partial summary judgment was entered against her on claims involving alleged fiduciary duties. The majority of remaining claims are all currently at significant risk because they are the subjects of three pending dispositive motions that have not been decided.

Nevertheless, based in its seriously flawed evaluation of the Litigation, Learning Annex contends that the proposed settlement is not reasonable. Learning Annex does so by advocating for a deference it is not entitled to, ignoring the pending dispositive motions and the substantial risk the Trustee would face in continuing the Litigation, misrepresenting the amount actually at issue by wildly inflating numbers, inventing "high value" claims that the Trustee has not brought *and cannot bring*, making unsupported factual assertions that are belied by substantial contrary evidence produced in the Litigation, and, above all, failing to properly evaluate the Trustee's claims. The settlement is within the necessary band of reasonableness, and the 9019 Motion should

3

be granted.

## II.   Analysis

### A.   Learning Annex is not entitled to general deference; such considerations are limited to Learning Annex's reasonable views of its own interests.

By requesting "'reasonable' deference," Learning Annex abuses the language of *Kopexa Realty Venture Co.*, 213 B.R. 1020, 1022 (B.A.P. 10th Cir. 1997). The court in *Kopexa* actually reasoned that such deference only applies to one factor — the evaluation of the "*interests of creditors*" — and even then only insofar as the creditor presents "*reasonable views*":

> In considering the propriety of the settlement it is appropriate for the court to consider the probable success of the underlying litigation on the merits, the possible difficulty in collection of a judgment, the complexity and expense of the litigation, and the *interests of creditors in deference to their reasonable views.*

213 B.R. at 1022 (emphasis added). Contrary to Learning Annex's argument, the Trustee is only required to consider the "*interests* of creditors in deference to their *reasonable views.*" *Id.* (emphasis added).

Unlike the general deference that is given to the business judgment of the Trustee, there is no general deference to creditors, and the specific deference that does exist is limited by the reasonableness of a creditor's view. Learning Annex's (ill-formed) opinions about the merits of the Litigation are entitled to no deference at all. *See In re Vazquez*, 325 B.R. 30, 37 (Bankr. S.D. Fla. 2005) ("It is not the creditors' task to determine the fairness of a proposed settlement; it is the court's obligation to make that determination while making certain not to ignore their legitimate views or concerns.").

To the extent that a creditor's opinions present an incorrect view, as here, those opinions are entitled to no deference, regardless of whether they touch on creditors' interests. *See e.g.*, *id.* at 41 (approving a settlement over the objection of the majority creditor, who offered to fund the

4

litigation rather than settle, because "the creditor's views can only be regarded as unreasonable, and cannot override every other consideration in favor of the settlement").

Learning Annex also significantly relies on *Reiss v. Hagmann*, 881 F.2d 890 (10th Cir. 1989), which fundamentally has no application here. *Reiss* has highly distinguishable facts and has already been limited in application by the Tenth Circuit *in this very case*. In *In re Rich Global, LLC*, 652 Fed. Appx. 625 (10th Cir. 2016), the Tenth Circuit affirmed the approval of a compromise where Learning Annex paid just $100,000 to settle the Debtor's appeal of the $23.7 million judgment against it, even after RDOC had offered to *fully* indemnify the Trustee for the pursuit of the appeal. The *In re Rich Global* court reasoned:

> RDOC states that the bankruptcy court's failure to reject the [settlement], in light of its indemnity offer, is *per se* reversible error. We disagree. In *Reiss*, this court reversed the rejection of a settlement where the only creditor had offered to pay the costs of a lawsuit upon which rested the only hope of any recovery for disbursement to that creditor. 881 F.2d at 893. We did not create a *per se* rule, however, and in fact we qualified our holding by stating "[a]t least in a case like that at bar." *Id*. The circumstances here are unlike those in *Reiss*.

652 Fed. Appx. at 632. As noted by the Tenth Circuit, *Reiss* is limited to its unique and extreme facts, and there would be no bar to approving the settlement even if Learning Annex had agreed to *fully* indemnify Trustee, which it has not done here. *See also In re Sabey*, 553 B.R. 883, 891 (Bankr. D. Utah 2016) ("*Reiss* does not stand for the proposition that a Trustee must defer to the judgment of a sole creditor and it is clearly distinguishable from this case . . . . [T]he Tenth Circuit made it clear that the disapproval of all creditors or a single creditor will not override the thoughtful decision of a trustee.").

### B.  Learning Annex relies on unsupported factual allegations that are belied by the evidence produced in the Litigation.

Learning Annex makes sweeping allegations about Defendants, their actions, and the alleged reasons for their actions but provides no evidence to support those statements. In fact,

5

Learning Annex completely ignores the contrary evidence produced and discovered in the Litigation that supports Defendants' positions. For example, attorney Charles Lotzar testified at length about the legitimate business reasons behind various transactions by the Debtor and by Defendants, as well as those behind the reorganizations of Defendants and of their relationship with Whitney/Tigrent.[3] [*See generally, e..g.*, Videotaped Trial Deposition of Charles W. Lotzar ("Lotzar Dep."), excerpts attached as <u>Exhibit A</u> hereto]. Reading the Objection, one would think Learning Annex had no idea that testimony existed.[4]

Specific misstatements by Learning Annex include:

- Objection ¶ 2 claims that "the Debtor and Defendants received *at least* $86 million through 2017 and continue to receive millions of dollars from the free seminar business." Learning Annex conflates the Defendants and provides *no evidence* for this broad allegation. Objection ¶ 14 alleges that the Debtor was formed "to receive the profits from the Rich Dad seminar business." Rather, the Debtor was formed to sublicense certain intellectual property (the "Rich Dad IP") to Rich Dad Education, LLC for use in the free seminar business.

- Objection ¶ 16 alleges that Defendants engaged in transactions beginning in 2007 that were designed to, and did, strip the Debtor of its assets. The Debtor's assets were not stripped, and Learning Annex provides no evidence that they were.

- Objection ¶ 17 claims that "Rich Dad" transferred the royalty stream from the free seminar business and the right to license the Rich Dad IP out of the Debtor and to RDOC. This is

---

[3] Whitney Information Network, Inc., later known as Tigrent, Inc., the Debtor's partner in the seminar business, is referred to herein as "Whitney/Tigrent."

[4] Learning Annex acknowledged in a prior filing that it has received 14 deposition transcripts and 249 deposition exhibits from the Litigation. [Unopposed Mot. by Learning Annex for Extension of Time to Respond to Trustee's Mot. to Approve Settlement, Doc. 347, ¶ 6]. The Lotzar transcript and exhibits were among those.

simply not true. As has been repeatedly noted in the Litigation by the Trustee and her expert witness, the Debtor had a *nonexclusive* license to the Rich Dad IP and that license was *terminable on 30 days' notice*. The license was ultimately terminated. No transfer occurred from the Debtor to RDOC. Additionally, Learning Annex fails to mention that the Trustee has waived any fraudulent transfer claim based on these allegations, as further discussed below.

- Objection ¶ 18 refers to "profits" earned by RDOC, referencing only the amount of royalties paid to RDOC. Learning Annex ignores the fact that revenues are different from profits.

- Objection ¶ 34 alleges that the transfers and obligations the Trustee has challenged as fraudulent "cannot be explained by anything other than fraud." This is contradicted by deposition testimony by Lotzar, Robert Kiyosaki, Kim Kiyosaki, Neil Dubé, and James May about the legitimate business reasons for Defendants' actions, as well as by the reports of Defendants' expert witness, Lynton Kotzin.[5] Those reports, attached as <u>Exhibit B</u> and <u>Exhibit C</u> hereto, demonstrate that, for example, the management and licensing fee arrangements were reasonable.

Learning Annex also makes much of the Kiyosakis' connection to individuals who advise on asset protection. [Objection ¶ 22]. Learning Annex has not demonstrated that asset protection is inherently nefarious. To the contrary, numerous courts have recognized that asset protection, done properly, is a legitimate business tool for minimizing monetary risk. *See, e.g.*, *In re Turner*, 335 B.R. 140, 147 (Bankr. N.D. Cal. 2005), *modified on reconsideration,* 345 B.R. 674 (Bankr. N.D. Cal. 2006), *aff'd,* 02-44874, 2007 WL 7238117 (B.A.P. 9th Cir. Sept. 18, 2007) ("'Asset

---

[5] Lynton Kotzin is the managing partner of Kotzin Valuation Partners, LLC and holds the following professional designations: certified public accountant (CPA), certified insolvency and reorganization advisor (CIRA), accredited in business valuation (ABV), accredited senior appraiser (ASA), certified business appraiser (CBA), certified in financial forensics (CFF), and chartered financial analyst (CFA).

protection' is not illegal and is honored by the law if done for a legitimate purpose."); *Estate of Turner v. C.I.R.*, 102 T.C.M. (CCH) 214 (T.C. 2011), *supplemented sub nom. Turner v. C.I.R.*, 138 T.C. 306 (2012) ("[A]sset protection may be a legitimate and significant nontax reason for formation of a family limited partnership . . . ."); *In re Woller*, 483 B.R. 886, 902 (Bankr. W.D. Wis. 2012) ("[T]he use of exemptions is at least a legitimate form of asset protection, and debtors should only be penalized when they go beyond taking advantage of the exemption laws themselves.").

### C.    Learning Annex misconstrues both the amount at issue in the Litigation and the Trustee's statements about amounts she is confident of recovering.

Learning Annex is ginning up gaudy numbers by misrepresenting the total amount the Trustee may recover — more than doubling the real number that the Trustee seeks. Learning Annex's repeated argument that the Trustee seeks "combined damages in excess of $60 million," Objection ¶ 4, is patently wrong and is directly contradicted by the Trustee's accurate calculation of her claims as set forth in the 9019 Motion. As the Trustee stated, "The maximum recovery the Trustee might obtain in this case is approximately $27.5 million. This sum includes the amount of the Learning Annex claim, plus an estimated figure for unpaid administrative expenses of the estate." [9019 Motion at 14-15].

Although the Trustee has challenged transfers exceeding $27.5 million in her fraudulent transfer claims,[6] her recovery is limited to the amount that will benefit the estate. She has asserted claims for avoidance of the Debtor's transfers and obligations under 11 U.S.C. § 548 and, through

---

[6] The larger figures Learning Annex references stem primarily from the fact that the Trustee has essentially challenged every single transfer and obligation by the Debtor during its existence. Even if she *could* recover damages exceeding the Debtor's liabilities to creditors and administrative expenses of the estate, she would have a difficult time proving her claims as to every single transaction, as further discussed below.

8

11 U.S.C. § 544, under the state-law Uniform Fraudulent Transfer Act ("UFTA").

11 U.S.C. § 550(a) provides that, once a transfer has been avoided under §§ 544 or 548, "the trustee may recover, *for the benefit of the estate*, the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a) (emphasis added). The effect of that section is that the Trustee may not recover any transfers beyond the amount that will benefit the bankruptcy estate. *See, e.g.*, *Wellman v. Wellman*, 933 F.2d 215, 218 (4th Cir. 1991) ("Courts considering the issue . . . have, with unanimity, concluded that a trustee or a debtor-in-possession of a bankruptcy estate cannot maintain an avoidance action under § 548 unless the estate would be benefitted by the recovery of the transferred property.") (collecting cases); *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 80, 94 (S.D.N.Y. 2008), *aff'd*, 379 Fed. Appx. 10 (2d Cir. 2010) (Because "the Bankruptcy Code's avoidance provisions can only be asserted to benefit a creditor of the debtor in question[, a] transaction can be avoided under section 544(b) only to the extent the avoidance benefits unsecured creditors." (internal quotation marks omitted)) (collecting cases).

In other words, the Trustee's recovery can only encompass: (a) the amount of all creditors' claims (approximately $23.7 million for Learning Annex and, *if RDOC is permitted to recover on its claim*, $2.2 million for RDOC) and (b) administrative expenses of the estate (according to the 9019 Motion, an estimated $3.8 million).[7] As one court has extensively explained:

> The recovery beyond the limitations of state law, however, must still provide a benefit to the estate, and not just a benefit to the debtor. Whether there is a benefit to the estate depends on a case-by-case, fact-specific analysis. This is not the usual case in which an increase in dollars to the estate results in a patent benefit to the estate. In this case, the increase in dollars to the estate which would result from the

---

[7] The Trustee, in calculating her "maximum recovery," assumes that she will not be recovering based on RDOC's claim. If RDOC's claim were approved (despite her attempt in the Litigation to disallow it), she could recover a maximum total of $29.7 million as a benefit to the estate — but the $2.2 million difference would be money that would go to RDOC, not Learning Annex. As far as Learning Annex is concerned, the $27.5 million figure is operative.

9

requested relief would not provide a benefit to the estate. In this case, the trustee has advised that the amount on hand for distribution from the estate already exceeds the total amount of estimated administrative expenses and all claims. Thus, in this case, the only party to benefit from avoiding and recovering the Transfer would be the debtor. Such a benefit to the debtor would be inappropriate.

*In re Goodspeed*, 535 B.R. 302, 315 (Bankr. D. Minn. 2015) (citations omitted).

The Trustee has no conceivable basis for recovering more than $27.5 million (or $29.7 million if RDOC's $2.2 million claim is allowed). But if, somehow, she did, any excess would flow back to the Debtor (the outcome deemed inappropriate by courts such as in *Goodspeed*) — not to Learning Annex. Learning Annex has no basis for recovering more than its allowed claim and has suggested no grounds for viewing the Trustee's potential recovery, for purposes of the 9019 Motion, as more than the $27.5 million the Trustee properly estimates.

Learning Annex also mischaracterizes and substantially inflates what it describes as "low-hanging fruit." [Objection ¶¶ 4, 31]. The Objection represents that the Trustee has at least $6 million in claims that she believes are easily attainable, referencing page 14 of the 9019 Motion. However, that page reveals that the Trustee has **only a single, $1.47 million claim on which she thinks it is "highly likely that she will prevail"** — and, despite her confidence, that claim is targeted by a pending summary judgment motion (*see* discussion on that motion below). The Trustee has nowhere represented that she is confident of success on $6 million in claims.[8]

---

[8] To the contrary, other than this single $1.47 million claim, the Trustee repeatedly indicates that she is "uncertain" about her ability to prevail on any of her claims. [9019 Motion at 8 ("The outcome of the pending motion for partial summary judgment on the Trustee's alter ego claim is uncertain."), 10 ("The outcome of the pending motion for partial summary judgment on the Trustee's fraudulent transfer and fraudulently incurred obligation claims is uncertain."), 10 ("The issue of the Debtor's insolvency is uncertain."), 11 ("When Defendants became aware of the existence and magnitude of the Learning Annex claim is uncertain."), 12 ("The extent of the Kiyosakis' personal involvement in wrongful acts is uncertain."), 13 ("The outcome of the

In addition to that $1.47 million transfer, Learning Annex mistakenly contends that "a transfer of at least $1.6 million to RDOC that was due to the Debtor and a $3.3 million equity distribution made by the Debtor to RDOC as part of the 2010 restructuring" are similarly low-hanging fruit. [Objection ¶ 31]. It is unclear what this statement references.[9] Learning Annex provides no support for its opinion that the Trustee has these claims in the bag. The Trustee has only expressed confidence in her ability to collect $1.47 million in the Litigation — 24.5% of the $6 million Learning Annex characterizes as "low-hanging fruit." The Court should listen to the Trustee here.

### D.    Learning Annex gives high value to a claim that *does not exist* in the Litigation.

Learning Annex argues, Objection ¶¶ 40-41, that the 9019 Motion fails to account for the Trustee's "highly valuable claim[]" for fraudulent transfer of the Debtor's right to license the Rich Dad IP for use in the free seminar business. Learning Annex also characterizes this supposed claim as "low-hanging fruit." But *the Trustee has not brought a fraudulent transfer claim for the Rich Dad IP licenses*. The question of whether she *could* have asserted the claim is irrelevant because, by this point in the Litigation, she has long since waived it. [*See, e.g.*, Pl.'s Objections & Answers to Def. Rich Dad Operating Company, LLC's Second Set of Non-Uniform Interrog's, <u>Exhibit D</u> hereto, identifying challenged transfers].[10]

---

Trustee's claims based on breach of warranty and recharacterization of debt to equity is uncertain"; "The outcome of the Trustee's objection to RDOC's proof of claim is uncertain.").

[9] The First Amended Complaint in the Litigation refers to a transaction where the Debtor allegedly distributed certain assets valued at $3.36 million to RDOC. There is no reference to any $1.6 million transfer to RDOC in the pleading — or, for that matter, in the report prepared by the Trustee's expert witness Patrick Donovan.

[10] Furthermore, the facts fail to support this claim imagined by Learning Annex.

Beyond waiving it, the Trustee has specifically argued the opposite — she and her expert, Patrick Donovan, made the strategic decision to argue that the Rich Dad IP licenses had zero value.[11] As Donovan testified in the *Daubert* hearing conducted in the Litigation:

> Q You didn't consider the earning capacity of the company. You've already said that, because the license was nonexclusive; is that correct?
>
> A No. Not because the license was nonexclusive, but because the license could be terminable within 30 days as happened in 2010, and the license was nonassignable.
>
> . . .
>
> Q Okay. But each one of those years through 2007, '8 and '9, that license generated one heck of a lot of cash for Rich Global.
>
> A It did.
>
> Q But you gave that license no value each of those years.
>
> A As to Rich Global it had no value beyond the 30-day termination. Period.

[Tr. of *Daubert* Proceedings, excerpts attached as Exhibit E hereto, at 119:5-10, 122:1-7]. The Trustee has affirmed Donovan's $0 valuation, stating that "Donovan properly valued the Debtor's IP licenses." [P's Resp. to Defs.' Mot. to Exclude Expert Testimony of Patrick Donovan & Request for a *Daubert* Hearing, D. Wyo. Case No. 16-cv-00217, Doc. 159, at 8].

Even if Learning Annex's hypothetical claim had any merit long ago, it has been fatally compromised in the Litigation. The Trustee and her expert have extensively argued that the Rich Dad IP licenses had no value. The Trustee cannot now take a contrary position, assert a new fraudulent transfer claim, and argue that an asset she has maintained was worthless was in fact a valuable one that was fraudulently transferred. By giving great weight to a claim that the Trustee *does not have*, Learning Annex overvalues the Litigation and demonstrates a fundamental

---

[11] This decision was apparently made because it is the only plausible way the Trustee can argue that the Debtor was insolvent at certain times.

12

misunderstanding about the weaknesses of the Trustee's claims.

### E.    Learning Annex overvalues the Trustee's claims by ignoring the risk she faces in preceding with the Litigation.

In addition to the wildly inflated "low-hanging fruit" and the fantasy claim for transfer of the Rich Dad IP licenses, Learning Annex opines that "[t]he Trustee's Fraudulent Transfer Claims [and] Alter Ego claim . . . are particularly compelling." [Objection ¶ 32]. Learning Annex ignores the fact that Defendants — who have already succeeded in getting six claims (including all fiduciary duty claims) and parts of others dismissed in the Litigation as a matter of law[12] — have targeted *all* of those "compelling" claims with pending dispositive motions. As the Trustee acknowledged in the 9019 Motion, the claims are full of risk for her, due to both legal and factual uncertainties in the positions she has taken. Even if the claims survive summary judgment, the Trustee will have a difficult time prevailing at trial.

Defendants, who have completely prevailed on the sole summary judgment motion that has been decided thus far, have filed three more dispositive motions that remain pending:

- A motion for partial summary judgment on the alter ego claim.[13] If granted, this would eliminate the Trustee's alter ego claim in its entirety. Wyoming law is particularly protective of the corporate form, and Defendants expect to succeed.

- A motion for partial summary judgment on the claims for fraudulent transfers and

---

[12] In September 2018, the District Court dismissed two claims in their entirety and five claims in part on a motion to dismiss filed by BI Capital. In November 2018, Defendants prevailed on a motion for partial summary judgment and the District Court dismissed all of the Trustee's claims for alleged breaches of fiduciary duties, eliminating four more claims in their entirety.

[13] In the Litigation, D. Wyo. Case No. 16-cv-00217, the memorandum in support of this motion is available at Doc. 123, the statement of facts is available at Doc. 124, and the reply is available at Doc. 153.

fraudulently incurred obligations.[14] If granted, this would eliminate all or part of eight claims. The Trustee's resistance to the motion relies on a *never-before-adopted* interpretation of what constitutes a creditor, disproven conjecture about Defendants' knowledge of the Learning Annex claim at relevant times, and a determination — never before applied to a quantum meruit judgment for purposes of a fraudulent transfer solvency analysis — that the Debtor's liability to Learning Annex was noncontingent. Defendants expect to succeed.

- A motion for partial summary judgment on the breach of warranty claims.[15] If granted, this would eliminate those four claims in their entirety. The Trustee's resistance to the motion relies on a nonsensical reading of certain corporate documents, and Defendants expect to succeed.

The pending motions have the potential to decimate the Trustee's claims in the Litigation. They establish substantial weaknesses in the Trustee's claims — even if the claims proceed to trial, the Trustee's ultimate success is uncertain and fraught with risk. The Trustee simply lacks evidence to support many of her claims. The Court, in weighing a Rule 9019 motion, is not to decide the underlying claims or the pending motions. However, some aspects of the alter ego and fraudulent transfer claims are highlighted below, demonstrating the risk of unfavorable outcomes the Trustee will face if she proceeds with the Litigation.[16]

---

[14] In the Litigation, D. Wyo. Case No. 16-cv-00217, the memorandum in support of this motion is available at Doc. 126, the statement of facts is available at Doc. 127, and the reply is available at Doc. 155.

[15] In the Litigation, D. Wyo. Case No. 16-cv-00217, the memorandum in support of this motion is available at Doc. 54, the statement of facts is available at Doc. 55, the reply is available at Doc. 57, and a supplemental filing is available at Doc. 128.

[16] The Trustee also substantially risks losing her claims on the dispositive motion on breach of warranty. Learning Annex has not contended that any of the breach of warranty claims are strong.

**1.    Learning Annex ignores the substantial risk that the Trustee will lose her alter ego claim.**

The motion for partial summary judgment on the alter ego claim points to the Trustee's significant lack of evidence. Under the Wyoming Limited Liability Company Act ("WLLCA"), alter ego liability can only be imposed if there is a showing of actual fraud or if there is a showing of a combination of at least two of the following: inadequate capitalization, lack of corporate formalities, or intermingling of assets/operations to a high extent. Wyo. Stat. Ann. § 17-29-304(c). In conducting that analysis, the court cannot consider "factors intrinsic to the character and operation of a limited liability company," which include but are not limited to tax structuring, flexibility in operations ("including the failure to observe any particular formality relating to the exercise of the company's powers or management of its activities"), a member's exercise of ownership and influence, and protection of members' personal assets. Wyo. Stat. Ann. § 17-29-304(d).[17]

The Trustee's fraud allegations fail to meet the requirements for an alter ego showing, as she has identified no false representations made by the Defendants that were relied on by Learning Annex (or anyone else) to their detriment. *See GreenHunter Energy, Inc. v. W. Ecosystems Tech., Inc.*, 337 P.3d 454, 470 (Wyo. 2014). She contends that her fraudulent transfer claims should meet that requirement but acknowledges in the 9019 Motion, page 9, that this result is uncertain because there are no Wyoming cases supporting her view. To the contrary, Wyoming alter ego law is clear

---

[17] The Trustee has contended that this statute does not apply retroactively to encompass the claims at issue. This is belied by Wyo. Stat. Ann. § 17-29-1103(a), which states that the WLLCA applies to all LLCs in existence on July 1, 2010. Certainly, application of the statute is a possibility that threatens the Trustee's claim if the Litigation proceeds. Regardless, Defendants point out in the alter ego motion that the Trustee has not presented sufficient evidence to prevail even under the now-superseded standard articulated in *GreenHunter Energy, Inc.*, 337 P.3d 454 (Wyo. 2014), either.

that:

> The elements of a claim for relief for fraud are **a false representation made by the defendant which is relied upon by the plaintiff to his damage, the asserted false representation must be made to induce action, and the plaintiff must reasonably believe the representation to be true**. A plaintiff who alleges fraud must do so clearly and distinctly, and fraud will not be imputed to any party when the facts and circumstances out of which it is alleged to arise are consistent with honesty and purity of intention. Fraud must be established by clear, unequivocal and convincing evidence, and will never be presumed.

*Id.* at 470 (quotation omitted) (emphasis added). Frankly, the Trustee's position is not likely to succeed.

Learning Annex, trying to make the Trustee's case for her in the Objection, cites *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 194 L. Ed. 2d 655 (2016), for the proposition that "actual fraud . . . encompasses fraudulent conveyance schemes[] that can be effected without a false representation." Simply looking at the omitted portions of that sentence shows why the case has no bearing here. The full statement by the Court was: "The term 'actual fraud' *in § 523(a)(2)(A)* encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Id.* at 1586 (emphasis added). 11 U.S.C. § 523 sets forth the types of debts that are nondischargeable in bankruptcy — including those for money obtained by fraud. The Court in *Husky* was deciding federal bankruptcy dischargeability law (§ 523), not Wyoming alter ego law. Similarly, *Matter of Ritz*, 832 F.3d 560 (5th Cir. 2016), which Learning Annex also cites, was applying Texas state law, not Wyoming law.[18]

Learning Annex has provided no legal basis for overriding the Trustee's assessment, stated

---

[18] Moreover, that case only held that a fraudulent transfer claim can support alter ego liability if the claim was brought under the "actual fraud" prong of fraudulent transfer law. *Matter of Ritz*, 832 F.3d at 566-67. Even if the District Court were to apply this nonbinding, extrajurisdictional law, the Trustee would have a difficult time showing actual fraud on her fraudulent transfer claims, as explained below.

in the 9019 Motion, that her alter ego claim is uncertain because fraudulent transfers may not constitute fraud for purposes of alter ego *under Wyoming law*. It is without dispute that the Trustee faces a high hurdle on showing fraud to support her claim. *See GreenHunter*, 337 P.3d at 470 (on an alter ego claim, "[f]raud must be established by clear, unequivocal and convincing evidence, and will never be presumed").

The Trustee's allegations of undercapitalization, lack of formalities, and intermingling are similarly deficient in factual support. The business entities in question were professionally managed by staff, kept separate books and accounts, underwent CPA audits, and nearly uniformly observed the corporate form over a period of years. The Trustee pointed to a few paltry instances where accounting inaccuracies occurred (but were later corrected in "real time" after audit) and to the fact that the Debtor did not set aside sufficient assets to satisfy the Learning Annex judgment during periods when — as the evidence uncovered in discovery in the Litigation has shown — Defendants did not know Learning Annex asserted any right to funds from the Debtor. Most of the facts the Trustee alleges as supporting her alter ego claim (inconsequential as those facts are) are of the type that may not even be considered in the alter ego analysis under Wyo. Stat. Ann. § 17-29-304(d). Application of the evidentiary rule in that statute would almost certainly be fatal to the Trustee's claim.

Learning Annex, in Objection ¶ 38, repeats the Trustee's allegations of payments that were initially misclassified as member distributions (conspicuously ignoring the fact that they were later corrected and reclassified), alleges that the Kiyosakis used Debtor funds to pay their taxes and invest in an apartment complex (conspicuously ignoring the fact that both transactions were recorded as loans and repaid), and references a loan the Debtor made to CTI for a payment CTI

17

then made to Donald Trump.[19] Learning Annex shows nothing inappropriate about the making of loans, and this trivial "evidence" hardly supports an alter ego finding.

The corporate veil may only be pierced in "exceptional circumstances." *GreenHunter Energy, Inc.*, 337 P.3d at 459. Based on the scant evidence identified by the Trustee, the alter ego claim could easily be dismissed on summary judgment. Even if it continues to trial, the Trustee bears a substantial risk of losing on this claim.

> ### 2. Learning Annex ignores the uphill battle the Trustee faces on fraudulent transfer claims and the fact that an adverse decision on her noncontingent liability theory would devastate her claims.

Several areas of weakness significantly compromise the Trustee's fraudulent transfer claims. Perhaps the largest dispute in this case is about the solvency of the Debtor at particular points in time, and the merits of that dispute completely elude Learning Annex in its brief. If the Trustee fails to establish insolvency at certain key points, her related claims fail. Further, Defendants' motion for partial summary judgment on the claims for fraudulent transfer/fraudulently incurred obligations targets those claims on various other grounds. Success by the Defendants on any basis would reduce (in some cases, substantially) the Trustee's fraudulent transfer claims, and the Trustee would need to surmount multiple hurdles and challenges — any of which could preclude recovery — to prevail at trial.

Fraudulent transfer claims can be brought for: (a) actual fraud — a transfer made or obligation incurred with actual intent to hinder, delay, or defraud a creditor — or (b) constructive fraud — a transfer made or obligation incurred (i) for less than reasonably equivalent value and (ii) under insolvency conditions. Ariz. Rev. Stat. Ann. §§ 44-1004(A), 44-1005; 11 U.S.C.

---

[19] Learning Annex, showing its failure to grasp the facts of the Litigation, alleges the Debtor "transferred" funds to CTI that CTI then "loaned" to Mr. Trump. This is simply incorrect.

§ 548(a)(1). The Trustee has challenged numerous transfers made and obligations incurred by the Debtor as fraudulent (collectively, the "Transactions").

> a.  **Sharon Lechter was not a creditor for fraudulent transfer purposes.**

To bring a fraudulent transfer claim, the Trustee needs to stand in the shoes of a creditor of the Debtor who could have brought such a claim. The Trustee has alleged that her claims are premised on two "creditors" of the Debtor: Learning Annex and Sharon Lechter ("Lechter"), a former business partner of the Kiyosakis'. But Lechter was not a creditor of the Debtor for fraudulent transfer purposes, because she never asserted a right to payment *from the Debtor* and was, at most, an indirect equity owner not entitled to a distribution *from the Debtor*[20] — which is not a "creditor" for fraudulent transfer purposes. Portions of the Trustee's claims depend entirely on Lechter being nonsensically considered a creditor of the Debtor.

A creditor under fraudulent transfer law is one who has a "right to payment." Ariz. Rev. Stat. Ann. § 44-1001. Lechter never asserted a right to payment from the Debtor. Learning Annex points out, Objection ¶ 35, that she sued the Debtor, but it ignores the fact that she named the Debtor "as [a] nominal defendant[,] solely in a derivative capacity," asserting claims against it for dissolution and access to records — not claims based on a right to *payment*.

Nor was Lechter a creditor by virtue of her indirect ownership interest in the Debtor. Courts applying the UFTA have consistently held that a holder of equity in an entity is not a creditor for fraudulent transfer purposes unless *presently* entitled to a *direct* distribution. *See, e.g.*, *In re Bolon*,

---

[20] Lechter was a member of BI Capital (she owned a one-third interest and the Kiyosakis owned the remaining two-thirds interests), which was the sole member of the Debtor. Under fraudulent transfer law, BI Capital could not be a creditor of the Debtor unless it was entitled to an immediate distribution (which it was not). Lechter could *never* be a creditor of the Debtor based on her *indirect* ownership.

19

538 B.R. 391, 407-08 (Bankr. S.D. Ohio 2015); *Chien v. Skystar Bio Pharm. Co.*, 623 F. Supp. 2d

255, 267 (D. Conn. 2009), *aff'd,* 378 Fed. Appx. 109 (2d Cir. 2010); *In re Revco D.S., Inc.*, 118

B.R. 468, 475 (Bankr. N.D. Ohio 1990). Lechter was not.

If the District Court were to hold, as it should, that Lechter was not a creditor of the Debtor

for fraudulent transfer purposes, the impact would be twofold. First, it would significantly limit

the scope of Transactions the Trustee could challenge, because Lechter could not serve as a

triggering creditor under the Bankruptcy Code. Second, it would render any alleged evidence of

Defendants trying to hinder *Lechter* irrelevant and meaningless as to the Trustee's fraudulent

transfer claims. The Trustee would only be able to bring fraudulent transfer claims based on

Learning Annex as the creditor, and she has produced no evidence of Defendants attempting to

hinder Learning Annex. The Trustee is essentially relying on alleged imputed intent; that imputed

intent will be removed from the case.

**b.      The Trustee has insufficient evidence of *actual* fraud.**

**i.      Claims for actual fraud cannot be brought for
Transactions preceding late January 2009.**

Transactions conducted before Defendants knew Learning Annex had a claim against the

Debtor could not have been made with intent to defraud Learning Annex as a creditor. The

evidence uncovered in discovery, referenced in the 9019 Motion, shows that Defendants had no

knowledge that Learning Annex was asserting a claim against the Debtor until late January 2009.

Learning Annex, Objection ¶ 35, alleges that Defendants' claimed lack of knowledge until late

January 2009 is "highly suspect" but *provides no evidence to the contrary*.[21] The Trustee has also

not provided evidence to the contrary — in depositions, the only evidence she developed was that

late January 2009 was when Defendants first had knowledge of the Learning Annex claim. There

*is no evidence* to the contrary. Learning Annex also argues that certain demands were made in

October 2006, but, as pointed out in the summary judgment briefing, none of the alleged demands

were made (a) to Defendants or (b) about a claim *against the Debtor*. Learning Annex's apparent

demands for payment from third party Whitney/Tigrent gave *Defendants* no knowledge that

Learning Annex had a claim *against the Debtor*.

Success for Defendants on this point — where the Trustee has produced no on-point

contrary evidence — would eliminate the Trustee's actual fraud claims for Transactions preceding

late January 2009. That category includes the largest Transactions at issue (the $10.1 million

payments related to the settlement with Lechter and the 2007 "BI Capital Transfers" totaling $9.3

million).

### ii.    Evidence is lacking for actual fraud.

The Trustee lacks evidence to support her claims for actual fraud even after January 2009.

---

[21] Learning Annex specifically refers to "January 1, 2009 transfers and obligations . . . just days after the Learning Annex lawsuit was filed." Presumably, Learning Annex refers to the licensing and management agreements effective January 1, 2009; no *transfers* on that date have been identified in the Litigation. Learning Annex cites to the opinions in the Cordes Report about the Rich Dad companies' internal restructuring, but that restructuring, which spanned late 2008 and into 2009 and was not linked to the January 1 date, was conducted for legitimate business reasons and was prompted by the 2008 departure of the Kiyosakis' former business partner, Lechter. Lotzar testified to that in his deposition [Lotzar Dep., Exhibit A, at 105:17-06:8, 108:6-114:10], and that testimony has not been refuted. And, again, **the unrefuted evidence is that Defendants did not learn about the Learning Annex lawsuit until late January 2009**. The changes complained of were initiated *before* Defendants had knowledge of the Learning Annex claims. The suspicion Learning Annex expresses is not grounded in any evidence and is contrary to the evidence that *has* been produced.

21

She has *no* direct evidence of intent to defraud Learning Annex.

The UFTA sets forth 11 factors to consider in determining whether there was actual intent to hinder, delay, or defraud a creditor. *See* Ariz. Rev. Stat. Ann. § 44-1004(B). The majority of those are completely lacking here. The Trustee can, at best, offer evidence related to three:

- Whether the transaction "was to an insider." However, this factor should *only* be considered an indication of actual fraud when accompanied by other evidence of fraud. *See* Unif. Fraudulent Transfer Act, § 4, cmt.

- Whether "the debtor had been sued or threatened with suit." Given that (a) 11 of the 14 claims against the Debtor (including all contract claims) in the Learning Annex Lawsuit were dismissed on summary judgment and (b) the evidence produced in discovery shows that Defendants thought the Learning Annex claim was meritless and unlikely to succeed until the July 2011 jury verdict, this is weak evidence of fraudulent intent for transactions before then.

- Whether "the debtor was insolvent" at the time of the transaction. Defendants have hotly disputed the allegation that the Debtor was insolvent during the Transactions and has demonstrated that, to the contrary, the Debtor was solvent. The Trustee will *only* be able to show this factor if she prevails in her contention that the Learning Annex claim was noncontingent for purposes of a fraudulent transfer solvency analysis. As will be discussed further below, this is an uncertain and risky argument — one that has never before succeeded in relation to a quantum meruit judgment — that is contradicted by a substantial body of law relied on by Defendants.

In short, the Trustee has scant evidence of fraudulent intent, particularly for transactions

preceding July 2011. Her claims based on actual fraud will likely come down to whether she can overcome the substantial body of contrary law and prove that the Learning Annex claim was noncontingent. This is very treacherous footing for her.

        **c.**      **The Trustee faces a difficult battle in proving *constructive* fraud for transactions preceding July 2011.**

To show constructive fraud, the Trustee must prove that each challenged transaction: (a) was for less than reasonably equivalent value, *and* (b) was while the Debtor was insolvent or near insolvency. Ariz. Rev. Stat. Ann. §§ 44-1004(A), 44-1005; 11 U.S.C. § 548(a)(1).

        **i.**      **The evidentiary hurdle for showing the transactions were for less than reasonably equivalent value is high.**

First, the sheer volume of challenged transactions — the Trustee has essentially challenged every transaction by the Debtor during its existence — creates an evidentiary difficulty for the Trustee. She must show that each transaction was not for reasonably equivalent value.

Second, the disparity in value the Trustee must show is substantial. Courts look at all relevant circumstances surrounding the transaction to determine whether the actual value and the transfer value were so widely disparate as to be considered constructively fraudulent. *See Neal v. Clark*, 251 P.2d 903, 906 (Ariz. 1952) (collecting cases applying the UFTA's predecessor, the Uniform Fraudulent Conveyance Act). Specifically:

> [I]inadequacy of price does not mean an honest difference of opinion as to price, but a consideration **so far short of the real value of the property as to startle a correct mind; or shock the moral sense**. Nor is it necessary that the consideration for the transfer was a just equivalent of the thing bought, or of equal values. What is a fair consideration must, of course, be determined upon the facts and circumstances of each particular case.

*Id.* (citations omitted) (emphasis added). The fact that the transferee got a bargain is not of itself an indicium of fraud. *Id.* For example, courts have held that consideration within 70% of the value is reasonable. *See In re Viscount Air Services, Inc.*, 232 B.R. 416, 435 (Bankr. D. Ariz. 1998). The

Trustee's ability to prove that the Transactions were for less than reasonably equivalent value is, at best, uncertain.

> ### ii.    Insolvency depends entirely on a finding that the Learning Annex liability was noncontingent — a dubious proposition.

Whether the Debtor was insolvent before entry of the Learning Annex judgment — a key element of the Trustee's fraudulent transfer claims — essentially comes down to whether the liability eventually owed to Learning Annex was contingent or noncontingent prior to entry of the judgment in favor of Learning Annex.[22] This is because, as the dueling expert reports filed in the Litigation show, the Debtor's solvency status at those relevant times depends on whether hindsight may be used to value the Learning Annex liability based on the judgment that was ultimately entered in July 2012. It is undisputed that hindsight may not be used to value a *contingent* liability. *See, e.g.*, *In re Blair*, 588 B.R. 605, 618-19 (Bankr. D. Colo. 2018).[23] If, as Defendants contend, the Debtor had a *contingent* liability[24] to Learning Annex until entry of judgment, that liability — valued without hindsight, based on information known at the time — was not substantial enough to render the Debtor insolvent. [Kotzin Valuation Partners Report, Exhibit B, at 20-21, Exhs. 3, 26-41]. The Trustee has no evidence to the contrary; her case here entirely depends on the liability being ruled noncontingent at all times.

The Learning Annex lawsuit, during its pendency, was considered a contingent liability by professional accountants. When public accounting firm McGladrey & Pullen, LLP audited the

---

[22] This issue was not addressed in the summary judgment motion but was briefed in the parties' competing *Daubert* motions in the Litigation.

[23] RDOC urges the Court to read the *Blair* decision, a copy of which is attached as Exhibit F hereto. The Trustee's expert opinions on solvency and valuation likely face the same fate.

[24] In fact, Learning Annex itself refers to the liability as having been contingent. [Objection at ¶¶ 33, 36].

consolidated financial statements of CTI and the Rich Dad entities for 2006, 2007, and 2008, the auditors did not accrue any liability for the lawsuit and, on September 2, 2009, they issued an unqualified opinion on the financial statements. Whitney/Tigrent, which was also targeted by Learning Annex's lawsuit, treated it similarly in its SEC filings at the time.

Numerous courts have held that "pending litigation that has not been reduced to judgment" is a contingent liability until judgment is entered. *See Blair*, 588 B.R. at 620-21; *accord In re Advanced Telecomm. Network, Inc.,* 490 F.3d 1325, 1335 (11th Cir. 2007); *Matter of Xonics Photochemical, Inc.*, 841 F.2d 198, 199 (7th Cir. 1988); *Protocols, LLC v. Leavitt,* 549 F.3d 1294, 1299 (10th Cir. 2008). This is particularly true for a quasi-contractual quantum meruit claim like that of Learning Annex, where the court/jury *later* imposes a legal obligation to pay that could not previously exist based on any agreement between the parties.[25] "Briefly stated, a quasi-contractual obligation is one imposed by law where there has been no agreement or expression of assent, by word or act, on the part of either party involved. *The law creates it*, regardless of the intention of the parties, to assure a just and equitable result." *Bradkin v. Leverton*, 257 N.E.2d 643, 645 (N.Y. 1970) (emphasis added). In other words, the Debtor's obligation to pay Learning Annex was *contingent* on success in litigation and the subsequent entry of a judgment.

Consistent with the nature of quantum meruit claims, courts have constantly held — including under the UFTA and § 548 of the Bankruptcy Code (which control here) — that such claims are contingent until judgment is *entered*. For example, the Bankruptcy Court for the Southern District of Florida, adjudicating fraudulent transfer claims under the UFTA and § 548, held that a judgment for quantum meruit/unjust enrichment and related claims was contingent for

---

[25] All contract and fraud claims in the Learning Annex Lawsuit were dismissed on summary judgment.

purposes of a solvency analysis until a motion for rehearing on the judgment was denied. *In re Kane & Kane*, 2013 WL 1197609, at \*6 (Bankr. S.D. Fla. Mar. 25, 2013). Before then, the judgment "was not an absolute liability due and payable by the Debtor." *Id.*

Courts have concluded similarly under other Bankruptcy Code provisions. For instance, the Bankruptcy Court for the District of Colorado has held that, for § 109(e) purposes, "contingent claims are 'open, unliquidated claims (e.g. tort or quantum meruit claims requiring proof as to liability, reasonable value, damages, etc.), which by their very nature are not fixed unless and until judicial award to fix liability and amount.'" *In re Blehm*, 33 B.R. 678, 680 (Bankr. D. Colo. 1983); *accord In re Clark*, 91 B.R. 570, 574 (Bankr. D. Colo. 1988) (referring to quantum meruit claims as contingent). Other courts have held that, under the Code, a "claim is contingent as to liability if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created." *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. 1981). This triggering "future event" may be, for many non-contract claims, *a finding of liability* "by a competent tribunal." *Id.* The *All Media* court, in its analysis, referenced decisions under § 59(b) of the Bankruptcy Act of 1898 (predecessor to the Bankruptcy Code) holding that "quantum meruit claims which required proof as to liability, reasonable value, or damages" were contingent as to liability. *Id.* at 132.

In the Litigation, the Trustee has taken the position that the Learning Annex liability was noncontingent and should be valued based on the amount of the judgment ultimately entered, using hindsight. The Trustee's fraudulent transfer claims overwhelmingly depend on her winning this point. In light of the body of case law cited by Defendants — including *Kane & Kane*, the only

26

case identified by either side that involves analysis of a quantum meruit claim for purposes of a fraudulent transfer solvency analysis — the Trustee's posture here is highly tenuous and fraught with risk. The Objection, baselessly arguing in ¶ 36 that the Trustee has "credibly" argued that the Learning Annex claim rendered the Debtor insolvent as of 2007, completely ignores this substantial risk to, and probable loss of, those claims.

**d.    The Trustee likely cannot assert fraudulent transfer law for a setoff conducted by CTI.**

The Trustee asserts fraudulent and preferential transfer claims for a transaction that involved (a) RDOC's transfer to CTI of $1.47 million of a payable the Debtor owed to RDOC and (b) CTI's subsequent setoff of that payable against the debt CTI owed the Debtor. The law is clear that a setoff cannot be considered a "transfer" for purposes of such claims. *See, e.g.*, *In re Balducci Oil Co., Inc.*, 33 B.R. 847, 852 (Bankr. D. Colo. 1983); *Lee v. Schweiker*, 739 F.2d 870, 873 n.4 (3d Cir. 1984); *In re Faasoa*, 576 B.R. 631, 647 (Bankr. S.D. Cal. 2017); *In re Damas*, 504 B.R. 290, 296 (Bankr. D. Mass. 2014); *Campos v. Wells Fargo Bank, N.A.*, 345 B.R. 678, 684-85 (E.D. Cal. 2005); *In re Murphy*, 203 B.R. 972, 975 (Bankr. S.D. Ill. 1997); *In re Remillong*, 131 B.R. 727, 728 (Bankr. D. Mont. 1991); *In re Brooks Farms*, 70 B.R. 368, 373 (Bankr. E.D. Wis. 1987); *In re Hinson*, 65 B.R. 675, 677 (Bankr. W.D. Tenn. 1986). The Trustee's claims under 11 U.S.C. §§ 547 and 548 for this transaction should be nonviable.

Overall, the Trustee's fraudulent transfer/obligation claims are complicated and challenging, and portions of them are completely nonviable. If the Trustee loses her bid to classify the Learning Annex liability as noncontingent — *as well she should* — the value of these claims will be next to nothing. The Objection completely disregards this substantial risk.

27

**F.     Learning Annex's representation that it has secured funding for the Litigation is misleading and irrelevant.**

Learning Annex suggests that it has "secured funding" for the Litigation and that, pursuant to *Reiss*, it would therefore be an abuse of discretion to approve the settlement. This argument misstates the funding Learning Annex offers, misconstrues the holding of *Reiss*, and is irrelevant, given that the financial ability for the Litigation to proceed to trial is not in question.

*First*, (contrary to the creditor in *Reiss*) Learning Annex has not offered full funding and has not actually secured anything. Rather, it has procured an expressly nonbinding "Term Sheet" from Burford Capital LLC ("Burford") that "is not a commitment or undertaking by Burford" but merely "forms the general basis for the continuation of . . . discussions," "is not a contract or a contractual offer and is not intended to be legally binding," and will only result in an investment by Burford "subject to appropriate diligence, approvals, negotiations, and execution of final documentation, the terms of which will not be limited to those set forth" in the Term Sheet. [Objection Exh. 10, Doc. 354-1, at 274]. Presumably, Burford has not looked at any of the confidential materials in this case, including competing expert reports, the pending summary judgment motions, etc.

In the Term Sheet, Burford proposes to loan the Trustee up to $1 million in payments to be agreed on. In exchange, Burford would receive the following from any amounts the Trustee recovered in the Litigation:

1.     Of any recovery up to $7.5 million: zero.

2.     Of any recovery from $7.5 million to $9.5 million: twice the amount loaned.

3.     Of any recovery from $9.5 million to the sum of Learning Annex's claim and the Trustee's expenses: zero.

4.    Of any recovery beyond that: 95%.[26]

While the creditor in *Reiss* "offered to pay the full costs of the litigation," 881 F.2d at 891, Learning Annex offers no such funding. Learning Annex has merely served up a potential, uncertain opportunity for the Trustee to *borrow* a limited amount of funds from a third party. There is no guaranty that $1 million will cover the costs of taking the Litigation through trial and any ensuing appeals. Additionally, the financing would not cover the more than $520,000 in costs currently outstanding to the estate beyond the balance of the estate's accounts, for payments owed to the Trustee, her attorneys, and her expert, as of December 31, 2018. [9019 Motion at 18].  Far from offering to *pay* the costs of the Litigation, Learning Annex seeks to make the Trustee forfeit a settlement that would pay all those debts and continue with litigation that might not.

The situation is even further distinguishable from that in *Reiss*. There, the sole creditor had a "nearly 100 percent" chance of success on its claim in litigation but would receive *nothing* in the proposed settlement. *Reiss*, 881 F.2d at 892. Under those specific circumstances, the 10th Circuit held that, "when there would be no cost to the estate and nothing to pay creditors without success in the lawsuit," it was abuse of discretion to approve the settlement over the creditor's objection. *Id.* at 893. The 10th Circuit has since explained, in this very case, that *Reiss* "did not create a *per se* rule" and was limited to the circumstances where "the only creditor had offered to pay the costs

_____

[26] As addressed above, RDOC believes the Trustee can, in effect, only recover the $27.5 million she asserts is her maximum recovery in the Litigation — i.e., the third stage of payments here. She could only exceed that amount if RDOC's proof of claim remained, in which case she could recover up to $2.2 million additional, but RDOC would be entitled to payment of its claim in that amount. The term sheet purports to give Burford rights to *95%* of any recovery over Learning Annex's claim and the estate's expenses — money that, if recoverable, would belong to RDOC. RDOC would vigorously fight any application by the Trustee to enter such a financing agreement with Burford. *See* 11 U.S.C. § 364(b) ("The court, *after notice and a hearing*, may authorize the trustee to obtain unsecured credit or to incur unsecured debt . . . under section 503(b)(1) of this title as an administrative expense.").

of a lawsuit upon which rested the *only* hope of any recovery for disbursement to that creditor."
*Rich Glob., LLC*, 652 Fed. Appx. at 632 (emphasis added).

This case is highly distinguishable from that in *Reiss*. Unlike the creditor there, Learning Annex (or its assignee) would receive substantial funds under the settlement agreement, and its potential for recovery in the Litigation is at best uncertain — far from the "nearly 100 percent" chance in *Reiss*. And while the *Reiss* creditor offered to pay for litigation so there would be no cost to the estate, Learning Annex has offered nothing. None of the circumstances at play in *Reiss* that made it an abuse of discretion to approve the settlement are present here, and Learning Annex wildly overstates the holding of *Reiss*. Approving the settlement is well within this Court's discretion.

Finally, a real offer of financing would be irrelevant because the Trustee's counsel "has assured the Trustee that it will continue to provide legal services until this case is concluded." [9019 Motion, Doc. 336, at 18]. This is not a case where outside funding is needed for the litigation to continue. The potential Burford financing would increase costs, but not litigation *opportunity*, for the estate.

In fact, because Burford would be entitled to the next slice of any recovery past the $7.5 million represented by the settlement, it would make it even more difficult for Learning Annex to do better than the settlement. Assuming Burford loaned the full $1 million, the Trustee would have to recover more than $9.5 million in the Litigation for Learning Annex to receive even a dollar more than it would under the $7.5 million settlement. This does not help Learning Annex's case.

## G. The Trustee would have significant default remedies under the proposed settlement.

Learning Annex argues in passing [Objection ¶¶ 5, 47] that it finds the settlement agreement's protections in the event of default to be inadequate. Without a single citation to

30

authority on the topic, Learning Annex argues that the immediate entry of a $7.5 million judgment against all Defendants in the event of default is somehow insufficient. Learning Annex would apparently prefer that the original claims be reinstated.

Learning Annex ignores two major aspects of the settlement agreement. First, the required judgment would be against *all* Defendants, including those defendants against whom the Trustee's claims are the most tenuous: Robert and Kim Kiyosaki. The Trustee's claims against the Kiyosakis are weak because they are but distant, indirect owners of the Debtor. Nevertheless, the full judgment would be entered against them in the event of default. Second, Learning Annex ignores Settlement Agreement Section 5(b), which provides for interest and mandatory payment of the Trustee's reasonable attorneys' fees and collection costs in the event of a default by Defendants.

Learning Annex's objection here cannot be reconciled with its argument that there is "minimal collection risk." [Objection at 16]. If the collection risk is as minimal as Learning Annex imagines, then there is little to no risk of default under the settlement agreement. Such a default would be nonsensical. Even if there were a default and judgment were entered, Learning Annex argues that "most if not all of the Defendants retain significant and valuable assets or possess significant revenue streams, all of which could be used to satisfy a judgment." [Objection ¶ 46]. Such confidence should surely apply to the $7.5 million dollar judgment, plus attorneys' fees and collection costs.

### H.    Learning Annex ignores the fact that the proposed settlement includes withdrawal of RDOC's proof of claim.

Learning Annex also fails to properly assess the reasonableness of the proposed settlement by ignoring the fact that, as part of the settlement, RDOC would withdraw its proof of claim. In this bankruptcy case, RDOC has filed Proof of Claim No. 2, for $2,205,217.43.

The withdrawal of that substantial claim represents another financial benefit to the estate

under the proposed settlement. In addition to bringing $7.5 million into the estate, the Trustee

would eliminate a claim against the estate for $2.2 million.[27] This fact, which increases the payout

to Learning Annex — and which Learning Annex completely ignores — must also be considered

in determining whether the proposed settlement is reasonable.

## III.    Conclusion

The Trustee, exercising her discretion based on knowledge built over years of the

Litigation, has deemed the proposed settlement to be in the best interests of the estate. Learning

Annex's Objection is based on a misunderstanding of the facts and claims at issue and a blatant

disregard for the risks the Trustee would face in proceeding with the Litigation. The Court should

grant the 9019 Motion and approve the settlement.

---

[27] The Trustee seeks to disallow RDOC's proof of claim in the Litigation, but the success of that
attempt is questionable. It essentially relies on the Trustee prevailing on sufficient claims against
RDOC to wipe out the claim, and, as addressed above, her ability to do so is uncertain.

32

Dated:  March 11, 2019                    Respectfully submitted,

                                          **MARKUS WILLIAMS YOUNG**
                                              **& HUNSICKER LLC**


                                          By: _____*/s/ John F. Young*_____
                                          JENNIFER SALISBURY (WYOMING BAR NO. 7-5218)
                                          JOHN F. YOUNG (PRO HAC VICE ADMISSION)
                                          1700 LINCOLN STREET, SUITE 4550
                                          DENVER, COLORADO 80203
                                          TELEPHONE:  (303) 830-0800
                                          FACSIMILE:  (303) 830-0809
                                          JSALISBURY@MARKUSWILLIAMS.COM
                                          JYOUNG@MARKUSWILLIAMS.COM
                                          *Attorneys for Rich Dad Operating Company, LLC, Pele-Kala*
                                          *Corporation, and BI Capital, LLC*

                                          *and*

                                          **DICKINSON WRIGHT PLLC**

                                          By:_____*/s/ Amanda E. Newman*_____
                                          ROBERT A. SHULL (PRO HAC VICE ADMISSION)
                                          MICHAEL R. SCHEURICH (PRO HAC VICE
                                          ADMISSION)
                                          BRADLEY A. BURNS (PRO HAC VICE ADMISSION)
                                          AMANDA E. NEWMAN (PRO HAC VICE ADMISSION)
                                          CASANDRA C. MARKOFF (PRO HAC VICE
                                          ADMISSION)
                                          1850 N. CENTRAL AVENUE, SUITE 1400
                                          PHOENIX, AZ 85004
                                          TELEPHONE:  (602) 285-5000
                                          FACSIMILE:  (602) 285-5100
                                          RSHULL@DICKINSONWRIGHT.COM
                                          MSCHEURICH@DICKINSONWRIGHT.COM
                                          BBURNS@DICKINSONWRIGHT.COM
                                          ANEWMAN@DICKINSONWRIGHT.COM
                                          CMARKOFF@DICKINSONWRIGHT.COM
                                          *Attorneys for Rich Dad Operating Company, LLC, Pele-Kala*
                                          *Corporation, and BI Capital, LLC*

33

CERTIFICATE OF SERVICE

The undersigned certifies that on March 11, 2019, I served by prepaid first-class mail a copy of the attached document on all parties against whom relief is sought and those otherwise entitled to service pursuant to the FED. R. BANKR. P. and the Wyoming LBR at the following addresses:

Philip A. Pearlman
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, CO 80203

Ronald L. Fano
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, CO 80203

Jamie N. Cotter
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, CO 80203

James R. Belcher, Esq.
Crowley Fleck PLLP
152 N. Durbin St., Ste. 220
Casper, WY 82601

Steven N. Berger
Engelman Berger, P.C.
3636 N. Central Ave., Ste. 700
Phoenix, AZ 85012-1936

Ethan J. Birnberg
Ballard Spahr LLP
1225 17th St., Ste. 2300
Denver, CO 80202-5596

Edwin G. Schallert, Esq.
Debevoise & Plimpton LLP
919 Third Ave.
New York, NY 100

Jenny M.F. Fujii
Kutner Brinen Garber PC
1660 Lincoln St., Ste. 1650
Denver, CO 80264-9911

Mark E. Macy
Macy Law Office, P.C.
217 W. 18th St.
Cheyenne, WY 82001-4413

Lee M. Kutner
Kutner Brinen Garber PC
1660 Lincoln St., Ste. 1650
Denver, CO 80264-9911

Tracy L. Zubrod
219 E. 18th St.
Cheyenne, WY 82001-4507

US Trustee
308 West 21st Street, 2nd Floor
Cheyenne, WY 82001-3669

Jonathan Harris, Esq.
Harris, St. Laurent & Chaudhry LLP
40 Wall St., 53rd Fl.
New York, NY 10005

Timothy Woznick, Esq.
Crowley Fleck PLLP
237 Storey Blvd., Ste. 110
Cheyenne, WY 82009

Plate Investments Limited
c/o Sandra Stern, Esq.
Nordquist & Stern PLLC
330 Madison Ave., 6th Floor
New York, NY 10017

Plate Investments Limited
c/o Sandra Stern, Esq.
Nordquist & Stern PLLC
43 West 43rd St., Ste. 125
New York, NY 10036

34

William Zanker, President
Learning Annex Holdings LLC
888c Eight Ave., #139
New York, NY 10019

William Zanker, President
The Learning Annex, L.P.
888c Eight Ave., #139
New York, NY 10019

Andrew L. Hyams, Esq.
Kerstein, Coren & Lichtenstein LLP
60 Walnut St., #400
Wellesley, MA 02481

Michael Schaper, Esq.
Debevoise & Plimpton LLP
919 Third Ave.
New York, NY 10022

Jeffrey M. Boldt
Overstreet Homar & Kuker
508 East Eighteenth Street
Cheyenne, WY 82001

Joseph T. Moldovan
Morrison Cohen LLP
909 Third Avenue
New York, NY 10022-4784

Henry F. Bailey, Jr.
Bailey Stock Harmon Cottam Lopez LLP
221 E. 21st St.
P.O. Box 1557
Cheyenne, WY 82003-1557

William Zanker, President
Benson Acquisition, LLC
888c Eight Ave., #139
New York, NY 10019

Production Resource Group, LLC
c/o Jeffrey Boldt, Esq.
The Kuker Group LLP
508 E. Eighteenth St.
Cheyenne, WY 82001

Production Resource Group, LLC
c/o Overstreet, Homar & Kuker
508 E. 18th St.
Cheyenne, WY 82001

Production Resource Group, LLC
c/o Neil G. Marantz, Esq.
The Marantz Law Firm
150 Theodore Fremd Ave., Ste. A-14
Rye, NY 10580

Robert K. Dakis
Morrison Cohen LLP
909 Third Avenue
New York, NY 10022-4784

Megan K. Bannigan
Debevoise & Plimpton LLP
919 Third Ave.
New York, NY 10022

Dale W. Cottam
Bailey Stock Harmon Cottam Lopez LLP
221 E. 21st St.
P.O. Box 1557
Cheyenne, WY 82003-1557

 /s/ Serina R. Schaefer
Serina R. Schaefer, Legal Assistant for
Markus Williams Young & Hunsicker LLC

35